## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BOUNLAP MATMANIVONG, individually and on behalf of a class, | : : : | Civil Action No. 1:13-cv-05347 |
| Plaintiff, | : : | Judge Kennelly |
| v. | : : : | |
| NATIONAL CREDITORS CONNECTION, INC., | : : : | |
| Defendant. | : : | |

### DEFENDANT'S APPENDIX OF EXHIBITS IN
### SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**Exhibit**          **Description**

1.          Excerpted portions of the April 4, 2014 Deposition of Plaintiff Bounlap Matmanivong

2.          Excerpted portions of the March 25, 2014 Deposition of Rick G. Bellows, Esq.

3.          Exhibit Number 2 to Plaintiff's Deposition, Mortgage and Note

4.          Plaintiff's First Amended Complaint – filed March 3, 2014

5.          Plaintiff's Responses to Defendant's Interrogatories

6.          Plaintiff's Responses to Defendant's First Requests for Admissions

7.          Affidavit of Rick G. Bellows, Esq.

7A.          Loss Mitigation Word Order LMO710.

7B.          NCCI Loss Mitigation Procedures/Guidelines

7C.          October 2, 2012 Letter from Bank of America to Plaintiff

7D.          2012 F2F FHA Checklist

18214147

7E.          2011 Making Home Affordable Program Request for Modification and Affidavit.

7F.          Field Report

7G.         2012 Making Home Affordable Program Request for Modification and Affidavit.

8.           Affidavit of Marc Rieck

9.           *Senne v. Vill. of Palatine*, 2013 U.S. Dist. LEXIS 168677 (N.D. Ill. Nov. 27, 2013)

10.         *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 2013 U.S. Dist. LEXIS 159491 (N.D. Ill. Nov. 7, 2013)

11.         *Martin v. Leading Edge Recovery Solutions*, 2012 U.S. Dist. LEXIS 112795 (N.D. Ill. Aug. 10, 2012)

12.         *Benton v. Shinseki*, 2013 U.S. Dist. LEXIS 147364 (N.D. Ill. Oct. 11, 2013)


Dated:  July 9, 2014           Respectfully submitted,


By: /s/ Jason A. Storipan
     JASON A. STORIPAN
     FISHER & PHILLIPS LLP
     430 Mountain Avenue, Suite 303
     Murray Hill, NJ 07974
     Phone:  (908) 516-1050
     Fax:  (908) 516-0151
     E-Mail:  jstoripan@laborlawyers.com

     Attorneys for Defendant National Creditors Connection, Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney of FISHER & PHILLIPS LLP, certifies as follows:

That on July 9, 2014, I electronically filed the foregoing **DEFENDANTS' APPENDIX OF EXHIBITS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> Catherine Anne Ceko, Esq.
> Edelman, Combs, Latturner & Goodwin, LLC
> 120 S. LaSalle Street, 18th Floor
> Chicago, IL  60603


   /s/ Jason A. Storipan 

18214147

1

ORIGINAL

# In The Matter Of:

*Bounlap Matmanivong, et al. v.*
*National Creditors Connection, Inc.*

---

### *Bounlap Matmanivong*
### *April 4, 2014*

---

## NEXTGEN|REPORTING

Making Litigation Easier.                www.nextgenreporting.com

WORLDWIDE COVERAGE I (888) 267-1200        PHILADELPHIA I NEW YORK CITY I WILMINGTON I SILICON VALLEY

*Min-U-Script® with Word Index*

1

1            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3

4    BOUNLAP MATMANIVONG, individually,    )
     and on behalf of a class,             )
5                                          )
                        Plaintiff,         )
6                                          )
         vs.                               )  No. 13 CV 05347
7                                          )
     NATIONAL CREDITORS CONNECTION, INC.,  )
8                                          )
                        Defendants.        )
9

10

11            The deposition of BOUNLAP MATMANIVONG,

12    called by the Defendants for examination, taken

13    pursuant to notice and pursuant to the Federal Rules

14    of Civil Procedure for the United States District

15    Courts pertaining to the taking of depositions, taken

16    before Kelly A. Siska, Certified Shorthand Reporter,

17    Registered Professional Reporter, Certified Reporting

18    Instructor, Certified LiveNote Reporter, and Notary

19    Public, at 10 South Wacker Drive, Suite 3450, Chicago,

20    Illinois, commencing at 10:00 a.m. on April 4th, 2014.

21

22

23

24

25

2

1    APPEARANCES:

2          EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
           MS. CATHERINE A. CEKO
3          120 South LaSalle Street
           18th Floor
4          Chicago, Illinois  60603
           Phone:  (312) 739-4200
5          E-mail:  cceko@edcombs.com

6                     On behalf of the Plaintiff;

7          FISHER & PHILLIPS, LLP
           MS. REGINA PETTY
8          MS. ALICE WANG (Via telephone)
           10 South Wacker Drive
9          Suite 3450
           Chicago, Illinois  60606
10         Phone:  (312) 346-8061
           E-mail:  rpetty@laborlawyers.com
11                   awang@laborlawyers.com

12                    On behalf of the Defendants.

13
     ALSO PRESENT:  Krisna Abhay, Interpreter.
14
                    *   *   *   *   *
15

16

17

18

19

20

21

22

23

24

25

Bounlap Matmanivong - April 4, 2014

7

1      A.      Like, you know, in Laos the teacher teach

2   topics, math, language, and science.

3      Q.      When you immigrated to the United States,

4   was the Chicago area the first place that you moved

5   to?

6      A.      I was in California for two months.

7      Q.      Where were you in California?

8      A.      In Fullerton.

9      Q.      And did you move from Fullerton,

10  California, to Chicago?

11     A.      I moved to Hanover Park.

12     Q.      Where do you currently reside?

13     A.      In Elgin.

14     Q.      What is your current address?

15     A.      1167 Sebring Drive.  That's S E B R I N G

16  Drive.

17     Q.      What is the zip code?

18     A.      60120.

19     Q.      How long have you lived at that address,

20  1167 Sebring Drive?

21     A.      Since 1985, '86.

22     Q.      Do you own the property at 1167 Sebring

23  Drive?

24     A.      No.  I still owe money.

25     Q.      Do you mean by that that you have a

Bounlap Matmanivong - April 4, 2014

8

1    mortgage on the property located at 1167 Sebring

2    Drive?

3         A.     Correct.

4         Q.     Are you currently married?

5         A.     Yes.

6         Q.     What is your wife's name?

7         A.     Her name is Prathana.

8                (Through the witness.)  Prathana.

9         Q.     When were you and Prathana married?

10        A.     I was married in Laos since 1972.  And I

11   have to formally marry in America because the

12   insurance -- I mean the company I work for required

13   for insurance purpose and requested a marriage

14   license.

15        Q.     So Prathana and you were first married in

16   Laos in 1972, and then you married again here in the

17   United States; is that correct?

18        A.     Just to do the paperwork when we were here.

19        Q.     Do you currently live with Prathana?

20        A.     Yes.

21        Q.     When you and Prathana were married in the

22   United States, where did that marriage take place?

23        A.     In Kane County.  Geneva.

24        Q.     And what was the date of your marriage in

25   the United States?

Bounlap Matmanivong - April 4, 2014

1    a loan against it to make the mortgage payment?

2         A.    I took it out from the account.

3         Q.    Do you still have that 401(k) account?

4         A.    It's still there, but there's not that

5    much.

6         Q.    After you went back to work, did you have

7    anymore late payments on your Bank of America

8    mortgage?

9         A.    I cannot pay -- I cannot catch up on the

10   payment because I was talking to Bank of America about

11   doing a modification.

12        Q.    I'm sorry.  Did you say that you could not

13   catch up on the payment?

14        A.    Yes.  They were working on the loan

15   modification with the Bank of America.

16        Q.    When did you first start working with Bank

17   of America to do a loan modification?

18        A.    It's about 2011.  I don't remember for

19   sure.

20        Q.    What do you mean when you said that you

21   could not catch up on the payment?

22        A.    At that time I was the only one earning

23   money and what my wife earned from unemployment was

24   used to buy the food.  And at the same time my son was

25   divorced and not working and was depending on the

Bounlap Matmanivong - April 4, 2014

43

1    that correct?

2         A.    I don't recall doing the loan.  It was

3    going to be with another bank, but not Bank of

4    America.  Must be a broker who did it.

5         Q.    Must be a broker?

6         THE INTERPRETER:  (Nodding.)

7    BY MS. PETTY:

8         Q.    Did you work with a broker to do a loan in

9    the beginning of 2009?

10        A.    Yes.  They came to my house and then it

11   might be a Polish gentleman that came and did the

12   loan.

13        Q.    But you cannot remember the name of that

14   company, as you sit here right now; is that correct?

15        A.    I cannot remember the name.  It was so

16   long, but it's not the name of the bank.  It's just a

17   company.  Must be a broker.

18        Q.    Is this the loan that you went into

19   foreclosure with Bank of America or is that a

20   different loan?

21        A.    It is Bank of America that I have a

22   foreclosure on me.

23        MS. PETTY:  We can mark as Exhibit 2 a deed of

24   trust that is an attachment to Mr. Matmanivong's

25   complaint in the lawsuit filed against Bank of America

Bounlap Matmanivong - April 4, 2014

44

1    that appears to be dated April 24th, 2009.

2                        (Deposition Exhibit No. 2 was so

3                        marked.)

4    BY MS. PETTY:

5       Q.     Mr. Matmanivong, I'd like you to take your

6    time to look at this document, and then I want you to

7    look at what's page No. 41 and tell me is that your

8    signature?

9       A.     Yes.  I remember this one.  I refinance

10   from this company.

11      Q.     Tell me what you remember about this loan?

12      A.     Yes.

13             (Through the interpreter.)  He went in to

14   sign these papers.

15      Q.     So is that your signature?

16      A.     Yes.  I borrowed money from these people.

17   I think that this was sold to Bank of America.

18      Q.     And is that your signature on the page that

19   has the No. 41 on the top on the right-hand side?

20      A.     Yes.

21      Q.     So this is the loan that you believe that

22   was sold to Bank of America and that you made payments

23   to Bank of America for; is that right?

24      A.     I believe that's the one.

25      Q.     And then after April of 2009, did you ever

49

1    another foreclosure.  When did that happen?

2         A.    They're not the latest ones that I'm

3    sharing with my attorney.

4         Q.    I don't understand.

5         A.    I don't recall, but I think around June.  I

6    share that foreclosure with my attorney.

7         Q.    Around June of 2013?

8         A.    I'm not sure, but around there.

9         Q.    Are you sure that the foreclosure was in

10   2013, not in 2012?

11        A.    I don't recall.  It was only in 2013, in

12   May or June.

13        Q.    And have you lost the house?

14        A.    No.  They only ask me if I'm still living

15   there.  And I told them if you want me to move out, I

16   will move out, but they didn't do anything.

17        Q.    When's the last time that you made a

18   mortgage loan payment on the house?

19        A.    At the beginning of 2013.

20        Q.    Was that payment accepted by Bank of

21   America?

22        A.    I think I did, and then I fell behind some

23   more.  They didn't accept a check, and then they told

24   me that it was in foreclosure.

25        Q.    Were you told about the foreclosure

Bounlap Matmanivong - April 4, 2014

51

1     A.     That's correct.

2     Q.     Do you see the "for" line on that check?

3 It's partially blacked out.  Do you recognize the last

4 four numbers that we can see on that line, 8940?

5     A.     That's the loan number.  That's the one I

6 wrote.

7     Q.     You wrote that on the "for" line on

8 Exhibit 3?

9     A.     Just the one on the bottom because I have

10 to write down the loan number when I send it to the

11 bank.

12     Q.     That's a different loan number than the one

13 that we saw on Exhibit 1 and 2.  Does that help you to

14 remember whether there had been a loan modification

15 after April of 2009?

16     A.     I don't remember.  I mean, one time I

17 recall that somebody from Bank of America called me

18 and say that there will be some people coming to your

19 house to help you do the loan modification, and I

20 think these were the people who came.

21     Q.     So you believe that people came to your

22 house regarding doing a loan modification in 2009; is

23 that what you're telling us?

24     A.     It's 2011.

25     Q.     So in 2011, Bank of America called you

Bounlap Matmanivong - April 4, 2014

1    and told you that people would be coming to your

2    house to do a loan modification; is that what you're

3    saying?

4         A.    I got a letter saying that Bank of America,

5    the personnel, would come to my house and do the loan

6    modification.  That was probably around 2012, but they

7    never came.

8         Q.    And I apologize.  Now I'm confused about

9    the date.  Was it in 2011 or 2012 that you got phone

10   calls, a phone call from Bank of America saying that

11   someone would be coming to your house to do a loan

12   modification?

13        A.    2012 was the day they sent a letter to me

14   and saying that somebody would be coming to the house

15   to help me fill the form for the loan modification.

16        Q.    Do you recall when in 2012 that happened?

17        A.    I cannot remember.

18        Q.    Did someone come to your house in 2012 to

19   do a loan modification?

20        A.    I was told to prepare some documents for

21   them, some statements, the bills I have to pay.

22                        (Discussion was had between

23                         witness and interpreter.)

24   BY THE WITNESS:

25        A.    Just one bank statement and a paycheck and

Bounlap Matmanivong - April 4, 2014

53

1    then the payments I have to make, and they just came

2    there.  I prepared that for them, and they came and

3    pick it up and they left.

4         Q.    Do you know who came to your house in 2012?

5         A.    He introduced himself as working for Bank

6    of America and that he was working for Bank of

7    America, but I don't remember the name of the company

8    he worked for.

9         Q.    Did he say that he worked for a company

10   other than Bank of America?

11        A.    He told me, but I don't remember the name.

12   He was concerning mortgages.

13        Q.    And what month in 2012 did that happen?

14        A.    I don't remember.

15        Q.    Do you have any documents or letters that

16   were given to you by the person who came to your

17   house?

18        A.    He just came here to pick up the paperwork

19   and then told me he would send it, forward to Bank of

20   America.  He just checked the documents that I gave

21   him, and he says, Okay, and then he left.

22        Q.    Did he leave any paperwork with you?

23        A.    No.  I think he might have had a personal

24   card, but it might be a business card.

25        Q.    Do you have a business card or personal

Bounlap Matmanivong - April 4, 2014

56

1      Q.      When did NCCI contact you?

2      A.      I received a lot of letters, and I don't

3  even know who they are and how they're related, and

4  that's why I shared the information with my lawyer.

5      Q.      Is it your testimony that you received

6  letters from NCCI?

7      A.      No.

8      Q.      What do you mean when you say you received

9  letters, that was the reason you went to talk to a

10  lawyer because you did not know why NCCI was

11  contacting you?

12      THE INTERPRETER:  Can you please repeat that or

13  rephrase that, please?

14      MS. PETTY:  Yes.

15  BY MS. PETTY:

16      Q.      If you did not receive any letters from

17  NCCI, what are you talking about when you bring up

18  letters that you received from NCCI that you talked to

19  a lawyer about?

20      A.      I didn't know what those letters was for,

21  and then so I brought it to show it to my attorney.

22      Q.      So you have a letter that you received

23  from NCCI that you have given to your attorney; is

24  that correct?

25      A.      There was a bunch of letters that was

Bounlap Matmanivong - April 4, 2014

57

1   mixed together, all those letters, and I don't know

2   what they are.  So I just brought them to the lawyer

3   to look at it because I don't understand what they're

4   all about.

5        Q.    Was one of those letters from NCCI?

6        A.    I don't know.  There's too many of them.  I

7   don't remember.

8        Q.    Did you call NCCI on October 9th, 2012?

9        A.    No.  I didn't call because I didn't know

10  what to say.

11       Q.    Have you ever called NCCI?

12       A.    I don't remember.  I don't remember because

13  I have contacted a lot of people to try to help get a

14  loan modification, and I don't remember who they are.

15       Q.    Did anyone from NCCI visit your home?

16       A.    No.

17       Q.    Did you ever make an appointment with

18  anyone from NCCI to give them documents for a loan

19  modification?

20       A.    Maybe that Spanish person that came to my

21  house that came to get those papers.

22       Q.    Do you have a recollection that the person

23  who came to your house was from NCCI?

24       A.    He just told me that he worked with Bank of

25  America, and I don't remember what he did.

Bounlap Matmanivong - April 4, 2014

58

1       MS. PETTY:  Let's mark as Exhibit 4 a letter on

2   NCCI letterhead dated October 12th, 2012.

3                       (Deposition Exhibit No. 4 was so

4                       marked.)

5   BY MS. PETTY:

6       Q.    Mr. Matmanivong, did you receive this

7   letter dated October 12th, 2012, that we've identified

8   as Exhibit 4?

9       A.    No, I don't remember anybody who brought

10  that letter to me.

11      Q.    Did you receive this letter via the mail?

12      A.    No.  I didn't see it.

13      Q.    As you sit here today reviewing Exhibit 4,

14  is it your testimony that you have no recollection of

15  seeing that document before today?

16      A.    Correct.

17      Q.    As you sit here now, do you have any

18  recollection of ever seeing a letter from NCCI?

19      A.    I haven't seen anything like that.  Usually

20  if I don't know what it is, I just let it be.  And my

21  kid might open it.  So I haven't seen this.

22      Q.    What do you mean when you say you just let

23  it be?

24      A.    Because I don't think this is related

25  to -- anything that is not related to Bank of America

Bounlap Matmanivong - April 4, 2014

1    I just ignore them.

2         MS. PETTY:   Let's mark a document as Exhibit 5.

3    It's on Bank of America stationery.   It's a two-page

4    document.   It has Bates 682 and 683.

5                        (Deposition Exhibit No. 5 was so

6                         marked.)

7    BY MS. PETTY:

8         Q.    Did you receive a letter that looked like

9    this document that we have identified as Exhibit 5?

10        A.    I remember receiving this letter.   That's

11   why after I received that, then the other person came

12   to get the documents that they have requested.

13        Q.    Exhibit 5 says that a representative from

14   NCCI was sent to your home to obtain information

15   required to evaluate your loan foreclosure

16   alternatives.   Do you recall someone from NCCI coming

17   to your home?

18        A.    I recall calling this number in this letter

19   here, and it was concerning loan modification.   They

20   came to collect the documents after I came back from

21   work.

22        Q.    Is the number that you called

23   (877) 249-1811?

24        THE INTERPRETER:   What was it again?   I'm sorry.

25        MS. PETTY:   (877) 249-1811.

Bounlap Matmanivong - April 4, 2014

64

1    to get paperwork, were you home alone or was another

2    family member or friend there at the time?

3         A.    I was alone.

4         Q.    You were alone?

5         A.    Yes.  It was after work.

6         Q.    About what time of day was it; do you

7    recall?

8         A.    It was around 4:30 or 5:00 o'clock.

9         Q.    Did the gentleman who came to your home do

10   or say anything that you thought was inappropriate?

11        A.    He didn't speak much.  He just collected

12   the documents.

13        Q.    Do you believe that anyone from NCCI has

14   ever done or said anything that was inappropriate

15   pertaining to you?

16        MS. CEKO:  Objection as to form.  By

17   inappropriate, what exactly do you mean?  Illegal or

18   immoral or something that made him afraid?  I mean,

19   exactly how are we using it, inappropriate?

20        MS. PETTY:  I'm not using it in any specific way.

21   His understanding of the word "appropriate."  I would

22   never ask a witness about an illegality.

23        THE INTERPRETER:  So I explained to him the

24   discussion was about "appropriate," and the term was

25   just a personal perception of him what is appropriate

1   or inappropriate.

2        MS. CEKO:  Thank you.

3        THE INTERPRETER:  You're welcome.

4   BY THE WITNESS:

5        A.    He didn't say too much about that.  He was

6   just talking that a lot of other people are in his

7   situation and that a lot of Mexicans are in this

8   situation, too.

9        Q.    Have you been in contact with other Bank of

10  America borrowers regarding their experience with Bank

11  of America for loan modification?

12       A.    No.

13       Q.    Have you been in contact with other

14  debtors -- Strike that.  Let me start over.

15        Have you been in contact with anyone else

16  regarding their involvement with NCCI?

17       A.    No.

18       Q.    Did Bank of America ever tell you that you

19  should make payments to NCCI?

20       A.    No.  Never.

21       Q.    Do you remember what documents you gave to

22  the person who came to your house?

23       A.    Yes.  I remember.

24       Q.    What documents did you give the person who

25  came to your house?

Bounlap Matmanivong - April 4, 2014

1    A.    I provided him with the form, the

2  modification form that he has filled, expense and

3  income statement, check stub, bank statement, list of

4  expenses, and the last two years of income tax.

5    Q.    Do you recall which two years of income tax

6  you provided?

7                      (Discussion was had between

8                       witness and interpreter.)

9  BY THE WITNESS:

10    A.    I think that it is the taxes for 2010 and

11  2011.

12    Q.    And there was just one time that you gave

13  this package of documents to someone who came to your

14  home; is that correct?

15    A.    Yes.

16    Q.    Are you aware of your wife having any

17  telephone or personal contact with anyone from Bank of

18  America about the mortgage?

19    A.    How can she contact them if she can't speak

20  English?  She has enough just to get around.

21    Q.    So I apologize for repeating the question,

22  but it's to have a complete record.  Even though you

23  already told us what the answer will be, are you aware

24  of your wife having any telephone or personal contact

25  with NCCI?

**2**

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| BOUNLAP MATMANIVONG,<br>individually and on behalf<br>of a class,<br><br>        Plaintiff,<br><br>      vs.<br><br>NATIONAL CREDITORS<br>CONNECTION, INC.,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 13-cv-5347 |

DEPOSITION OF RICK G. BELLOWS, ESQ.

March 25, 2014

Joanna B. Brown, CSR No. 8570,
RPR, CRR, RMR
373150




(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine    (858) 455-5444 San Diego
(916) 922-5777 Sacramento    (408) 885-0550 San Jose    (760) 322-2240 Palm Springs    (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills    (212) 808-8500 New York City    (347) 821-4611 Brooklyn    (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains    (312) 379-5566 Chicago    (702) 366-0500 Las Vegas
+33 1 70 72 65 26 Paris    +971 4 8137744 Dubai    +852 3693 1522 Hong Kong

1    IN THE UNITED STATES DISTRICT COURT

2   FOR THE NORTHERN DISTRICT OF ILLINOIS

3      EASTERN DIVISION

4

5 BOUNLAP MATMANIVONG,    )
  individually and on behalf )
6 of a class,       )
             )
7      Plaintiff,  )
             )
8   vs.       ) Case No. 13-cv-5347
             )
9 NATIONAL CREDITORS    )
  CONNECTION, INC.,    )
10            )
      Defendant.  )
11 _____)

12

13

14

15    Deposition of RICK G. BELLOWS, ESQ., taken on

16 behalf of the Plaintiff, at 14 Orchard, Lake Forest,

17 California, beginning at 9:15 a.m. and ending at

18 11:35 a.m., on Tuesday, March 25, 2014, before

19 JOANNA B. BROWN, Certified Shorthand Reporter No. 8570,

20 RPR, CRR, RMR.

21

22

23

24

25

            2

BARKLEY
Court Reporters

1    collect information on two occasions?

2        A    No.  Well, it's a little bit vague.  There

3    were multiple contacts with the plaintiff with respect

4    to a loss mitigation.  That would be --

5        Q    Can you just tell me --

6            MS. PETTY:  Just a minute.

7            MS. COMBS:  Go ahead.

8            MS. PETTY:  Mr. Bellows, you need to read the

9    context in terms of the date for her question.

10           THE WITNESS:  I understand that, but if I read

11   the rest of paragraph 23, it doesn't talk about a loss

12   mitigation.  It talks about a field call.  That's a

13   completely different service.  To my knowledge, we

14   never contacted the plaintiff with respect to a field

15   call.

16           MS. COMBS:  Okay.  So let's just get a

17   clarification.

18           MS. PETTY:  That terminology is not used.

19           THE WITNESS:  I'm sorry.  Say that again.

20   BY MS. COMBS:

21       Q    I'm going to ask you some follow-up questions.

22       A    Okay.

23       Q    What is a loss-mitigation contact?

24       A    A loss-mitigation contact is in the context

25   of -- an attempt to help a debtor avoid a foreclosure.

12

BARKLEY
Court Reporters

1   specific loss mit in that sense.  For example, if the
2   problem is that the debtor has not maintained insurance
3   on the property, it may well be that in order to
4   continue with his mortgage, he has to produce a copy of
5   the insurance policy or something like that.  We would
6   pick that up and get it to the bank.
7           But other than those kinds of unusual
8   situations, I have to presume they are in default, or
9   they wouldn't be into a loss-mitigation queue.
10      Q     Okay.  What kinds of records does NCCI keep of
11  its contacts with debtors on behalf of Bank of America
12  in the context of a loss mitigation?
13          MS. PETTY:  Objection.  Vague and overbroad.
14          THE WITNESS:  Let me see if I can answer the
15  best I can.  As far as the records we would have at any
16  given point, we would obviously have a record of the
17  download from the bank that gives us our information
18  about a particular case.  They come in a batch file.
19  It's a common deliminated database file that is sent
20  through to our computer.  Our computer would then
21  generate the documents, the letters and so on, that
22  would be needed for the contact.
23          That information would then be posted on our
24  computer so that it could be conveyed to a regional
25  vendor and then conveyed to an actual field rep who

14

RICK G. BELLOWS, ESQ.

BARKLEY
Court Reporters

1    The contacts would relate to, at some point, a delivery

2    of a packet of documents.  The initial purpose of the

3    contact is to simply inquire of the debtor if he would

4    be interested in a HUD or other program that might help

5    him save the home.  I don't mean him in every case.

6    Sorry.

7              But that's the initial inquiry is "Would you

8    be interested in a program that may save your home?"

9              If the answer to that is no, there's no

10   further contact.  He's given a -- for Bank of America,

11   he would be given an opt-out letter to say he's opting

12   out of the program.

13             If he says yes, he would be -- either he has

14   already received a packet of documents he has to

15   gather, or if he has lost them or doesn't have them or

16   they were never sent to him, our rep would have a

17   package to hand to him, and we would hand him the

18   package of documents that he would need to either

19   gather or fill out for the bank.

20        Q    In any instance, would a loss-mitigation

21   contact be made if the customer or if the debtor was

22   not in default on their mortgage?

23        A    I would say that that's probably true in

24   almost all cases.  There are situations where we are

25   sent out to collect documents and so on that may not be

13

RICK G. BELLOWS, ESQ.

BARKLEY
Court Reporters

1    an appointment has been set, and it would record that

2    in this particular log.  That would also be recorded in

3    the report by the field rep.

4        Q    And can you -- as you sit here today, can you

5    tell who would have inputted the information

6    "Appointment Set:  10/14/2012"?

7        A    The information would have been generated by

8    the field rep or by whoever plaintiff contacted.  That

9    would be the person who came up with the information

10   that it was going to be set for the 14th.  Who actually

11   inputs that into the system, I don't know.  I think

12   it's automatic.

13       Q    Okay.  So just to make sure I understand, the

14   first entry on page 670 is an entry saying that the F2F

15   letter has, in fact, been sent -- generated and sent to

16   an NCCI field rep; correct?

17       A    No.  It doesn't quite work like that.  What

18   happens is the download comes into our computer, and

19   documents are automatically generated as a result of

20   that.  Nobody does it.  Nobody inputs the data.  It

21   comes in automatically based on the download.  The

22   letter then is -- every time, it's not always the same.

23   I mean, there are always going to be exceptions, but

24   typically, once the system has generated the letter, it

25   is made a part of a packet of information that's posted

22

RICK G. BELLOWS, ESQ.

BARKLEY
Court Reporters

**3**

0012604028 Page: 2 of 10

29020673

This instrument was prepared by:

Name:
Radn Josilovski

Address:
Taylor, Bean & Whitaker Mortgage
Corp.
1417 North Magnolia Ave
Ocala, FL 34475
After Recording Return To:
CHICAGO TITLE COMPANY

2175 POINT BLVD, STE 105, STE 165

ELGIN,        IL        60123

[Space Above This Line For Recording Data]

## MORTGAGE

FHA CASE NO.
137-4784522-703

MIN: 100029500032780748

THIS MORTGAGE ("Security Instrument") is given on April 24, 2009 . The mortgagor is
Bounlap Matmanivong and Pratharia Matmanivong, in joint tenants

("Borrower"). This Security Instrument is given to
Mortgage Electronic Registration Systems, Inc. ("MERS"). MERS is a separate corporation that is acting solely as nominee for
Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument. MERS is organized
and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026,
tel. (888) 679-MERS. Taylor, Bean & Whitaker Mortgage Corp.

("Lender") is organized and existing
under the laws of FL ,                                                                                                 , and
has an address of 1417 North Magnolia Ave, Ocala, FL 34475 .

Borrower owes Lender the principal sum of Two Hundred Twelve Thousand Three Hundred Eighty and 00/100
Dollars (U.S. $212,380.00 ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly
payments, with the full debt, if not paid earlier, due and payable on      May 01, 2039      . This Security Instrument
secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and
modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security
of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument
and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender
and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in
Cook                                               County, Illinois:

ILLINOIS FHA MORTGAGE                                                                                              6/96

ILLINOIS-MERS                                                                                                    GreatDocs™
ITEM 7601L1 (0701)                                                                                              (Page 1 of 8)
                                                                                                      T0601_20000020.100001

BOX 333-CTI

EXHIBIT NO.
a
4/11/14
Kelly A. Siska



0912601026 Page: 3 of 10

See Attached Exhibit A.

which has the address of _____ [Street]

_____ [City], Illinois _____ [Zip Code] ("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest and Late Charge. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

2. Monthly Payment of Taxes, Insurance, and Other Charges. Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2601 et seq. and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items (a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the

ILLINOIS FHA MORTGAGE                                                          6/96

ILLINOIS MERS
ITEM T9601L1 (020604)                                                    (Page 2 of 8)

Public Record

0912604020 Page: 4 of 10

Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

3. **Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

FIRST, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

SECOND, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

THIRD, to interest due under the Note;

FOURTH, to amortization of the principal of the Note; and

FIFTH, to late charges due under the Note.

4. **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

5. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within ninety days of a later sale or transfer of the Property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

6. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

7. **Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

ILLINOIS FHA MORTGAGE

ILLINOIS-MERS
ITEM 9601L2 (0212) (070567)

GreatDocs
(Page 2 of 7)

Public Record

0012604028 Page: 5 of 10

If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement at the Note rate, and at the option of Lender shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

   8.   Fees. Lender may collect fees and charges authorized by the Secretary.

   9.   Grounds for Acceleration of Debt.

     (a)   Default. Lender may, except as limited by regulations issued by the Secretary in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

       (i)   Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

       (ii)   Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

     (b)   Sale Without Credit Approval. Lender shall, if permitted by applicable law (including section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

       (i)   All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

       (ii)   The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property, but his or her credit has not been approved in accordance with the requirements of the Secretary.

     (c)   No Waiver. If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

     (d)   Regulations of HUD Secretary. In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

     (e)   Mortgage Not Insured. Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within eight months from the date hereof, Lender may, at its option require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to eight months from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

   10.   Reinstatement. Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

ILLINOIS FHA MORTGAGE

8-226801-08-BHS
ITEM 5701L4 (070703)

436

(GreatDocs)
(Page 4 of 8)

0912604028 Page: 6 of 10

11. Borrower Not Released; Forbearance by Lender Not a Waiver. Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-Signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

14. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

15. Borrower's Copy. Borrower shall be given one conformed copy of the Note and of this Security Instrument.

16. Hazardous Substances. Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. Assignment of Rents. Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this paragraph 17.

ILLINOIS FHA MORTGAGE                                                                                           6/96

ILLINOIS MERS
THCE: 1950012B1AX0001                                                                              (page 2 of 3)

0912604028 Page: 7 of 10

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

18. Foreclosure Procedure. If Lender requires immediate payment in full under paragraph 9, Lender may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 18, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this paragraph 18 or applicable law.

19. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

20. Waiver of Homestead. In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

21. Placement of Collateral Protection Insurance. Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

22. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)].

☐ Condominium Rider ☐ Graduated Payment Rider ☐ Growing Equity Rider

☐ Planned Unit Development Rider ☐ Adjustable Rate Rider ☐ Rehabilitation Loan Rider

☐ Non-Owner Occupancy Rider ☐ Other [Specify]

ILLINOIS FHA MORTGAGE

Ermilion®
[page 6 of 9]

Public Record

0912604026 Page: 9 of 10

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in pages 1 through 8 of this Security Instrument
and in any rider(s) executed by Borrower and recorded with it.

_____ (Seal)        Prathana Matmanivong (Seal)
Bounlap Matmanivong      -Borrower        Prathana Matmanivong        -Borrower

_____ (Seal)        _____ (Seal)
-Borrower        -Borrower

_____ (Seal)        _____ (Seal)
-Borrower        -Borrower

Witness:        Witness:

_____        _____

ILLINOIS FHA MORTGAGE        6/96

0912604028 Page: 9 of 10

State of Illinois
County of _COOK_

This instrument was acknowledged before me on _April 24, 2009_ (date) by

_Bounlap Matmanivong + Prathana Matmanivong_

_____

_____

_____

(name[s] of person[s]).

SHANBORIA M. GARNER
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
August 14, 2012

_Shanm. Garner_          8-14-10
Notary Public

ILLINOIS FHA MORTGAGE
ILFH03-15.FH
ILFH (3558US 08/2007)

0912604026 Page: 10 of 10

 **CHICAGO TITLE INSURANCE COMPANY**

ORDER NUMBER: 1409  008465299 CL
STREET ADDRESS: ████████████
CITY: ███████            COUNTY: COOK
TAX NUMBER: 06-16-218-015-0000

LEGAL DESCRIPTION:

LOT 464 IN PARKWOOD UNIT NO. 5, A SUBDIVISION OF PART OF THE NORTHEAST 1/4 OF SECTION 16 TOWNSHIP 41 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS

LEGALD            AT            04/24/09

LEGAL DESCRIPTION

LOT 464 IN PARKWOOD UNIT NUMBER 5, BEING A SUBDIVISION OF PART OF THE NORTHEAST 1/4 OF SECTION 18, TOWNSHIP 41 NORTH, RANGE 9 EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED MAY 13, 1974 AS DOCUMENT NO. 22715297, IN COOK COUNTY, ILLINOIS.

# NOTE

| FHA CASE NO. |
|---|
| 137-4794522-703 |

April 24, 2009
[Date]

 , IL

[Property Address]

### 1. PARTIES
"Borrower" means each person signing at the end of this Note, and the person's successors and assigns. "Lender" means Taylor, Bean & Whitaker Mortgage Corp.

and its successors and assigns.

### 2. BORROWER'S PROMISE TO PAY; INTEREST
In return for a loan received from Lender, Borrower promises to pay the principal sum of Two Hundred Twelve Thousand Three Hundred Eighty and no/100                    Dollars (U.S. $212,380.00       ), plus interest, to the order of Lender. Interest will be charged on unpaid principal, from the date of disbursement of the loan proceeds by Lender, at the rate of Five and One Half                percent ( 5.5000 %) per year until the full amount of principal has been paid.

### 3. PROMISE TO PAY SECURED
Borrower's promise to pay is secured by a mortgage, deed of trust or similar security instrument that is dated the same date as this Note and called the "Security Instrument." The Security Instrument protects the Lender from losses which might result if Borrower defaults under this Note.

### 4. MANNER OF PAYMENT
(A) Time
Borrower shall make a payment of principal and interest to Lender on the first day of each month beginning on June 01, 2009              . Any principal and interest remaining on the first day of        May 2039        , will be due on that date, which is called the "Maturity Date."
(B) Place
Payment shall be made at Taylor, Bean & Whitaker Mortgage Corp., 1417 North Magnolia Ave, Ocala, FL 34475

or at such other place as Lender may designate in writing by notice to Borrower.

(C) Amount
Each monthly payment of principal and interest will be in the amount of U.S. $ 1,205.87            . This amount will be part of a larger monthly payment required by the Security Instrument, that shall be applied to principal, interest and other items in the order described in the Security Instrument.

MULTISTATE FHA FIXED RAT

MULTISTATE
ITEM 0432L1 (022709)

610 REDACTED      N  001  001

*02321

6/96

GreatDocs®
(Page 1 of 3)

T6432_20090408.100007

EXHIBIT B

(D)  Allonge to this Note for Payment Adjustments
If an allonge providing for payment adjustments is executed by Borrower together with this Note, the covenants of the allonge shall be incorporated into and shall amend and supplement the covenants of this Note as if the allonge were a part of this Note. (Check applicable box.)

☐ Growing Equity Allonge    ☐ Graduated Payment Allonge

☐ Other [specify]

5.  BORROWER'S RIGHT TO PREPAY
Borrower has the right to pay the debt evidenced by this Note, in whole or in part, without charge or penalty, on the first day of any month. Lender shall accept prepayment on other days provided that Borrower pays interest on the amount prepaid for the remainder of the month to the extent required by Lender and permitted by regulations of the Secretary. If Borrower makes a partial prepayment, there will be no changes in the due date or in the amount of the monthly payment unless Lender agrees in writing to those changes.

6.  BORROWER'S FAILURE TO PAY
(A)  Late Charge for Overdue Payments
If Lender has not received the full monthly payment required by the Security Instrument, as described in Paragraph 4(C) of this Note, by the end of fifteen calendar days after the payment is due, Lender may collect a late charge in the amount of Four                        percent (  4.0000  %) of the overdue amount of each payment.
(B)  Default
If Borrower defaults by failing to pay in full any monthly payment, then Lender may, except as limited by regulations of the Secretary in the case of payment defaults, require immediate payment in full of the principal balance remaining due and all accrued interest. Lender may choose not to exercise this option without waiving its rights in the event of any subsequent default. In many circumstances regulations issued by the Secretary will limit Lender's rights to require immediate payment in full in the case of payment defaults. This Note does not authorize acceleration when not permitted by HUD regulations. As used in this Note, "Secretary" means the Secretary of Housing and Urban Development or his or her designee.
(C)  Payment of Costs and Expenses
If Lender has required immediate payment in full, as described above, Lender may require Borrower to pay costs and expenses including reasonable and customary attorneys' fees for enforcing this Note to the extent not prohibited by applicable law. Such fees and costs shall bear interest from the date of disbursement at the same rate as the principal of this Note.

7.  WAIVERS
Borrower and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

8.  GIVING OF NOTICES
Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail to Borrower at the property address above or at a different address if Borrower has given Lender a notice of Borrower's different address.
Any notice that must be given to Lender under this Note will be given by first class mail to Lender at the address stated in Paragraph 4(B) or at a different address if Borrower is given a notice of that different address.

9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note against each person individually or against all signatories together. Any one person signing this Note may be required to pay all of the amounts owed under this Note.

MULTISTATE FHA FIXED RATE NOTE                                                                6/96
MULTISTATE                                                                        GreatDocs®
ITEM 6432L2 (022105)                                                               (Page 2 of 3)

**4**

FILED
3/3/2014
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BOUNLAP MATMANIVONG,
individually and on behalf of a class,       )
                                   )
       Plaintiff,                    )
                                   )
       vs.                         )
                                   )
NATIONAL CREDITORS CONNECTION, INC.,       )
                                 )
       Defendant.           )

13-cv-5347

Judge Matthew F. Kennelly

Magistrate Judge Gilbert

## PLAINTIFF'S FIRST AMENDED COMPLAINT – CLASS ACTION

### INTRODUCTION

1.     Plaintiff brings this action to secure redress from unlawful credit and collection practices engaged in by defendant. Plaintiff alleges violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA").

### VENUE AND JURISDICTION

2.     This Court has jurisdiction under 15 U.S.C. §1692k (FDCPA), 28 U.S.C. §1331 and 28 U.S.C. §1337.

3.     Venue and personal jurisdiction in this District are proper because:

     a.     Defendant's collection communications were received by plaintiff within this District;

     b.     Defendant does or transacts business within this District.

### PARTIES

4.     Plaintiff is a resident of Northern District of Illinois.

5.     Defendant National Creditors Connection, Inc. ("NCCI") is a corporation with principal offices at 14 Orchard Road, Suite 200, Lake Forest, CA 92630. NCCI does business in Illinois. Its registered agent and office is National Registered Agents, 200 West Adams, Chicago, Illinois 60606.

1

### DEFENDANT'S BUSINESS

6.     NCCI is engaged in the business of assisting creditors and debt collectors with collecting delinquent debts by visiting the homes of delinquent debtors.

7.     NCCI uses the mails and interstate telephone system to conduct its business.

8.     NCCI describes its standard business practices on its web site.

9.     NCCI  states on its web site that "As the nation's leader in field contact services since 1992, NCCI provides the face-to-face contact solutions you need to effectively reconnect with customers and gather information vital to your success. These face-to face contacts are made by our nationwide network of background-screened and trained field representatives who treat your customers with dignity, sincerity, and professionalism. Our secure technology systems, insurance protection and unparalleled experience give you the means to efficiently collect what is rightfully yours." (http://www.nationalcreditors.com/default.aspx)

10.     NCCI further states on its website "We communicate contact data through our secure technology systems. Knowing that the data we deal with is sensitive, all information we obtain from our clients or as a result of our field contact services will be stored and transferred securely. In fact, our IT programs and hardware are regularly audited by top ranked financial institutions. We have passed each test with high scores and remarkable consistency. [¶] Successful businesses begin with the end in mind. Because we've taken the time and care to focus on outcomes, you can be certain that our service will help you reduce your loan losses - and we will do it right the first time. In short, we connect, we protect and you collect. We have been the leader in the field contact industry since 1992. And, while many have tried to duplicate our processes, there is only one NCCI." (http://www.nationalcreditors.com/our-difference.aspx)

11.     NCCI also states on its web site that "NCCI is a privately held corporation.  The company administers all client services from our corporate headquarters, a 20,000 square foot office building located in Lake Forest, California. NCCI principals own the building at corporate headquarters. We have a regional office in Omaha, NE. We are a fully licensed, bonded, and

2

insured California Corporation currently working with over 750 financial institutions throughout the United States. [¶] NCCI has successfully conducted more than 3 Million Field Contacts to date. We also conduct physical on-site inspections specifically for credit bureaus and credit bureau resellers, and loss mitigation services for multiple major mortgage companies. [¶] Our clients enjoy a seamless management service which utilizes a variety of tools and resources designed to increase customer contact, motivating them toward account resolution. [¶] In addition to our national network of qualified field representatives, we provide clients with an unprecedented variety of updates, status reports and secure assigning via a secure web portal." (http://www.nationalcreditors.com/our-company.aspx)

12.     NCCI's web site also states "NCCI has an In-House General Counsel which quickly and professionally handles any issues that may arise. NCCI continues to keep 'up-to-date' with changes in laws that govern the assistance in the collection of debts, as well as acquiring all required State Licenses needed by ALL Field Service Firms. [¶] NCCI is licensed in all states that require a Collection Agency License. . . ." (http://www.nationalcreditors.com/our-difference/legal-corner.aspx)

13.     NCCI's web site also states "NCCI maintains a highly experienced IT and Data Security Team that has over 100 years of collective experience. [¶] We have developed extremely sophisticated custom applications that provide secure real time access to information, results and status of work that is being performed. Our custom application allows our development team to provide highly customized reporting and accommodate any special request quickly, efficiently and effectively. [¶] Our fault tolerant/ redundant enterprise-level IT infrastructure ensures that you have continuous access to our systems, enabling a smooth and uninterrupted workflow. [¶] NCCI's state-of-the-art security programs and technologies reduce your risk of liability by protecting your company's sensitive information against data breaches." (http://www.nationalcreditors.com/our-difference/information-technology.aspx)

14.     NCCI's web site states "National Creditors Connection, Inc. (NCCI) was

3

founded in 1992. The company began performing field contact services for California Credit Unions and quickly grew to over 600 clients such as banks, finance companies, mortgage and auto lenders, to name a few. In 2003, we began conducting onsite physical inspections for the credit bureau industry nationwide. Today, the NCCI staff has more than 300 years of combined experience in the collections arena, and has conducted over three million Field Contacts nationwide for our valued clients."

(http://www.nationalcreditors.com/our-company/ncci-history.aspx)

15.    NCCI's web site also states "Since June of 1992, NCCI has strived to be the leading provider of a variety of specialized field services in an effort to allow our valued clients to become the leaders in their respective industries. [¶] Our ability to perform onsite commercial and residential inspections and to make face to face contact with their customers, has allowed us to assist the Financial Institutions, Credit Bureaus, Loan Servicers, and Commercial and Leasing Industries. [¶] We have established a nationwide network of field service professionals, whom must complete FDCPA testing and a seven year background check, thus giving us the finest fleet of representatives in all 50 states and Puerto Rico. [¶] Our staff has over 300 years of combined experience in collections and loss mitigation and over 30 years in the credit bureau industry. At NCCI, we are serious about protecting our clients by providing five million dollar E&O Insurance, national state licensing, data and IT security and to the process in which we engage our field representatives. Please read more about the exceptional (behind the scenes) services we offer. We are very proud of them and are unsurpassed in client protection."

(http://www.nationalcreditors.com/our-company/president's-message.aspx)

16.    NCCI describes the types of clients it serves as follows:

Field Contact/Loss Mitigation Clients

Credit Unions
Community Banks
Major Banks
Auto Lending Companies
Mortgage Lending Companies
Finance Companies

4

Equipment/Capital Leasing Companies
Commercial Loan Services
Commercial Collection Agencies
Collection Agencies
All Credit Card Companies

On-Site Inspections

Credit Reporting Bureaus
Pre-Funding SBA Inspections
SBA Certifications/Verifications

(http://www.nationalcreditors.com/our-company/types-of-clients.aspx)

17.     NCCI describes its field contact services as follows: "Field Contact [¶] Field Contact History [¶]  Field calls have been an effective loss mitigation tool for many years for a variety of different creditors. 'Hard money' unsecured lenders began field collection efforts in the late 1940s and auto finance entities have done so since the 1950s. Even today, local governmental municipalities utilize their own field investigators to recover millions of lost tax and fine revenues.  [¶]   A trend towards outsourcing field collections and investigations has been seen in the last 20 years due to the liability issues of large corporations having employees in the field. Even with all of the technological advances in today's professional debt collection practices, a 'personal field visitation' continues to be a highly effective tool in motivating the customer to resolve their delinquent account.  [¶]  A 'Field Contact' is a specific service request where a personal visit is made to a borrower's residence or place of employment to assist with re-establishing contact between the creditor and borrower. The role of this service is to act as the 'eyes and ears' of the creditor and gathering data important to reducing loan losses."
(http://www.nationalcreditors.com/our-services/field-contact/field-contact-history.aspx)

18.     NCCI describes the goals of a "field contact" as follows: "NCCI's field call specialists will follow your specific instructions and requests so that we can interact with your clients the way you would. These valuable services include:  Speaking directly with your customers, face to face, whenever possible.  Facilitating a phone conversation between you and your customers[.]  Motivating your customers to reestablish and continue an open line of

communication with your institution. Interviewing with family, friends and neighbors if a customer is not available. Educating your customers on the importance of communicating with you[.] Delivering confidential correspondence[.] Updating demographic and contact information such as place of employment, current telephone numbers and reason for delinquency. Verifying location and/or condition of your collateral, noting any assets, via digital photos and property condition. [¶] Our field contact services will dramatically increase your staff's ability to communicate with your customers. With increased contact, you will reduce your need for more costly actions such as repossession and foreclosure. [¶] Additionally, NCCI's professionals recognize that most financial institutions value a 'saved loan' as 'money in the bank' and will work diligently to achieve that result. As a lending institution, you need someone that will truly be 'your eyes and ears in the field.'"

(http://www.nationalcreditors.com/our-services/field-contact/field-contact-goals.aspx)

19.  Under "field contact strategy," NCCI states:

Early Stage Collection Period:

High Balances
High Risk Type Accounts
First Payment Default
Repeat Offenders

Late Stage Collection Period:

Pre-Foreclosure
Pre-Legal
Pre-Charge Off
Pre-Repossession

Other Stages of Collections:

Skip Accounts
Broken Payment Arrangements
Location of Collateral
Charge Off Accounts
Recovery Efforts Condition Reports

(http://www.nationalcreditors.com/our-services/field-contact/field-contact-strategy.aspx)

20.  Under "frequently asked questions," NCCI states:

Q: What do you say to our borrowers when you contact them?

A: NCCI trained Loss Mitigation staff advises your borrower that we are working, on your behalf, to update their contact information, find out reason for delinquency and obtain a financial snapshot of their current position; we explain in general loss mitigation alternatives. We do not advise that we guarantee any particular remedy, just that we provide the information to their lender, so they can hopefully reach a mutually beneficial resolution.

Q: Will you update us directly on any Loss Mit Work Orders that appear as though we can complete a workout agreement?

A: Yes. We will call you directly to discuss or leave a message for you in such cases. For non-urgent files, we will be concluding and you will receive our email completion notices. In some instances, we may feel that the borrower qualifies based on information you may not have and we will contact you directly.

Q: What if the borrower tells you that they have already spoken to our office recently?

A: In such cases, we will still conduct our educational and information gathering procedures. We will advise you via email or message board of the borrowers contentions so you can review directly.

Q: Which part of the final report is most important?

A: The final report that can be accessed off the web contains all of the information obtained when working the file. It is separated out by internal processes such as field interview, internal interview, skip tracing and recommendations. Although all is important, the second page Summary and Overview will relate our efforts in a checklist format as well as crucial recommendations from our loss mitigation staff.

Q: What is the role of your field rep in your Loss Mitigation services?

A: As is with our field call program, our professionally trained field contact reps are focusing on locating and contacting your borrower. They will run the property addresses and other addresses we may have off of our skip tracing module. They will also take three digital pictures of the property.

(http://www.nationalcreditors.com/faqs/loss-mitigation.aspx)

## FACTS RELATING TO PLAINTIFF

21.    Defendant has been involved in attempting to collect a residential  mortgage loan from plaintiff.

22.    In October 2012, plaintiff received the document in Appendix A.

23.    Thereafter, on two occasions, representatives of NCCI visited plaintiff's home to

7

collect information from plaintiff and perform the field call services described above.

24.     NCCI did not comply with 15 U.S.C. § 1692g, before or within 5 days after such contacts.

25.     It is the policy and practice of defendant to not comply with 15 U.S.C. § 1692g.

26.     NCCI claims to have sent Appendix B to Plaintiff on October 11, 2012.

27.     Even if Defendant sent Plaintiff Appendix B, it is still in violation of 15 U.S.C. § 1692g for the following reasons:

(a)     The letter is misleading in that it states "Any questions you may have regarding the debt should be directed to the contact person of your BofA letter" but then also states that "If you have any questions regarding this notification, please contact NCCI. . . ."

(b)     The letter states that "Unless you, within thirty (30) days after receipt of this letter, dispute the validity of the debt or any portion of the debt, Bank of America will assume the debt to be valid." Since NCCI is the one sending the notice, the letter should state that NCCI will assume the debt to be valid or that both NCCI and Bank of America assume the debt to be valid.

(c)     The letter states that "Upon your written request within the thirty (30) day period, Bank of America will provide you with the name and address of the original creditor if it is different from the current creditor." This is misleading or noncompliant, as the verification must be requested of and come from the entity that sent the notice. Here, that would be NCCI.

(d) The letter states that "Kindly note, NCCI is not collecting the above referenced debt, nor are we demanding any money," but then further states that *"This communication may be part of an effort to collect a debt, and any information obtained may be used for that purpose."* The former statement renders the "disclaimer" in the second completely uneffective, as at that point the debtor would have no idea whether a debt collection attempt is occurring or not and what its rights were (those it can assert against a debt collector, those it can assert against a creditor, or those it can assert against a third party who is neither of the above).

8

28.     On multiple occasions during approximately May and June of 2013, NCCI called Plaintiff's daughter at work regarding the mortgage loan, even though she was not listed on the document Plaintiff received from NCCI or on the mortgage.

29.     This contact was not to obtain Plaintiff's location information, as Defendant clearly already had that information.

## COUNT I – FDCPA - CLASS CLAIM

30.     Plaintiff incorporates paragraphs 1-29.

31.     Defendant violated 15 U.S.C. §1692g, by failing to provide the required notices within five days of the initial communication with plaintiff or, in the alternative, by providing defective notice.

32.     Section 1692g provides:

**§ 1692g.  Validation of debts**

**(a) Notice of debt; contents.  Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing--**

> **(1) the amount of the debt;**

> **(2) the name of the creditor to whom the debt is owed;**

> **(3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector;**

> **(4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and**

> **(5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.**

**(b) Disputed debts.  If the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt or a copy of a**

9

judgment, or the name and address of the original creditor, and a copy of such verification or judgment, or name and address of the original creditor, is mailed to the consumer by the debt collector. Collection activities and communications that do not otherwise violate this title may continue during the 30-day period referred to in subsection (a) unless the consumer has notified the debt collector in writing that the debt, or any portion of the debt, is disputed or that the consumer requests the name and address of the original creditor. Any collection activities and communication during the 30-day period may not overshadow or be inconsistent with the disclosure of the consumer's right to dispute the debt or request the name and address of the original creditor.

(c) Admission of liability. The failure of a consumer to dispute the validity of a debt under this section may not be construed by any court as an admission of liability by the consumer.

(d) Legal pleadings. A communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a).

(e) Notice provisions. The sending or delivery of any form or notice which does not relate to the collection of a debt and is expressly required by the Internal Revenue Code of 1986 [*26 USCS §§ 1* et seq.], title V of Gramm-Leach-Bliley Act [*15 USCS §§ 6801* et seq.], or any provision of Federal or State law relating to notice of data security breach or privacy, or any regulation prescribed under any such provision of law, shall not be treated as an initial communication in connection with debt collection for purposes of this section.

## CLASS ALLEGATIONS

33.    Plaintiff brings this action on behalf of a class.

34.    The class consists of (a) all natural persons with an Illinois address (b) that defendant contacted to obtain information or induce communications (c) on or after a date one year prior to the filing of this action, and (d) on or before a date 20 days after the filing of this action (e) to whom defendant did not provide the disclosures described in 15 U.S.C. §1692g either at all or by sending a letter in the form of Appendix B.

35.    The class members are so numerous that joinder is impracticable.

36.    On information and belief, there are more than 40 natural persons with an Illinois address that defendant contacted with a request for information or communications on or after a date one year prior to the filing of this action, and on or before a date 20 days after the filing of this action, to whom defendant did not provide the disclosures described in 15 U.S.C. §1692g.

37.    There are questions of law and fact common to the class members, which

common questions predominate over any questions that affect only individual class members. The predominant common questions are:

        a.      Whether defendant was required to comply with the FDCPA; and

        b.      Whether defendant's method of doing business violates the FDCPA.

38.     Plaintiff's claim is typical of the claims of the class members.  All are  based on the same factual and legal theories.

39.     Plaintiff will fairly and adequately represent the interests of the class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

40.     A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.   Many debtors may not realize that their rights are violated.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and the class members and against defendant for:

        (1)     Statutory damages;

        (2)     Attorney's fees, litigation expenses and costs of suit; and

        (3)     Such other or further relief as the Court deems proper.

## COUNT II - FDCPA - INDIVIDUAL CLAIM

41.     Plaintiff incorporates paragraphs 1-29.

42.     Defendants violated 15 U.S.C. §1692c by contacting third parties for purposes other than those permitted by 15 U.S.C. §1692b.

43.     Section 1692c provides:

      **§ 1692c.**      **Communication in connection with debt collection [Section 805 of P.L.]**

      **. . . (b) Communication with third parties--Except as provided in section 1692b of this title, without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the**

attorney of the creditor, or the attorney of the debt collector. . . .

44.    Section 1692b provides:

> § 1692b.    Acquisition of location information [Section 804 of P.L.]
>
> Any debt collector communicating with any person other than the consumer for the purpose of acquiring location information about the consumer shall--
>
> (1)    identify himself, state that he is confirming or correcting location information concerning the consumer, and, only if expressly requested, identify his employer;
>
> (2)    not state that such consumer owes any debt;
>
> (3)    not communicate with any such person more than once unless requested to do so by such person or unless the debt collector reasonably believes that the earlier response of such person is erroneous or incomplete and that such person now has correct or complete location information;
>
> (4)    not communicate by post card;
>
> (5)    not use any language or symbol on any envelope or in the contents of any communication effected by the mails or telegram that indicates that the debt collector is in the debt collection business or that the communication relates to the collection of a debt; and
>
> (6)    after the debt collector knows the consumer is represented by an attorney with regard to the subject debt and has knowledge of, or can readily ascertain, such attorney's name and address, not communicate with any person other than that attorney, unless the attorney fails to respond within a reasonable period of time to communication from the debt collector.

45. NCCI violated the FDCPA by contacting third parties regarding plaintiff's debt.

WHEREFORE, the Court should enter judgment in favor of plaintiff and against defendant for:

(1)    Statutory damages;

(2)    Attorney's fees, litigation expenses and costs of suit;

(3)    Such other and further relief as the Court deems proper.


s/Daniel A. Edelman
Daniel A. Edelman

12

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Catherine A. Ceko
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

T:\28581\Pleading\Plaintiff's First Amended Complaint_Pleading.WPD

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.

s/ Daniel A. Edelman
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

14

# APPENDIX A




There may be options
to help you stay in your home
or avoid foreclosure.

**Please read this letter carefully.**





Loan Number:                                     10/02/2012

Dear: BOUNLAP MATMANIVONG

As your home loan servicer, we want to work with you to determine what options may be available to help you stay in your home or avoid foreclosure. Please read this letter carefully.

**We will be sending a representative from NCCI to meet with you at your home to collect documents that will help us review your loan and assistance options. If you are already working with a Bank of America representative on obtaining assistance, you are still eligible for this home visit. To schedule the visit on a day and time that is most convenient for you, please call NCCI at 1-855-395-6031 from 10am – 10pm EST Monday – Friday.** If you do not want our representative to visit your home, please let us know by calling that same number. If we do not hear from you, our representative will attempt to visit your home over the next seven to ten days.

- ☐ Our representative will show you his/her identification and, to protect your privacy, will verify your identity by asking to see photo identification, such as a driver's license.
- ☐ Our representative will give you a copy of this letter, but without the enclosures.
- ☐ When our representative comes to your home, please have copies of the financial information described in the enclosed checklist ready for our representative to take with him/her.
- ☐ Our representative will collect the financial information that you provide and return it to us. If you want to confirm the status of documents that you have already sent us, or if you want to find out if there are documents that you still need to provide before we can consider you for assistance, our representative can call us during his or her visit.

Once we have all of your necessary financial documents, we will assign a Customer Relationship Manager to your loan. Your Customer Relationship Manager will evaluate your options and explain those options to you. If you already have an assigned Customer Relationship Manager, please use this opportunity to submit any other documents that you may still need to submit to be considered for assistance.

**We urge you to provide the requested information to NCCI, so we can work together to determine if you are eligible for mortgage assistance.** If you have any questions about this letter or the documentation that we need, please call NCCI at 1-855-395-6031 from 10am – 10pm EST Monday - Friday.

Home Loan Team
Bank of America N.A.

# APPENDIX B



**FDCPA NOTICE**

Re: Creditor: Bank of America
    Account No.:
    Amount of Debt:

Dear

On _____ National Creditors Connection, Inc. ("NCCI") on behalf of Bank of America, made or attempted to make contact with you to encourage you to contact Bank of America. The purpose of this letter is to explain why NCCI is visiting you and to provide you with the information/disclosures as required by law.

As an introduction, NCCI is contracted with Bank of America for the sole purpose of making contact with you and to deliver Bank of America communications to you via NCCI Field visits. The purpose of a NCCI Field visit is to merely encourage you to contact Bank of America. Kindly note, NCCI is not collecting the above referenced debt, nor are we demanding any money. Any questions you may have regarding the debt should be directed to the contact person on your BofA letter.

NCCI is not a traditional debt collection agency. However, under Federal and certain State Laws NCCI may be considered a debt collector. Thus, the following are legal disclosures that NCCI is required to disclose to you. As mentioned above, NCCI is not asking you to pay off your loan. Federal and State law requires us to bring this information to you.

(1) Under the Fair Debt Collections Practices Act, federal law, and certain state laws NCCI may be considered a debt collector. The purpose of this letter is to provide you with information required by law, including the amount of the debt.

(2) Debt Validation Notice:
    • The amount of the debt: As of _____, you owe _____. Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater. Therefore, if you pay the amount



shown above, an adjustment may be necessary after Bank of America receives your check, in which event Bank of America will inform you or your agent before depositing the check for collection. For further information, write to the address provided below or call (800) 300-0743 ext. 7565.

- The name of the creditor to whom the debt is owed: Bank of America

- Unless you, within thirty (30) days after receipt of this letter, dispute the validity of the debt or any portion of the debt, Bank of America will assume the debt to be valid.

- If you notify NCCI in writing, at the address provided below within the thirty (30) day period, that the debt, or any portion thereof, is disputed, NCCI will obtain verification of the debt and mail it to you.

- Upon your written request within the thirty (30) day period, Bank of America will provide you with the name and address of the original creditor if it is different from the current creditor.

NCCI
14 Orchard Road
Lake Forest, California 92630

(3) <u>Bankruptcy Notice</u>: If you are currently in a bankruptcy proceeding or have received a discharge of the home loan debt referenced above, this statement is being furnished for informational purposes only. It should not be construed as an attempt to collect against you personally. Bank of America will take no steps to collect from you personally or against the property securing this loan while the bankruptcy's automatic stay remains in effect. If you are represented by an attorney, please provide this notice to your attorney.

(4) STATE DISCLOSURES (if any):

If you have any questions regarding this notification, please contact NCCI, 14 Orchard Road, Lake Forest, California 92630, at (800) 300-0743 ext. 7565. Office hours are Monday through Friday from 9:00 a.m to 4:00 p.m. Pacific Time.

Sincerely,

National Creditors Connection, Inc.

*This communication may be part of an effort to collect a debt, and
any information obtained may be used for that purpose.*

CONFIDENTIAL                    NCCI/BM 59

**5**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

BOUNLAP MATMANIVONG,                )
individually and on behalf of a class,    )
                                                              )      13-cv-5347
            Plaintiff,               )
                                                              )      Judge Matthew F. Kennelly
        vs.                                )
                                                              )      Magistrate Judge Gilbert
NATIONAL CREDITORS CONNECTION, INC.,   )
                                                              )
          Defendant.              )

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST DOCUMENT REQUESTS AND INTERROGATORIES

Plaintiff Bounlap Matmanivong, by and through his attorneys Daniel A. Edelman,

Cathleen M. Combs, James O. Latturner, and Catherine A. Ceko of Edelman, Combs, Latturner

& Goodwin, LLC and in response to National Creditors Connection, Inc.'s First Document

Requestss and Interrogatories, states as follows:

### DOCUMENT REQUESTS

1.      Any and all documents relating or referring, directly or indirectly, in any way to any debt

serviced by Bank of America and owed by plaintiff at any time, including but not limited to all

documents related to or regarding any communications with Bank of America, any legal actions

taken by plaintiff against Bank of America, and any communications by any person or entity

hired by Bank of America to collect on the debt serviced by Bank of America.

**ANSWER:** Objection. Plaintiff objects on the grounds that this request seeks irrelevant

information and is not reasonably calculated to lead to the production of admissible information,

in that the information sought does not deal with any matter at issue in this case. Plaintiff further

premature juncture. Plaintiff has not completed discovery or preparation for trial, and plaintiff's responses are therefore made only on the basis of such information as is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of all of plaintiff's knowledge regarding any particular subject and are made without prejudice to plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, once they have completed discovery and trial preparation. Objection. Plaintiff further objects to the extent that defendant seeks information protected by the attorney work-product doctrine. No privileged information will be disclosed in response to this, or any other, discovery request made by defendant. Subject to and without waving the aforementioned objection, none.

29.     Any and all documents requested to be identified in the interrogatories propounded upon you by defendant.

**ANSWER:** All documents that plaintiff identified are being produced.

30.     Any and all documents not covered by the preceding requests which relate or refer in any way to the allegations in the complaint or to the subject matter of this actions whether or not they support your claims, including but not limited to any and all correspondence, e-mails, diaries, calendars, appointment books, notes and/or memoranda.

**ANSWER:** All non-privileged responsive documents currently in plaintiff's possession are being produced.

## INTERROGATORIES

1.     Identify all persons having knowledge of any relevant facts pertaining to this Action or the issues raised herein, setting forth the complete substance of each such person's knowledge.

**ANSWER:** Objection. Plaintiff objects to the extent that this request seeks information at a

premature juncture. Plaintiff has not completed discovery or preparation for trial, and plaintiff's responses are therefore made only on the basis of such information as is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of all of plaintiff's knowledge regarding any particular subject and are made without prejudice to plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, once they have completed discovery and trial preparation. Subject to and without waving the aforementioned objection, Plaintiff, Joy Lynh Matmanivong (Plaintiff's daughter), R.G. Bellows, V.P. and General Counsel of NCCI, unknown agents and employees of Defendant.

2.      Identify what actions, and how those actions, of the defendant violated the Fair Debt Collection Practices Act, specifically 15 U.S.C. §1692g, as alleged in your complaint.

**ANSWER:** Plaintiff alleges violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA") based upon a letter that Plaintiff received in October 2012 attempting to collect on an alleged debt. Furthermore, on two occasions, representatives of NCCI visited plaintiff's home to collect information from plaintiff and perform field call services. NCCI did not comply with 15 U.S.C. 1692g before or within 5 days after such contacts.

3.      Identify each and every communication, whether written or verbal, you had with any employee, agent, or representative of Bank of America concerning the debt identified in Exhibit A of your Complaint, stating the date of each communication, the parties thereto, a summary of the substance thereof, including what was said to whom, and attach a copy of each written communication relating to each communication described.

**ANSWER:** Objection. Plaintiff objects on the grounds that this request seeks irrelevant information and is not reasonably calculated to lead to the production of admissible information,

in that the information sought does not deal with any matter at issue in this case. Plaintiff further objects on the grounds that this request is overly broad and unduly burdensome, and is not limited in time or scope.

4.      Identify any and all communications you had with any agent, employee, or representative of NCCI concerning your debt identified in Exhibit A of the complaint, stating the date of each communication, the parties thereto, a summary of the substance thereof, including what was said to whom, and attach a copy of each written communication relating to each communication described.

**ANSWER:** Objection. Plaintiff further objects on the grounds that this request is overly broad and unduly burdensome. Subject to and without waiving the aforementioned objection, to the best of his recollection, plaintiff states that he received multiple phone calls from NCCI where he was never explicitly told  the basis for the alleged debt. Plaintiff's daughter also states that she received multiple phone calls at her place of work regarding the debt, which she conveyed to her father.

5.      Identify all persons with knowledge of plaintiff's receipt of the communication from Bank of America identified as Exhibit A of your complaint, and set forth the substance of each person's knowledge.

**ANSWER:** Plaintiff and Plaintiff's daughter, who was directly contacted by NCCI regarding the debt.

6.      Set forth the computation of each category of damages alleged in the Complaint, including but not limited to, plaintiff's computation of his alleged damages including attorney's fees.

**ANSWER:** Objection. Plaintiff objects to the extent that this request seeks information at a

premature juncture. Plaintiff has not completed discovery or preparation for trial, and plaintiff's responses are therefore made only on the basis of such information as is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of all of plaintiff's knowledge regarding any particular subject and are made without prejudice to plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, once they have completed discovery and trial preparation. Subject to and without waiving the aforementioned objection, Plaintiff is only seeking statutory damages on behalf of himself and the putative class, and attorney's fees and costs of litigation.

7.      Identify those persons from whom plaintiff or plaintiff's attorneys have received statements in any form regarding this Action, setting forth: the name, address and job title of each such person; the date on which said statement was made; the name, address and employer or the person who took said statement; whether the statement was oral or written; the full substance of each oral statement; and attach a copy of each transcription of all oral statements identified, and identify the name and address of the person who made each transcription. Identify and attach all documents referring or relating to your response to this interrogatory.

**ANSWER:** Objection. Plaintiff objects to the extent that this request seeks information at a premature juncture. Plaintiff has not completed discovery or preparation for trial, and plaintiff's responses are therefore made only on the basis of such information as is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of all of plaintiff's knowledge regarding any particular subject and are made without prejudice to plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, once they have completed discovery and trial preparation. Subject to and without waiving the aforementioned objection, Rick Bellows, Vice President and General

Counsel of NCCI in Lake Forest, deposed via telephone on May 20, 2013 in the case *Campo v. National Creditors Connection, Inc.*, 12-cv-1405, see bate stamped documents 1-46.

8.      Identify any and all communications you had with any agent, employee or representative of any person believed to be a member of the alleged class, stating the date of each communication, the parties thereto, a summary of the substance thereof, including what was said to whom, and attach a copy of each written communication relating to each communication described.

**ANSWER:** Objection. Plaintiff objects to the extent that this request seeks information at a premature juncture. Plaintiff has not completed discovery or preparation for trial, and plaintiff's responses are therefore made only on the basis of such information as is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of all of plaintiff's knowledge regarding any particular subject and are made without prejudice to plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, once they have completed discovery and trial preparation. Subject to and without waiving the aforementioned objection, none.

9.      Identify any and all persons believed to be a member of the alleged class, stating the date of each communication he or she received from or mentioning NCCI, the nature of NCCI's involvement with the communication, and attach a copy of each written communication identified above.

**ANSWER:** Objection. Plaintiff objects to the extent that this request seeks information at a premature juncture. Plaintiff has not completed discovery or preparation for trial, and plaintiff's responses are therefore made only on the basis of such information as is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of all of

plaintiff's knowledge regarding any particular subject and are made without prejudice to plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, once they have completed discovery and trial preparation. Subject to and without waiving the aforementioned objection, Plaintiff does not know any person believed to be a member of the alleged class.

10.    Identify all persons who have been retained or specifically employed or consulted in anticipation of this litigation or preparation of trial and whom you expect to call at trial offer opinion and testimony, setting forth the subject matter on which he or she was retained, employed, or consulted.

**ANSWER:** Objection. Plaintiff objects to the extent that this request seeks information at a premature juncture. Plaintiff has not completed discovery or preparation for trial, and plaintiff's responses are therefore made only on the basis of such information as is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of all of plaintiff's knowledge regarding any particular subject and are made without prejudice to plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, once they have completed discovery and trial preparation. Subject to and without waving the aforementioned objection, none.

11.    With respect to any and all admissions or declarations against interest made regarding the subject matter of this litigation by any of the parties to this lawsuit, including but not limited to any admissions or declarations against interest made by plaintiff or any person acting (or purporting to act) on behalf of defendant, set forth the substance of the admission or declarations against interest, identify the date and time the admission or declarations against interest was made (and the location where made), and state the identity of the person(s) who made such

admission or declarations against interest and any person(s) present when the admission or declarations against interest was made.

**ANSWER:** Objection. Plaintiff objects to the extent that this request seeks information at a premature juncture. Plaintiff has not completed discovery or preparation for trial, and plaintiff's responses are therefore made only on the basis of such information as is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of all of plaintiff's knowledge regarding any particular subject and are made without prejudice to plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, once they have completed discovery and trial preparation. Subject to and without waving the aforementioned objection, Rick Bellows, Vice President and General Counsel of NCCI in Lake Forest, deposed via telephone on May 20, 2013 in the case *Campo v. National Creditors Connection, Inc.*, 12-cv-1405, see bate stamped documents 1-46.

12.     Identify all films, photographs, audio tapes or audio recordings, videotapes or video recordings of any nature that were taken by you or on your behalf of any person or meeting related to this Action, the facts upon which this Action is based.

**ANSWER:** There are none.

13.     Identify all audio, electronic or digital recordings, transcripts or other records of any kind that were made of any meeting, conversation or oral communication relating to this Action, or the facts upon which this Action is based.

**ANSWER:** There are none.

14.     Set forth the caption, docket number, subject matter, and outcome/status of all lawsuits, whether civil or criminal, to which you have been a party or a witness.

**ANSWER:** Objection. Plaintiff objects on the grounds that this request seeks irrelevant

information and is not reasonably calculated to lead to the production of admissible information, in that the information sought does not deal with any matter at issue in this case. Subject to and without waiving the aforementioned objection, Matmanivong v. Unifund CCR Partners, et al., No. 08 CV 6415 (settled); Matmanivong v. Bank of America, N.A. & et al., Case No: 13 CV 5370 (pending); Bank of America, N.A. v. Matmanivong, Case No. 13-CH-12833 (dismissed).

15.     Identify all complaints, grievances, and/or charges you have filed, lodged, and/or otherwise made to any State or Federal agency as a result of any of the conduct alleged in the Complaint, setting forth the date(s), to whom you complained or grieved, and the result of your complaint or grievance or relating to the facts upon which this Action is based. Attach a copy of any complaints, grievances, and/or charges identified and any related communications.

**ANSWER:** Objection. Plaintiff objects on the grounds that this request seeks irrelevant information and is not reasonably calculated to lead to the production of admissible information, in that the information sought does not deal with any matter at issue in this case. Subject to and without waiving the aforementioned objection, none.

16.     Identify all persons consulted in obtaining information for answers to these interrogatories and response to these requests for documents and, as to each, indicate each answer to which he/she contributed information.

**ANSWER:** Plaintiff's counsel (all document requests and interrogatories), plaintiff (all document requests and interrogatories), and plaintiff's daughter (document requests 4-6, 9, 11, 13, 16, 18, 20, 25-28, and Interrogatories 4, 6, 7-9, 12-15).

17.     Identify each witness you intend to call to testify at trial and provide his/her address and telephone number.

**ANSWER:** Objection. Plaintiff objects to the extent that this request seeks information at a

premature juncture. Plaintiff has not completed discovery or preparation for trial, and plaintiff's responses are therefore made only on the basis of such information as is currently known and reasonably available. Plaintiff's responses do not purport to constitute a final statement of all of plaintiff's knowledge regarding any particular subject and are made without prejudice to plaintiff's right to introduce additional evidence at the time of trial, or to supplement the responses, as appropriate, once they have completed discovery and trial preparation. Subject to and without waving the aforementioned objection, Plaintiff, Joy Lynh Matmanivong (Plaintiff's daughter), R.G. Bellows, V.P. and General Counsel of NCCI, unknown agents and employees of Defendant.

Respectfully Submitted,

Catherine A. Ceko

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Catherine A. Ceko
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## VERIFICATION

I, Bounlap Matmanivong, hereby affirm under penalty of perjury that, to the best of my knowledge, the preceding responses to defendant's written interrogatories are true and correct. As to objections, I claim no knowledge but rely upon my counsel.

Bounlap Matmanivong

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BOUNLAP MATMANIVONG, individually and on behalf of a class, | ) ) ) | |
| Plaintiff, | ) ) | 13-cv-5347 |
| vs. | ) ) | Judge Matthew F. Kennelly |
| NATIONAL CREDITORS CONNECTION, INC., | ) ) ) | Magistrate Judge Gilbert |
| Defendant. | ) ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S
## FIRST REQUESTS FOR ADMISSION

Plaintiff Bounlap Matmanivong, by and through his attorneys Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, and Catherine A. Ceko of Edelman, Combs, Latturner & Goodwin, LLC and in response to National Creditors Connection, Inc.'s First Requests for Admission, states as follows:

1.  Admit you never opened any letters sent by mail from NCCI.

**ANSWER:**  Plaintiff cannot recall whether he opened any letters sent by mail from NCCI, and therefore denies this request.

2.  Admit you never read any letters sent by mail from NCCI (before your deposition on April 4, 2014).

**ANSWER:**  Plaintiff cannot recall whether he read any letters sent by mail from NCCI and therefore denies this request.

3.  Admit you never saw any letters sent by mail from NCCI (before your deposition on April 4, 2014).

**ANSWER:** Plaintiff cannot recall whether he saw any letters sent by mail from NCCI and therefore denies this request.

4.     Admit you never received any letters sent by NCCI.

**ANSWER:** Denied.

5.     Admit you do not know if NCCI sent any letters to you.

**ANSWER:** Denied.

6.     Admit you have never communicated with NCCI, anyone on behalf of NCCI, or any NCCI representative (other than NCCI's attorney at you deposition on April 4, 2014).

**ANSWER:** Denied.

7.     Admit you have never spoken with NCCI, anyone on behalf of NCCI, or any NCCI representative (other than NCCI's attorney at your deposition on April 4, 2014).

**ANSWER:** Denied.

8.     Admit you have never called NCCI, anyone on behalf of NCCI, or any NCCI representative.

**ANSWER:** Admit.

9.     Admit NCCI, anyone on behalf of NCCI, or any NCCI representative has never been to 1167 Sebring Drive, Elgin, IL 60120.

**ANSWER:** Denied.

10.     Admit you have never met anyone from NCCI, anyone on behalf of NCCI, or any NCCI representative (other than NCCI's attorney at your deposition on April 4, 2014.

**ANSWER:** Denied.

11.     Admit NCCI, anyone on behalf of NCCI, or any NCCI representative has never asked you to make a payment regarding your mortgage(s) on 1167 Sebring Drive, Elgin, IL, 60120.

**ANSWER:**   Admit.

12.   Admit Bank of America has never asked you to make a mortgage payment to NCCI.

**ANSWER:**   Plaintiff cannot recall the specific entities to whom Bank of America requested Plaintiff make mortgage payments and therefore denies this request.

13.   Admit letter(s) sent to you by NCCI did not confuse you.

**ANSWER:**   Denied.

14.   Admit letter(s) sent to you by NCCI did not mislead you.

**ANSWER:**   Denied.

15.   Admit you did not sustain any damages through letter(s) sent to you by NCCI.

**ANSWER:**   Admit.

16.   Admit no one in your family (e.g. wife, son and daughter) has ever opened a letter from NCCI.

**ANSWER:**   Plaintiff's family has opened letters on his behalf and he cannot recall whether those letters were from NCCI, and on that basis Plaintiff denies this request.

17.   Admit no one in your family (e.g. wife, son and daughter) has ever received a letter from NCCI.

**ANSWER:**   Admit.

18.   Admit no one in your family (e.g. wife, son and daughter) has ever read a letter from NCCI.

**ANSWER:**   Plaintiff's family has read letters on his behalf and he cannot recall whether those letters were from NCCI, and on that basis Plaintiff denies this request.

19.   Admit no one in your family (e.g. wife, son and daughter) has ever seen a letter from NCCI.

**ANSWER:**    Plaintiff's family has seen letters sent to Plaintiff and he cannot recall whether those letters were from NCCI, and on that basis Plaintiff denies this request.

20.    Admit no one in your family (e.g. wife, son and daughter) has ever communicated with NCCI, anyone on behalf of NCCI, or an NCCI representative (other than NCCI's attorney at your daughter's deposition on April 4, 2014).

**ANSWER:**    Admit.

21.    Admit no one in your family (e.g. wife, son and daughter) has ever spoken with NCCI, anyone on behalf of NCCI, or an NCCI representative (other than NCCI's attorney at your daughter's deposition on April 4, 2014).

**ANSWER:**    Admit.

22.    Admit no one in your family (e.g. wife, son and daughter) has ever called NCCI, anyone on behalf of NCCI, or an NCCI representative.

**ANSWER:**    Admit.

23.    Admit no one in your family (e.g. wife, son and daughter) has ever has ever met with NCCI, anyone on behalf of NCCI, or an NCCI representative (other than NCCI's attorney at your daughter's deposition on April 4, 2014).

**ANSWER:**    Admit.

24.    Admit that the only letters you opened regarding your mortgage loan and loan modification(s) of 1167 Sebring Drive, Elgin  IL 60120 were from Bank of America.

**ANSWER:**    Denied.

25.    Admit the only person(s) you ever communicated with by telephone regarding your mortgage loan and loan modification(s) were from Bank of America.

**ANSWER:**    Admit.

26.    Admit the only person(s) you ever called regarding your mortgage loan and loan modification(s) were from Bank of America.

**ANSWER:**    Admit.

27.    Admit the only person(s) you ever met regarding your mortgage loan and loan modification(s) were from Bank of America.

**ANSWER:**    Deny. Plaintiff has only communicated with Bank of America via telephone regarding his mortgage loan and modification.

28.    Admit that the only time a person went to 1167 Sebring Drive, Elgin, IL 60120 regarding your loan was for the purpose of the loan modification.

**ANSWER:**    Admit.

29.    Admit that the person who went to 1167 Sebring Drive, Elgin, IL 60120 on one occasion went to your house to pick up loan modification documents.

**ANSWER:**    Admit. To the best of plaintiff's recollection, the person who came to Plaintiff's home specifically asked for copies of Plaintiff's bank statement and paycheck.

30.    Admit that the person who went to 1167 Sebring Drive, Elgin, IL 60120 on one occasion to pick up loan modification documents was from Bank of America.

**ANSWER:**    Denied.

31.    Admit that the person who went to 1167 Sebring Drive, Elgin, IL 60120 on one occasion to pick up loan modification documents did not ask you for payment.

**ANSWER:** Admit.

Respectfully Submitted,

Catherine A. Ceko

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Catherine A. Ceko
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

**7**

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| BOUNLAP MATMANIVONG, individually and on behalf of a class, | Civil Action No. 1:13-cv-05347 |
| Plaintiff, | Judge Kennelly |
| v. | **AFFIDAVIT OF R.G. BELLOWS IN SUPPORT OF DEFENDANT NATIONAL CREDITORS CONNECTION, INC.'S MOTION FOR SUMMARY JUDGMENT** |
| NATIONAL CREDITORS CONNECTION, INC., | |
| Defendant. | |

I, R.G. Bellows, declare as follows:

1.     I am making this affidavit in support of defendant National Creditors Connection, Inc.'s ("NCCI") Motion for Summary Judgment and Separate Statement of Undisputed facts.

2.     I am over the age of 18 and have personal knowledge of all matters set forth herein and, if called as a witness, I could and would competently testify thereto.

3.     I am currently the General Counsel of NCCI and have served as such from January 2007 to the present. From January 2007 to July 2013, I concurrently served as the Vice President of Operations in addition to my capacity as General Counsel. Prior to January 2007, I was outside counsel for NCCI for approximately ten (10) years.

4.     Established in 1992, National Creditors Connection, Inc. (NCCI) is a California corporation that maintains its headquarters at 14 Orchard Road, Lake Forest, California.

5.     NCCI is in the business of providing a variety of support services to the financial and credit industry. These services include: (1) Debtor Contact, (2) Collateral Inspection and Verification, (3) Loss Mitigation Service, and (4) Credit Inspection and Verification. NCCI contracts with 11 to 12 vendors throughout the United States to perform these services. NCCI does not employ any individual or agent of any of its vendors. The individuals and agents retained by vendors of NCCI are referred to by NCCI as field representatives.

6.     NCCI performs services for Bank of America under General Services Agreements and Statements of Work issued by Bank of America.

7.     During my tenure as General Counsel and VP of Operations, I personally negotiated these General Services Agreements with Bank of America, including the Service Agreement and Statement of Work pertaining to Loss Mitigation Service.

8.     NCCI's Loss Mitigation Service entails collecting and picking up documents from the loss mitigation assignment, packaging the documents filled out and provided by the loss mitigation individual in an order required by the mortgage servicer and delivering the documents to the servicer.

9.     Bank of America contracted with NCCI to perform Loss Mitigation Services as part of the Making Home Affordable Program in accordance with the Emergency Economic Stabilization Act of 2008 (EESA), Troubled Asset Relief Program (TARP), and American Recovery and Reinvestment Act of 2009 (ARAA).  Pursuant to the EESA, TARP, and ARAA, mortgage servicers are required to communicate with borrowers and determine if the borrowers are interested and eligible to participate in mortgage loan modification programs such as the HUD program.

10.     Loss Mitigation provides an opportunity to individuals to avoid foreclosure and preserve their home through one of the programs created pursuant to the EESA and the implementing regulations.  The purpose of loss mitigation is to permit the homeowner to maintain ownership of the home through a mortgage modification.

11.     During the years of 2010 to 2012, after the passage of the EESA and the implementing regulations, NCCI received voluminous Statements of Work for Loss Mitigation Service per month from Bank of America.

12.     NCCI is paid a flat rate per loss mitigation package picked up and delivered to Bank of America.  The determination of whether a homeowner qualifies for loss mitigation or receives a mortgage modification is determined by Bank of America and does not in any way dictate or effect Bank of America's payment to NCCI for Loss Mitigation Service.

2

13.     Based on NCCI and Bank of America's Service Agreement for Loss Mitigation, all information related to an individual loss mitigation assignment  is electronically transmitted into NCCI's portal system by Bank of America.  NCCI's portal automatically processes and sends the information to NCCI's vendors to perform Loss Mitigation Service by field representatives.

14.     Based on NCCI and Bank of America's Service Agreement for Loss Mitigation, disclosure letters are automatically created, populated, generated and sent with the data received by NCCI's portal system from Bank of America.  NCCI and Bank of America elected and contractually agreed to use the five (5) day letter provision of the Fair Debt Collection Practices Act (FDCPA) as guidance for its disclosure letter for Loss Mitigation Service.  This choice was not because loss mitigation for mortgage modification was believed by NCCI to be considered debt collection under the FDCPA, but because it was preferred business practice.

15.     The principle purpose of NCCI's Loss Mitigation Service for Bank of America is to pick up documents from the homeowner and to deliver the documents to Bank of America. (Attached as Exhibit A is a true and correct copy of a Statement of Work for Loss Mitigation Service issued by Bank of America to NCCI, and attached as Exhibit B is a true and correct copy of protocols, guidelines, and inspection worksheet from NCCI to Regional Vendors and field representatives when performing Loss Mitigation Service.)

16.     All of NCCI's Regional Vendors and field representatives who engaged in Loss Mitigation Service for Bank of America are advised of this purpose of only collecting and picking up documents, packaging documents in an order required by Bank of America, and delivering the documents to Bank of America.  (See Exhibits A and B.)

17.     Bank of America sent loss mitigation customers a loss mitigation document package to be completed by the homeowner, with a letter advising the homeowner that NCCI will contact them to pick up the completed document package.  (Attached as Exhibit C is a true and correct copy of the letter from Bank of America to Plaintiff regarding loss mitigation attached to Plaintiff's Amended Complaint.)

3

18.     NCCI has no control over the information required or the documents required by Bank of America for loss mitigation.

19.     NCCI, through its portal, then electronically receives information populated by Bank of America to follow up with the homeowner regarding the loss mitigation package previously sent by Bank of America. The assignment is automatically processed and sent to NCCI's Regional Vendor, and an assigned field representative of the vendor will attempt to schedule a date and time for the pick up visit.

20.     All of NCCI's Regional Vendors and field representatives who perform Loss Mitigation Service for Bank of America are advised both verbally and in writing of the specific contractually agreed protocols and tasks they are permitted to engage and not permitted to engage when performing Loss Mitigation Service, which are detailed below. (See Exhibits A and B.)

21.     When engaging in a pick up visit, the field representative cannot enter the loss mitigation individual's home, even if invited. This is required and contractually agreed under the Service Agreement for Loss Mitigation between NCCI and BOA, and NCCI communicates this requirement to all Regional Vendors and field representatives. (See Exhibit B, document entitled "FHA/HUD Face-to-Face Working with BOFA's Customers.)

22.     At the onset of the pick up visit, the filed representative must verify the person is the homeowner, confirm receipt of the loss mitigation package from the bank, and confirm interest in the loan modification program. This is required and contractually agreed under the Service Agreement for Loss Mitigation between NCCI and BOA, and NCCI communicates this requirement to all Regional Vendors and field representatives.

23.     If the field representative is not able to make contact with the homeowner during a pick up visit, but makes contact with a third party, then the field representative leaves an Unauthenticated Contact Letter in a sealed envelope, marked personal and confidential, and departs the premises. The field representative cannot leave the Unauthenticated Letter if no

4

contact is made with anyone. (See Exhibit B, document entitled "NCCI Loss Mitigation Procedures/Guidelines.")

24. If contact with the homeowner is confirmed, but the homeowner is not interested in loss mitigation or shows any sign of negativity at any point during a pick up visit, the field representative cannot pressure the homeowner and the field representative must immediately end the visit, leave a Opt-Out Letter, depart the premises, and no further visits are required or permitted. (See Exhibit B.) This is required and contractually agreed under the Service Agreement for Loss Mitigation between NCCI and BOA, and NCCI communicates this requirement to all Regional Vendors and field representatives.

25. If the homeowner is interested, the field representative can only:

(a). Review documents only to confirm they are filled out and signed (e.g. loss mitigation application). This review does not entail checking the accuracy or truthfulness of the information, it is only a cursory review for the purpose of only confirming all documents are filled out and signed by the loss mitigation individual. (See Exhibit B, document entitled "NCCI Loss Mitigation Procedures/Guidelines.")

(b). Go over documents provided by the loss mitigation individual by comparing and referencing an inventory checklist for the purpose of only verifying that all documents are provided and it is a complete loss mitigation package. (See Exhibit B, document entitled "NCCI Loss Mitigation Procedures/Guidelines," and attached as Exhibit D is a true and correct copy of the inventory checklist field representatives reference during a pick up visit for Loss Mitigation.)

This is required and contractually agreed under the Service Agreement for Loss Mitigation between NCCI and BOA, and NCCI communicates this requirement to all Regional Vendors and field representatives.

5

26.     If the loss mitigation package is complete (e.g. filled out, signed, and includes all documents on the inventory checklist), the field representative will place all documents in a required order, then the homeowner will place the completed loss mitigation package into a FedEx envelope and seal it.   This is required and contractually agreed under the Service Agreement for Loss Mitigation between NCCI and BOA, and NCCI communicates this requirement to all Regional Vendors and field representatives.  (See Exhibit B, document entitled "NCCI Loss Mitigation Procedures/Guidelines.")

27.     The field representative will then take the sealed FedEx envelope to the nearest shipping or mailing location for delivery to Bank of America.  This is required and contractually agreed under the Service Agreement for Loss Mitigation between NCCI and BOA, and NCCI communicates this requirement to all Regional Vendors and field representatives.   (See Exhibit B, document entitled "NCCI Loss Mitigation Procedures/Guidelines.")

28.     If the loss mitigation package is incomplete, a subsequent visit(s) may be required to pick up additional documents to complete the loss mitigation package. Throughout the mortgage modification process, multiple pick ups and deliveries may be necessary and required to complete the process.  This is required and contractually agreed under the Service Agreement for Loss Mitigation between NCCI and BOA, and NCCI communicates this requirement to all Regional Vendors and field representatives.  (See Exhibit B, document entitled "NCCI Loss Mitigation Procedures/Guidelines.")

29.     If the loss mitigation package is incomplete and it is the third pick up visit with the homeowner, the field representative will leave the Incomplete Document Letter in a sealed envelope with the homeowner and depart the premises.   This is required and contractually agreed under the Service Agreement for Loss Mitigation between NCCI and BOA, and NCCI communicates this requirement to all Regional Vendors and field representatives.  (See Exhibit B, document entitled "NCCI Loss Mitigation Procedures/Guidelines.")

30.     If a homeowner has any questions at any point in time during any pick up visit regarding loss mitigation or any matter related to his or her mortgage, the field representative

6

states that he or she is not authorized to discuss the matter and state that all questions should be referred to Bank of America. This is required and contractually agreed under the Service Agreement for Loss Mitigation between NCCI and BOA, and NCCI communicates this requirement to all Regional Vendors and field representatives.

31.    The field representative will then complete the Field Interview/Inspection Worksheet and submit the information into NCCI's portal to confirm and prove that the loss mitigation contact was actually made. (See Exhibit B, document entitled "Inspection Worksheet".)

32.    The Field Interview/Inspection Worksheet has required preliminary questions to ensure quality control and prevent against fraudulent activities related to falsified loss mitigation packages.

33.    NCCI cannot collect or receive payment on any debt during a pick up visit for loss mitigation.

34.    NCCI cannot attempt to collect payment or seek payment of any debt during a pick up visit for loss mitigation

35.    NCCI cannot direct or induce, or attempt to direct or induce, payment submission of money owed from a loss mitigation individual during a pick up visit for loss mitigation.

36.    NCCI cannot discuss or offer to discuss payment, payment options, payment plans, repayment options, or foreclosure options with a loss mitigation individual during a pick up visit for loss mitigation.

37.    NCCI does not and cannot analyze information regarding any loss mitigation individual's financial status for a mortgage modification.

38.    NCCI does not and cannot conduct a comprehensive interview of any loss mitigation individual to assess, analyze, or determine financial status for a mortgage modification or mortgage modification qualifications.

7

39.    NCCI does not and cannot conduct any assessment, take part in any assessment, or influence any assessment of any loss mitigation individuals' qualifications regarding mortgage modification.

40.    NCCI does not and cannot determine, take part in the determination, or influence the determination, concerning any loss mitigation individuals qualification for a mortgage modification.

41.    NCCI does not discuss or consult with Bank of America on next steps if a loss mitigation individual is declined a mortgage modification.

42.    NCCI does not discuss or consult with Bank of America on the collection process if a loss mitigation individual is declined a mortgage modification.

43.    NCCI does not own debts and does not own Plaintiff's debt, including the subject debt.

44.    NCCI does not purchase debts and did not purchase Plaintiff's debt, including the subject debt.

45.    NCCI does not assume debts and did not assume Plaintiff's debt, including the subject debt.

46.    NCCI does not take assignment of debts and did not take assignment of Plaintiff's debt, including the subject debt.

47.    The only service Bank of America retained NCCI for with respect to Plaintiff Bounlap Matmanivong ("Plaintiff") was Loss Mitigation Service pertaining to the property located at 1167 Sebring Drive, Elgin, IL.   (Attached as Exhibit A is a true and correct copy of the Statement of Work for the October 2012 Loss Mitigation Service contact.)

48.    In or about August 2011, Bank of America issued a Statement of Work to NCCI to perform a Loss Mitigation Service with Plaintiff.  Bank of America provided NCCI with Plaintiff's information, a copy of the mortgage modification package, and requested NCCI to pick up the completed modification package and send it to Bank of America.  (Attached as

8

Exhibit E is a true and correct copy of the Loss Mitigation documents (without attachments) picked up from Plaintiff and delivered to Bank of America in August 2011.)

49.    On August 29, 2011, an agent of a vendor of NCCI conducted a Loss Mitigation Service with Plaintiff regarding his mortgage modification package from Bank of America. (See Exhibit E.)

50.    Within five days of August 29, 2011, NCCI sent Plaintiff a letter in accordance with the preferred business practice of providing the disclosures in Section 1692g of the FDCPA using the information provided by Bank of America and populated into NCCI's portal, including the amount Plaintiff owed to Bank of America. This disclosure letter was sent pursuant to NCCI and Bank of America's contractually agreed standard operating procedure for Loss Mitigation Service.

51.    In or about October 2012, Bank of America again issued a Statement of Work to NCCI to perform a Loss Mitigation Service with Plaintiff. (See Exhibit A.)

52.    On October 10, 2012, a field representative from a vendor of NCCI went to Plaintiff's house for a pick up visit, but was unsuccessful. (Attached as Exhibit F is the Field Interview/Inspection Worksheet documenting the unsuccessful Loss Mitigation service attempt on October 10, 2012.)

53.    On October 15, 2012, a field representative from a vendor of NCCI went back to Plaintiff's house and picked up the mortgage modification packet, and sent it to Bank of America that same day. Attached as Exhibits F and G are a true and correct copies of the Field Interview/Inspection Worksheet confirming the successful loss mitigation contact on October 15, 2012 and the Loss Mitigation documents (without attachments) picked up from Plaintiff and delivered to Bank of America in October 2012 respectively.

54.    Within 5 days of the October 10, 2012, NCCI once again sent Plaintiff a standard disclosure letter with the information provided by Bank of America  The letter did not state the amount Plaintiff owed to Bank of America because the amount was not populated into NCCI's

9

portal from Bank of America at the time of the second loss mitigation assignment in October 2012.

55.     Any and all of NCCI's communications with Plaintiff were made pursuant to its Service Agreement with Bank of America for Loss Mitigation Service, Statements of Work issued by Bank of America for Loss Mitigation Service, contractually agreed standard operating procedures, and all information populated into NCCI's portal by Bank of America. (See Exhibits A through G.)

56.     Both in August 2011 and October 2012, NCCI's field representative only performed loss mitigation services by collecting mortgage modification documents from Plaintiff and delivering the required document package to Bank of America. (See Exhibits A through G.)

I declare under penalty of perjury according to the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of July 2014, at Alta, California.

R.G. Bellows

10

# EXHIBIT A



| | Loss Mitigation Work Order LM0710 |
| --- | --- |
| | Bank of America |

The objective of this assignment is to contact the borrower on behalf of Bank of America / HUD and attempt to verify they are interested in the opportunity to save their home and to collect documents needed to assist them in this process and Overnight Ship them back to NCCI.

### You have Fifteen (15) Calendar Days to accomplish this.

**Scheduled Field Visit:** NCCI will attempt to pre-schedule the dates and times the customer will be available to go over documents needed and/or pickup the completed documents to be shipped back to the NCCI. If you are unable to comply with the date and time, please contact the customer to verify a better time to meet and make sure they have the documents. Remember you are not to extend over 5 business days. The appointments will be listed on your Manifest in the column marked **Schedule Appt**

**Non-Scheduled Field Visit:** If NCCI is unable to schedule a date and time customer is available, you will have 15 Days to complete your required attempts. Once you contact the customer, you will request to obtain the documents listed in the checklist attached to this work order (Use the Worksheet to verify you obtain the correct documents). If make contact with customer and they do not have all the documents, please re-schedule a date and time, no to extend 5 business days, to review and pickup the completed packages.

### Non Scheduled Field Visit Requirement
#### You are required to make Three (3) attempts on Three (3) different dates.
- One (1) of the attempts must be made after 4:30 PM weekdays.(Log attempts within 24hours of attempt date)
- One (1) of the attempts must be made on a **Weekend**.
- One (1) attempt can be made anytime. Please run all attempts in accordance to FDCPA guidelines.
- NCCI is also reaching out to the borrower(s) and will be setting appointments when the borrower will have the documents collected, and ready to be reviewed to be sent back to NCCI.

**First Contact Attempt:** Must be completed within THREE (3) Calendar Days of the Order Date
**Second Contact Attempt:** Must be completed within Five (5) Calendar Days after the first attempt.
**Third Contact Attempt:** Must be completed within Five (5) Calendar Days after the Second attempt.

### REP PICTURE REQUIREMENT FOR THE REPORT (in addition to the picture required per attempt)
1. A picture of the residence.
2. A picture showing the actual street address.
3. A picture of the street scene/neighborhood area.

**BORROWER INFORMATION**

Trans #: ZEACNI                                      Order Date : 10/02/12

Loan Number :

Borrower:                                            Co-Borrower:
  BOUNLAP MATMANIVONG

Chase Address:                                       Phone Home:
  1167 Sebring Dr
  Elgin IL 60120

Property Address:                                    Mailing Address:
  1167 Sebring Dr                                      1167 Sebring Dr
  Elgin IL 60120                                       Elgin IL 60120

**Special Comments:**

**CONFIDENTIAL**                                     **NCCI / BM 672**

# EXHIBIT B

## NCCI Loss Mitigation Procedures / Guidelines:

### Preparing for the Field Interview - Updating Web Manifest:

- Print Loss Mitigation Work Order and THREE BOFA DELIVERY LETTERS
- THREE (3) contact attempts must be completed within Fifteen (15) CALENDAR DAYS.
- Contact must be attempted at various times, including after 4:30pm and one on a Saturday or Sunday
- LOG All Contact Attempts into the ATTEMPT INFO section of the On-Line Manifest. Failure to do so may result in re-assignment of work,(log each attempt NO LATER than 24HOURS after of date of the attempt).
- If you are experiencing delays in completing this particular work order contact your Region Rep. If you have incomplete information or need assistance locating an address, please contact NCCI immediately at (888) 292-6356

## Conducting the Loss Mitigation Field Interview:

Attempt contact at the Chase Address provided, If contact with the borrower is made:

- ✓ Confirm the documents are completed correctly and signed by the borrower(s)
- ✓ Once you verify the documents are complete by the borrower(s) make sure the documents are in the Fed Ex package mailed to the borrower(s) previously.
- ✓ Take the Fed Ex package to your nearest Fed Ex location.
- ✓ If you contact the borrower and confirm that they do not have all required documents available, obtain the date the documents will be completed and schedule a date and time if possible to obtain the completed package.
- ✓ Complete Field Interview worksheet thoroughly and submit.

## LEAVING THE LETTERS (Client Rules)

- If unable to contact borrower but contact with 3rd party at the chased address, provide the 3rd party with the Unauthenticated Contact letter in sealed envelope, marked personal and confidential. Do no leave letter if no contact.
- If Customer is not interested leave the Opt Out Letter in a sealed P&C envelope with the cusotmer
- If Customer on the 3rd attempt, is not able to provide you with all needed documentation, leave the Incomplete Doc Letter in a sealed P&C envelope with the customer

## SCRIPT TO USE WHEN CONTACT IS MADE:

Please print and refer to the "Guidelines and Tips for BofA-HUD Success" link on each BofA-HUD assignment for the client approved script when attempting contact with their Customer.

Once you have completed the Field Interview, submit your results through the NCCI Field Rep Manifest. Click "RESULTS" next to the corresponding Transaction Number. Download pictures as specified in .jpeg file format

If you have questions or having trouble locating the address please cal NCCI Loss Mitigation for help during the hours and phone number below. .

NCCI Loss Mitigation: 1-855-395-6031

7:00am and 6:00pm PST, Monday – Thursday, 7:00am – 5:00pm PST Friday, and 7:00am – 11:00pm PST on Saturday.

**CONFIDENTIAL**                    NCCI/BM 673

## FHA/HUD FACE-TO-FACE WORKING WITH BOFA's CUSTOMERS

*Overview*   This initiative is for customers who are past due on an FHA loan and may be eligible for various home retention and foreclosure alternatives. NCCI Will mail the customer a letter informing him/her of the face-to-face meeting opportunity. The customer will be able to call our designated number to (1) set up a face-to-face meeting or (2) opt out of the meeting. If we do not hear from the customer, we will proceed with three unscheduled meeting attempts. If a face-to-face meeting is scheduled, the customer will be told what to expect during the visit and given a list of documents to have copied and ready to turn over to the vendor during the visit.

*Etiquette and*   It is important to remain professional and sensitive to the customer's situation at all
*Tone*   times while still displaying a sense of urgency.

- Vendor should be aware of their **tone of voice.** It is important to **speak in a friendly and receptive voice.** The customer can perceive words spoken in a harsh or monotone voice as a lack of concern for their issues, even if this is not the intent.

- Vendor should **speak with confidence;** this will make the customer comfortable and reassure them that the advocate is there to help them.

- Vendor should not, under any circumstances, enter the customer's home.

- Also, vendor must wear ID Badge in a place customer can easily view.

- The vendor should carry a copy of both an authenticated (customer specific) and unauthenticated letter to each visit.

**Introductory Note –**
**Communication with Non-Borrower/Third Party:**

As a debt collector it is imperative that you adhere to privacy and debt collection laws, including the federal Fair Debt Collection Practices Act (FDCPA), which has prescribed rules relating to communication with third parties. Until you have confirmed that the resident or person answering the door is the loan borrower, you should assume that you are dealing with a third party, and must be particularly mindful of information that is shared with third persons.

When communicating with a third party you are prohibited from stating or implying that you are a debt collector. This is quite different to the rule that applies when communicating with the customer, where you are required to notify the customer that you are a debt collector. Remember, when speaking with third parties, you must not say or allude to debt collection or anything that would suggest that your visit relates to a defaulted loan or loss mitigation options.

**CONFIDENTIAL**                    **NCCI/BM 674**

## INSPECTION WORKSHEET

**1. Contact Type:**
☐ Customer (Customer)  ☐ Third Party (Non-Customer)  ☐ Vacant (non- occupied, no pers. Property) ☐Unknown (Not Verified)  ☐Bad Address (Cannot Locate)  ☐Gated (Gated Cannot Gain access after three attempts)

**Update Phones:**
If Contact with Customer / Third Party: Update Phones:  Yes ☐ No
   List New Phones Obtained:   Customer; Home / Work / Cell / Other: _____
                      Co-Customer; Home / Work / Cell / Other: _____

**2. Customer Contact:**
Contact with Customer: Validate ID:  Yes  ☐ No, If Yes, Verification Type:  Drivers License☐ Passport   State ID ☐ Other
               Obtain DOB: ID  Yes   ☐ No, If Yes, Please Enter _____ (MM/YYYY)

**Validate ID:**
Are you a Current Service Member?  Yes ☐ No , If Yes, are you currently on Active Duty and/or scheduled for deployed?  Yes ☐ No
Is this Customer Primary Residence?  Yes ☐ No
Customer Interested in Saving Home:  Yes ☐ No
If NO, Provide Reason:  Doesn't want Home / Selling Property  ☐ Working w/3rd Party - Attorney   Unemployed ☐ Other

If YES, Customer Receive Fed Ex Package?  Yes ☐ No; If NO, Did you provide printed package to customer  Yes ☐ No
If YES, Any Recent Payments Made?  Yes ☐ No  List Amount / When and method of payment: _____
If YES, Does Customer Have the Completed / Necessary documents Requested by Bank of America?  Yes ☐ No
   If No, and if customer is interested in saving home, please re-schedule date to come back up completed documents
      Date and Time of Next Scheduled Visit to pick up docs: Date: _____   Time: _____
   If YES, did you obtain documents  Yes ☐ No ; Submit Tracking ID _____ and Date Shipped _____

   Request for Modification   Household Ex / Liabilities   4506-T ☐ Tax Returns (2 Years)   Dodd-Frank Cert   Utility Bill   Auth & Ackw Form
   ☐ Income Documents   3rd Party Auth Form   Homeowners Association ☐ Other List: _____

**Refused to Validate ID:**
Did you discuss with customer that no ID, we could not discuss opportunity to save their home?  Yes ☐ No

**Bankruptcy:**
Provide the following BKK information: BKK Representative: _____ ; BKK Rep Phone Number: _____
Did customer refuse to provide you this information?  Yes ☐ No

**3. Third Party**
Customer Resides at Property?  Yes ☐ No
If No, did you obtain Forwarding Information?  Yes ☐ No Address: _____   Phone: _____

**4. Property Occupied by:** (Check which applies as a result of your inspection)
☐Owner (Mortgager)  ☐Tenant (Renter)  ☐ Vacant (non- occupied, no pers. property)   ☐Abandoned (non-occupied, has pers. property)
☐Unknown (Not Verified)  ☐Bad Address (Cannot Locate)  ☐Gated (Gated Cannot Gain access after three attempts)

If Bad Address: Is Private Mailbox:  Yes ☐ No ; Verified Bad Address with   USPO ☐ Fire / Police   Other ☐ Not Applicable
If Gated: Where you able to Obtain Community Information?  Yes ☐ No  Community Name: _____   Phone: _____
If Vacant or Abandoned, is house locked and secured against vandalism and elements?  Yes ☐ No

**5. Property Condition:**  ☐Excellent ☐Good  ☐ Fair   ☐Poor/Damage ☐Property Inaccessible _____ ;
   If Damage: Please Explain: _____
   Provide additional pictures of Damage to property when spotted

**6. Utilities On?**  Yes ☐ No Please Explain: _____

**7. Property Listed for Sale?**  Yes ☐ No

      Provide Realtor Company / Realtor Name / Realtor Phone: _____
         If contact with Customer: Is there a Pending Sale?  Yes ☐ No; Customer Provide Copy of Purchase Contract?  Yes ☐ No

**8. Did you leave Letter/ Package?**  Yes ☐ No
   If NO, did you destroy the letter or package?  Yes ☐ No

**CONFIDENTIAL**                                    **NCCI/BM 675**