# EXHIBIT C

 

There may be options
to help you stay in your home
or avoid foreclosure.

Please read this letter carefully.

 

·BOUNLAP MATMANIVONG



Loan Number: ▓▓▓▓▓                                    10/02/2012

Dear: BOUNLAP MATMANIVONG

As your home loan servicer, we want to work with you to determine what options may be available to help you stay in your home or avoid foreclosure. Please read this letter carefully.

We will be sending a representative from NCCI to meet with you at your home to collect documents that will help us review your loan and assistance options. If you are already working with a Bank of America representative on obtaining assistance, you are still eligible for this home visit. To schedule the visit on a day and time that is most convenient for you, please call NCCI at 1-855-395-6031 from 10am – 10pm EST Monday – Friday. If you do not want our representative to visit your home, please let us know by calling that same number. If we do not hear from you, our representative will attempt to visit your home over the next seven to ten days.

- ☐ Our representative will show you his/her identification and, to protect your privacy, will verify your identity by asking to see photo identification, such as a driver's license.
- ☐ Our representative will give you a copy of this letter, but without the enclosures.
- ☐ When our representative comes to your home, please have copies of the financial information described in the enclosed checklist ready for our representative to take with him/her.
- ☐ Our representative will collect the financial information that you provide and return it to us. If you want to confirm the status of documents that you have already sent us, or if you want to find out if there are documents that you still need to provide before we can consider you for assistance, our representative can call us during his or her visit.

Once we have all of your necessary financial documents, we will assign a Customer Relationship Manager to your loan. Your Customer Relationship Manager will evaluate your options and explain those options to you. If you already have an assigned Customer Relationship Manager, please use this opportunity to submit any other documents that you may still need to submit to be considered for assistance.

We urge you to provide the requested information to NCCI, so we can work together to determine if you are eligible for mortgage assistance. If you have any questions about this letter or the documentation that we need, please call NCCI at 1-855-395-6031 from 10am – 10pm EST Monday – Friday.

Home Loan Team
Bank of America N.A.

# EXHIBIT D

**F2F FHA Checklist**

☐ **COMPLETE PACKAGE**   ☑ **INCOMPLETE PACKAGE**

TRANS#: _ZEA CNI_

MATMANIVONG, BOUNLAP

Account Number: _____

| | | |
|---|---|---|
| ☐ | 1. | Field Report |
| ☑ | 2. | Request for Modification and Assistance **(4 Pages)**\*\* |
| ☑ | 3. | Household Expenses and Liabilities Worksheet **(2 Pages)**\*\* |
| ☐ | 4. | 4506T Form **(1 Pages)**\*\* _Need 4506-T form (2011, 2010, 2009 Tax Returns)_ |
| ☑ | 5. | Authorization and Acknowledgment Form **(1 Page)**\*\* |
| ☑ | 6. | 3rd Party Authorization Form **(1 Page – Not Required)**\*\* |

<u>Income Documentation Requirements Provided by Customer (7a – 7f):</u>

| | | |
|---|---|---|
| ☑ | 7a. | **(Employed)** |
| | | ☑ (Most Recent Pay Stub – Must Include Year-to-Date Total) |
| ☐ | 7b. | **(Self-Employed)** |
| | | ☐ Profit / Loss Statement (most recent quarter) **Optional BofA Provided**\*\* |
| ☐ | 7c. | **(Un-Employed)** |
| | | ☐ Benefit Letter supporting continuance for 12 months |
| | | ☐ Two most recent Bank Statements (all pages), deposit slips or cancelled checks or IRS tax transcripts |
| ☐ | 7d. | **(Supplement – Income) (Select Type of Assistance and Documentation)** |

☐ Social Security   ☐ Disability   ☐ Death Benefits
☐ Pension   ☐ Adoption Asst   ☐ Public Assistance

☐ Award Letter(s) from selected above
☐ Bank Statement showing receipt of income

| | | |
|---|---|---|
| ☐ | 7e. | (Supplement – Income) If **APPLICABLE**, selected one of the below |

☐ Divorce Decree   ☐ Alimony   ☐ Child Support
☐ Separation Agreement
☐ Copy of Decree, Court Order or other legal written agreements to support
☐ Bank Statement, Deposit Slip or Cancelled Check **(supporting receipt)**

| | | |
|---|---|---|
| ☐ | 7f. | Rental Income |
| | | ☐ Signed Letter documenting, see package checklist |
| | | ☐ Bank Statements (Two most recent showing receipt of income) |
| ☐ | 8. | Active Military Document |
| ☐ | 9. | Misc (please list): **(Customer Provided)** |
| ☐ | 10. | Is Sale Pending on Property? |

☐ Listing Agreement   ☐ Purchase Contract   ☐ HUD1

Date Received: _Oct 16, 2012_   Completed By: _A. LOPEZ_

Trailing Docs: _____   Date Shipped: _____

NCCI/BM 34

# EXHIBIT E

Print Form

**Making Home Affordable Program**
**Request For Modification and Affidavit (RMA)**

MAKING HOME AFFORDABLE.gov

**REQUEST FOR MODIFICATION AND AFFIDAVIT (RMA), Page 1**     **COMPLETE ALL THREE PAGES OF THIS FORM**

▶ Loan I.D. Number _____     ▶ Servicer _____

| BORROWER | CO-BORROWER |
|---|---|
| Borrower's name *Bounlap Matmanivong* | Co-borrower's name |
| Social Security number _____  Date of birth _____ | Social Security number _____  Date of birth _____ |
| *N/A* | Home phone number with area code _____ |
| Cell or work number with area code _____ | Cell or work number with area code _____ |

| | |
|---|---|
| I want to: | ☑ Keep the Property   ☐ Sell the Property |
| The property is my: | ☐ Primary Residence   ☐ Second Home   ☐ Investment |
| The property is: | ☐ Owner Occupied   ☐ Renter Occupied   ☐ Vacant |

Mailing address  *Same*                                        *N/A*
Property address (if same as mailing address, just write same)                    E-mail address

| | |
|---|---|
| Is the property listed for sale?  ☐ Yes  ☑ No | Have you contacted a credit-counseling agency for help  ☐ Yes  ☑ No |
| Have you received an offer on the property?  ☐ Yes  ☑ No | If yes, please complete the following: |
| Date of offer _____  Amount of offer $ _____ | Counselor's Name: _____ |
| Agent's Name: _____ | Agency Name: _____ |
| Agent's Phone Number: _____ | Counselor's Phone Number: _____ |
| For Sale by Owner?  ☐ Yes  ☐ No | Counselor's E-mail: _____ |
| Who pays the real estate tax bill on your property? | Who pays the hazard insurance premium for your property? |
| ☑ I do  ☐ Lender does  ☐ Paid by condo or HOA | ☑ I do  ☐ Lender does  ☐ Paid by Condo or HOA. |
| Are the taxes current?  ☐ Yes  ☐ No | Is the policy current?  ☐ Yes  ☐ No |
| Condominium or HOA Fees ☐ Yes  ☐ No  $ _____ | Name of Insurance Co. *State Farm Insurance* |
| Paid to: _____ | Insurance Co. Tel #: *830 8* |
| Have you filed for bankruptcy?  ☑ Yes  ☐ No  If yes:  ☐ Chapter 7  ☑ Chapter 13 | Filing Date: _____ |
| Has your bankruptcy been discharged?  ☑ Yes  ☐ No | Bankruptcy case number _____ |

Additional Liens/Mortgages or Judgments on this property:

| Lien Holder's Name/Servicer | Balance | Contact Number | Loan Number |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

**HARDSHIP AFFIDAVIT**

I (We) am/are requesting review under the Making Home Affordable program.
I am having difficulty making my monthly payment because of financial difficulties created by (check all that apply):

| | |
|---|---|
| ☐ My household income has been reduced. For example: unemployment, underemployment, reduced pay or hours, decline in business earnings, death, disability or divorce of a borrower or co-borrower. | ☐ My monthly debt payments are excessive and I am overextended with my creditors. Debt includes credit cards, home equity or other debt. |
| ☑ My expenses have increased. For example: monthly mortgage payment reset, high medical or health care costs, uninsured losses, increased utilities or property taxes. | ☑ My cash reserves, including all liquid assets, are insufficient to maintain my current mortgage payment and cover basic living expenses at the same time. |

☐ Other:

Explanation (continue on back of page 3 if necessary): _____

page 1 of 3

**NCCI/BM 15**

REQUEST FOR MODIFICATION AND AFFIDAVIT (RMA), Page 2 | COMPLETE ALL THREE PAGES OF THIS FORM

## INCOME/EXPENSES FOR HOUSEHOLD

Number of People in Household: _____

| Monthly Household Income | Monthly Household Expenses | Household Assets |
|---|---|---|
| Monthly Gross Wages | First Mortgage Payment | Checking Account(s) |
| Overtime | Second Mortgage Payment | Checking Account(s) |
| Child Support / Alimony / Separation* | Insurance | Savings/ Money Market |
| Social Security/SSDI | Property Taxes | CDs |
| Other monthly income from pensions, annuities or retirement plans | Credit Cards / Installment Loan(s) (total minimum payment per month) | Stocks / Bonds |
| Tips, commissions, bonus and self-employed income | Alimony, child support payments | Other Cash on Hand |
| Rents Received | Net Rental Expenses | Other Real Estate (estimated value) |
| Unemployment Income | HOA/Condo Fees/Property Maintenance | Other _____ |
| Food Stamps/Welfare | Car Payments | Other _____ $ |
| Other (investment income, royalties, interest, dividends, etc.) | Other | Do not include the value of retirement plans when calc pension funds, annuities, if |
| Total (Gross Income) | Total Debt/Expenses | Total Assets |

## INCOME MUST BE DOCUMENTED

Include combined income and expenses from the borrower and co-borrower (if any). If you include income and expenses from a household member who is not a borrower, please specify using the back of this form if necessary.

*You are not required to disclose Child Support, Alimony or Separation Maintenance income, unless you choose to have it considered by your servicer.

## INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the federal government in order to monitor compliance with federal statutes that prohibit discrimination in housing. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender or servicer may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, the lender or servicer is required to note the information on the basis of visual observation or surname if you have made this request for a loan modification in person. If you do not wish to furnish the information, please check the box below.

| BORROWER | ☐ I do not wish to furnish this information | CO-BORROWER | ☐ I do not wish to furnish this information |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino<br>☐ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino<br>☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native<br>☑ Asian<br>☐ Black or African American<br>☐ Native Hawaiian or Other Pacific Islander<br>☐ White | Race: | ☐ American Indian or Alaska Native<br>☑ Asian<br>☐ Black or African American<br>☐ Native Hawaiian or Other Pacific Islander<br>☐ White |
| Sex: | ☐ Female<br>☑ Male | Sex: | ☑ Female<br>☐ Male |

| To be completed by Interviewer | | Name/Address of Interviewer's Employer |
|---|---|---|
| This request was taken by:<br>☐ Face-to-face interview<br>☐ Mail<br>☐ Telephone<br>☐ Internet | Interviewer's Name (print or type) & ID Number<br><br>Interviewer's Signature _____ Date _____<br><br>Interviewer's Phone Number (include area code) | |

NCCI/BM 16

REQUEST FOR MODIFICATION AND AFFIDAVIT (RMA) (Page 3)     COMPLETE ALL THREE PAGES OF THIS FORM

## ACKNOWLEDGEMENT AND AGREEMENT

*In making this request for consideration under the Making Home Affordable Program, I certify under penalty of perjury:*

1. That all of the information in this document is truthful and the event(s) identified on page 1 is/are the reason that I need to request a modification of the terms of my mortgage loan, short sale or deed-in-lieu of foreclosure.

2. I understand that the Servicer, the U.S. Department of the Treasury, or their agents may investigate the accuracy of my statements and may require me to provide supporting documentation. I also understand that knowingly submitting false information may violate Federal law.

3. I understand the Servicer will pull a current credit report on all borrowers obligated on the Note.

4. I understand that if I have intentionally defaulted on my existing mortgage, engaged in fraud or misrepresented any fact(s) in connection with this document, the Servicer may cancel any Agreement under Making Home Affordable and may pursue foreclosure on my home.

5. That my property is owner-occupied; I intend to reside in this property for the next twelve months; I have not received a condemnation notice; and there has been no change in the ownership of the Property since I signed the documents for the mortgage that I want to modify.

6. I am willing to provide all requested documents and to respond to all Servicer questions in a timely manner.

7. I understand that the Servicer will use the information in this document to evaluate my eligibility for a loan modification or short sale or deed-in-lieu of foreclosure, but the Servicer is not obligated to offer me assistance based solely on the statements in this document.

8. I am willing to commit to credit counseling if it is determined that my financial hardship is related to excessive debt.

9. I understand that the Servicer will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. I understand and consent to the disclosure of my personal information and the terms of any Making Home Affordable Agreement by Servicer to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Homeowner Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services in conjunction with Making Home Affordable; and (e) any HUD-certified housing counselor.

▶ _____     8-29-11
Borrower Signature                                         Date

▶ _____     _____
Co-Borrower Signature                                         Date

### HOMEOWNER'S HOTLINE

*If you have questions about this document or the modification process, please call your servicer.*
*If you have questions about the program that your servicer cannot answer or need further counseling, you can call the Homeowner's HOPE™ Hotline at 1-888-995-HOPE (4673). The Hotline can help with questions about the program and offers free HUD-certified counseling services in English and Spanish.*



**888-995-HOPE**
Homeowner's HOPE™ Hotline

### NOTICE TO BORROWERS

Be advised that by signing this document you understand that any documents and information you submit to your servicer in connection with the Making Home Affordable Program are under penalty of perjury. Any misstatement of material fact made in the completion of these documents including but not limited to misstatement regarding your occupancy in your home, hardship circumstances, and/or income, expenses, or assets will subject you to potential criminal investigation and prosecution for the following crimes: perjury, false statements, mail fraud, and wire fraud. The information contained in these documents is subject to examination and verification. Any potential misrepresentation will be referred to the appropriate law enforcement authority for investigation and prosecution. By signing this document you certify, represent and agree that "Under penalty of perjury, all documents and information I have provided to Lender in connection with the Making Home Affordable Program, including the documents and information regarding my eligibility for the program, are true and correct."

If you are aware of fraud, waste, abuse, mismanagement or misrepresentations affiliated with the Troubled Asset Relief Program, please contact the SIGTARP Hotline by calling 1-877-SIG-2009 (toll-free), 202-622-4559 (fax), or www.sigtarp.gov. Mail can be sent to Hotline Office of the Special Inspector General for Troubled Asset Relief Program, 1801 L St. NW, Washington, DC 20220.

*page 3 of 3*

NCCI/BM 17

NCCI/BM 14

# EXHIBIT F

Page 1 of 3

  

## BANK OF AMERICA-F2F

BORROWER INFORMATION

ClientID: LM0716
Ordered By: sfeltman
Borrower: MATMANIVONG, BOUNLAP
Loan Number : '
Address: 1167 SEBRING DRIVE
City,State,Zip: ELGIN IL 60120
Reference No:

Transaction #: ZEACNI
Order Date: 10/2/2012
Co-Borrower:

CID : PC6
Sub Rep: 60030MR   *Marc Rieck*

| Date: | Time: | | Date: | Time: |
|---|---|---|---|---|
| 10/10/2012 | 1249 | | 10/10/2012 | 1635 |

F2F Visit Result - Reschedule to Pick Up Docs

Enter any comments below:
2 STORY BRICK AND FRAME SINGLE FAMILY HOME WITH A 1 CAR ATTACHED GARAGE

F2F Visit Result - Picked Up Docs

Enter any comments below:
2story brick and frame one story single family home

Access Attempt Information

Contact Type
- (•) Direct Contact made with debtor and ID verification complete
- ( ) Direct Contact made with debtor and unable to verify ID
- ( ) Direct Contact made with debtor and Bankruptcy Process noted.
- ( ) Contact made with 3rd Party (Customer Resides at property)
- ( ) Contact made with 3rd party at address and Customer no longer at address.
- ( ) Unable able to locate address
- ( ) Address is Vacant
- ( ) Gated Community - Unable to gain access
- ( ) NDC - No Direct Contact

RPC - Verification Type?        STATE DRIVERS LICENSE

If Other, please enter.

Are you current a Service Member?
( ) Yes (•) No
If Yes, are you currently on Active Duty and/or scheduled for deployment?
( ) Yes ( ) No

Is this Customer's primary residence?
(•) Yes ( ) No

Is Customer interested in the opportunity to save their home?
(•) Yes ( ) No

Interested In   Did Customer receive the Fed Ex Package?
Saving Home?  (•) Yes ( ) No

Did you deliver the Letter Package to Customer?

**NCCI/BM 50**

Page 2 of 3

&#9673; Yes &#9675; No &#9675; N/A

Recent Payments Made?
&#9675; Yes &#9673; No
If Yes, please enter the amount, date, and method of payment.

Did you pick up all required documents from the customer?
&#9673; Yes &#9675; No

Did you ship the documents Overnight?
&#9673; Yes &#9675; No
799105260993      (Overnight Tracking ID number: )
10/15/12      (Date Shipped-MM/DD/YY)
Please enter name / address of FedEX dropoff site.

Update Contact Phones?   &#9675; Yes &#9673; No

Property Occupied By?   Owner

Property Condition?   Good

Is there any Damage spotted on property?
&#9675; Yes &#9673; No

Utilities On?   &#9673; Yes &#9675; No
If Yes, Please detail:
Meters on

Is Property Listed for Sale?   &#9675; Yes &#9673; No

Letter/Package Delivered?   &#9673; Yes &#9675; No

Letter/Package Destroyed?   &#9675; Yes &#9673; No

Field Agent Comments?   Property is a white brick nd frame one story ingle family home with an attached one car garage. The home is furnishe dand maintained. The borrower provided all the docs and the package was submitted.

Exterior Photos:
Multiple pictures of the residence.
A picture showing the actual street address/numeric address.
A picture of the neighborhood area.
Additional pictures if Damage/ Home Repairs / Realtor Sign seen at property.

| NAME | UPLOAD DATE | THUMBNAIL |
|------|-------------|-----------|
| Attempt No(1)   ZEACNI_0590916.JPG | 10/11/2012 7:42:50 AM | VIEW IMAGE |

NCCI/BM 51

Page 3 of 3

|  | ZEACNI_0508916.JPG | 10/11/2012 7:43:22 AM | VIEW IMAGE |
|  | ZEACNI_0508917.JPG | 10/11/2012 7:43:22 AM | VIEW IMAGE |
|  | ZEACNI_0508918.JPG | 10/11/2012 7:43:23 AM | VIEW IMAGE |
| Attempt No(2) | ZEACNI_0611557.JPG | 10/16/2012 8:30:15 AM | VIEW IMAGE |
|  | ZEACNI_0611561.JPG | 10/18/2012 6:41:58 AM | VIEW IMAGE |
|  | ZEACNI_0611562.JPG | 10/18/2012 6:41:58 AM | VIEW IMAGE |
|  | ZEACNI_0611563.JPG | 10/18/2012 6:41:59 AM | VIEW IMAGE |

Click here to upload photos

Delete Selected Images

Update Information Only     Submit     Print Preview     Close Form

# EXHIBIT G

**Making Home Affordable Program**
**Request for Mortgage Assistance (RMA)**


MAKING HOME AFFORDABLE.gov

| REQUEST FOR MORTGAGE ASSISTANCE (RMA) PAGE 1 | COMPLETE ALL FOUR PAGES OF THIS FORM |
|---|---|

▶ Loan I.D. Nu ▶ Servicer

| BORROWER | CO-BORROWER |
|---|---|
| Borrower's name<br>BOUNLAP MATMANIVONG<br>Social Security Number<br>Hom<br>Cell or work number with area code | Co-borrower's name<br>Social Security Number<br>Home phone number with area code<br>Cell or work number with area code |

| | |
|---|---|
| I want to: ☑ keep the Property ☐ Sell the Property | |
| The property is my: ☑ Primary Residence ☐ Second Home | ☐ Investment Property |
| The property is: ☑ Owner Occupied ☐ Renter Occupied for Less than 12 Months | ☐ Vacant for Less than 12 Months |

Mailing address  SAME
Property address (if same as mailing address, just write same).

Is the property listed for sale? ☐ Yes ☑ No
Have you received an offer on the property? ☐ Yes ☑ No
Date of offer _____ Amount of offer $ _____
Agent's Name: _____
Agent's Phone Number: _____
For Sale by Owner? ☐ Yes ☑ No

Who pays the real estate tax bill on your property?
☐ I do ☑ Lender does ☐ Paid by condo or HOA
Are the taxes current? ☑ Yes ☐ No
Condominium or HOA Fees ☐ Yes ☑ No $ _____
Paid to: _____

Have you contacted a credit-counseling agency for help ☐ Yes ☑ No
If yes, please complete the following:
Counselor's Name: _____
Agency Name: _____
Counselor's Phone Number: _____
Counselor's E-mail: _____

Who pays the hazard insurance premium for your property?
☐ I do ☑ Lender does ☐ Paid by Condo or HOA
Is the policy current? ☑ Yes ☐ No
Name of Insurance Co.: _____
Insurance Co. Tel # : _____

Have you filed for bankruptcy? ☐ Yes ☑ No  If yes: ☐ Chapter 7 ☐ Chapter 13  Filing Date: _____
Has your bankruptcy been discharged? ☐ Yes ☐ No  Bankruptcy case number _____

Additional Liens/Mortgages or Judgments on this property:

| Lien Holder's Name/Servicer | Balance | Contact Number | Loan Number |
|---|---|---|---|
| | | | |
| | | | |

| HARDSHIP AFFIDAVIT |
|---|

I (We) am/are requesting review under the Making Home Affordable Program.
I am having difficulty making my monthly payment because of financial difficulties created by (check all that apply):

☐ My household income has been reduced. For example: reduced pay or hours, decline in business earnings, death, disability or divorce of a borrower or co-borrower.

☑ My expenses have increased. For example: monthly mortgage payment reset, high medical or health care costs, uninsured losses, increased utilities or property taxes.

☐ I am unemployed and (a) I am receiving/will receive unemployment benefits or (b) my unemployment benefits ended less than 6 months ago.

☐ My monthly debt payments are excessive and I am overextended with my creditors. Debt includes credit cards, home equity or other debt.

☐ My cash reserves, including all liquid assets, are insufficient to maintain my current mortgage payment and cover basic living expenses at the same time.

☐ Other:

Explanation (continue on a separate sheet of paper if necessary): _____

*page 1 of 4*

NCCI/BM 35

## REQUEST FOR MORTGAGE ASSISTANCE (RMA) page 2 — COMPLETE ALL FOUR PAGES OF THIS FORM

### INCOME/EXPENSES FOR HOUSEHOLD[1]   Number of People in Household:

| Monthly Household Income | Monthly Household Expenses/Debt | Household Assets |
|---|---|---|
| Monthly Gross Wages | First Mortgage Payment | Checking Account(s) |
| Overtime | Second Mortgage Payment | Checking Account(s) |
| Child Support/Alimony/Separation[2] | Insurance *INCLD* | Savings/Money Market |
| Social Security/SSDI | Property Taxes *INCLD* | CDs |
| Other monthly income from pensions, annuities or retirement plans | Credit Cards/Installment Loan(s) (total minimum payment per month) | Stocks/Bonds |
| Tips, commissions, bonus and self-employed income | Alimony, child support payments | Other Cash on Hand |
| Rents Received | Net Rental Expenses | Other Real Estate (estimated value) |
| Unemployment Income | HOA/Condo Fees/Property Maintenance | Other _____ $ |
| Food Stamps/Welfare | Car Payments | Other _____ $ |
| Other (investment income, royalties, interest, dividends etc.) | Other _____ | Do not include the value of retirement plans when calc pension funds, annuities, IR |
| Total (Gross Income) | Total Debt/Expenses | Total Assets |

### INCOME MUST BE DOCUMENTED

[1] Include combined income and expenses from the borrower and co-borrower (if any). If you include income and expenses from a household member who is not a borrower, please specify using the back of this form if necessary.

[2] You are not required to disclose Child Support, Alimony or Separation Maintenance Income, unless you choose to have it considered by your servicer.

### INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the federal government in order to monitor compliance with federal statutes that prohibit discrimination in housing. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender or servicer may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, the lender or servicer is required to note the information on the basis of visual observation or surname if you have made this request for a loan modification in person. If you do not wish to furnish the information, please check the box below.

| BORROWER ☑ I do not wish to furnish this information | CO-BORROWER ☐ I do not wish to furnish this information |
|---|---|
| **Ethnicity:** ☐ Hispanic or Latino ☐ Not Hispanic or Latino | **Ethnicity:** ☐ Hispanic or Latino ☐ Not Hispanic or Latino |
| **Race:** ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White | **Race:** ☐ American Indian or Alaska Native ☐ Asian ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander ☐ White |
| **Sex:** ☐ Female ☐ Male | **Sex:** ☐ Female ☐ Male |

### To be completed by Interviewer

| This request was taken by: | Interviewer's Name (print or type) & ID Number | Name/Address of Interviewer's Employer |
|---|---|---|
| ☐ Face-to-face interview ☐ Mail ☐ Telephone ☐ Internet | Interviewer's Signature _____ Date _____  Interviewer's Phone Number (include area code) | |

page 2 of 4

NCCI/BM 36

**REQUEST FOR MORTGAGE ASSISTANCE (RMA): page 3**     **COMPLETE ALL FOUR PAGES OF THIS FORM**

## DODD-FRANK CERTIFICATION

The following information is requested by the federal government in accordance with the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. 111-203). **You are required to furnish this information.** The law provides that no person shall be eligible to begin receiving assistance from the Making Home Affordable Program, authorized under the Emergency Economic Stabilization Act of 2008 (12 U.S.C. 5201 et seq.), or any other mortgage assistance program authorized or funded by that Act, if such person, in connection with a mortgage or real estate transaction, has been convicted, within the last 10 years, of any one of the following: (A) felony larceny, theft, fraud, or forgery, (B) money laundering or (C) tax evasion.

I/we certify under penalty of perjury that I/we have not been convicted within the last 10 years of any one of the following in connection with a mortgage or real estate transaction:

    (a) felony larceny, theft, fraud, or forgery,
    (b) money laundering or
    (c) tax evasion.

I/we understand that the servicer, the U.S. Department of the Treasury, or their agents may investigate the accuracy of my statements by performing routine background checks, including automated searches of federal, state and county databases, to confirm that I/we have not been convicted of such crimes. I/we also understand that knowingly submitting false information may violate Federal law.

This certification is effective on the earlier of the date listed below or the date received by your servicer.

## ACKNOWLEDGEMENT AND AGREEMENT

*In making this request for consideration under the Making Home Affordable Program, I certify under penalty of perjury:*

1. That all of the information in this document is truthful and the event(s) identified on page 1 is/are the reason that I need to request a modification or forbearance of the terms of my mortgage loan, short sale or deed-in-lieu of foreclosure.

2. I understand that the Servicer, the U.S. Department of the Treasury, or their agents may investigate the accuracy of my statements, and may require me to provide supporting documentation. I also understand that knowingly submitting false information may violate Federal law.

3. I understand the Servicer will pull a current credit report on all borrowers obligated on the Note.

4. I understand that if I have intentionally defaulted on my existing mortgage, engaged in fraud or misrepresented any fact(s) in connection with this document, the Servicer may cancel any Agreement under Making Home Affordable and may pursue foreclosure on my home.

5. That I have not received a condemnation notice, there has been no change in the ownership of the Property since I signed the documents for the mortgage that I want to modify, and:

    (a) for consideration for the Home Affordable Modification Program (HAMP) or unemployment assistance, my property is owner-occupied and I intend to reside in this property for the next twelve months, or

    (b) for consideration for the Home Affordable Foreclosure Alternatives Program (HAFA), my property has been owner-occupied within the last twelve months.

6. I am willing to provide all requested documents and to respond to all Servicer questions in a timely manner.

7. I understand that the Servicer will use the information in this document to evaluate my eligibility for a loan modification or forbearance or short sale or deed-in-lieu of foreclosure, but the Servicer is not obligated to offer me assistance based solely on the statements in this document.

8. I am willing to commit to credit counseling if it is determined that my financial hardship is related to excessive debt.

9. I understand that the Servicer will collect and record personal information, including, but not limited to, my name, address, telephone number, Social Security Number, credit score, income, payment history, government monitoring information, and information about account balances and activity. I understand and consent to the disclosure of my personal information and the terms of any Making Home Affordable Agreement by Servicer to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Homeowner Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that ... in connection with Making Home Affordable; and (e) any HUD-certified housing counselor.

The undersigned certify/y under penalty of perjury that all s

| | | |
|---|---|---|
| ▶ _[signature]_ | | **10.10.12** |
| Borrower Signature | Social Security Number   Date of Birth | Date |
| ▶ | | |
| Co-borrower Signature | Social Security Number   Date of Birth | Date |

*page 3 of 4*

**NCCI/BM 37**

**REQUEST FOR MORTGAGE ASSISTANCE (RMA) - page 4**     **COMPLETE ALL FOUR PAGES OF THIS FORM**

### HOMEOWNER'S HOTLINE

*If you have questions about this document or the Making Home Affordable Program, please call your servicer.*

*If you have questions about the program that your servicer cannot answer or need further counseling, you can call the Homeowner's HOPE™ Hotline at 1-888-995-HOPE (4673). The Hotline can help with questions about the program and offers free HUD-certified counseling services in English and Spanish.*



### NOTICE TO BORROWERS

Be advised that by signing this document you understand that any documents and information you submit to your servicer in connection with the Making Home Affordable Program are under penalty of perjury. Any misstatement of material fact made in the completion of these documents including but not limited to misstatement regarding your occupancy in your home, hardship circumstances, and/or income, expenses, or assets will subject you to potential criminal investigation and prosecution for the following crimes: perjury, false statements, mail fraud, and wire fraud. The information contained in these documents is subject to examination and verification. Any potential misrepresentation will be referred to the appropriate law enforcement authority for investigation and prosecution. By signing this document you certify, represent and agree that: "Under penalty of perjury, all documents and information I have provided to Lender in connection with the Making Home Affordable Program, including the documents and information regarding my eligibility for the program, are true and correct."

If you are aware of fraud, waste, abuse, mismanagement or misrepresentations affiliated with the Troubled Asset Relief Program, please contact the SIGTARP Hotline by calling 1-877-SIG-2009 (toll-free), 202-622-4559 (fax), or www.sigtarp.gov and provide them with your name, our name as your servicer, your property address, loan number and reason for escalation. Mail can be sent to Hotline Office of the Special Inspector General for Troubled Asset Relief Program, 1801 L. St. NW, Washington, DC 20220.

*page 4 of 4*

**NCCI/BM 38**

8

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BOUNLAP MATMANIVONG, individually and on behalf of a class, | : : : | Civil Action No. 1:13-cv-05347 |
| Plaintiff, | : : | Judge Kennelly |
| v. | : : | **AFFIDAVIT OF MARC RIECK IN** |
| | : | **SUPPORT OF DEFENDANT NATIONAL** |
| NATIONAL CREDITORS | : | **CREDITORS CONNECTION, INC.'S** |
| CONNECTION, INC., | : | **MOTION FOR SUMMARY JUDGMENT** |
| | : | |
| Defendant. | : | |

I, Marc Rieck, declare as follows:

1.      I am making this affidavit in support of Defendant National Creditors Connection, Inc.'s ("NCCI") Motion for Summary Judgment and Separate Statement of Undisputed facts.

2.      I am over the age of 18 and have personal knowledge of all matters set forth herein and, if called as a witness, I could and would competently testify thereto.

3.      I am a Partner in and own a company called AAA Preservation and Inspections, LLC ("AAA Preservation").  Established in 2010, AAA Preservation performs Loss Mitigation Service as a vendor for NCCI and other similar companies, including competitors of NCCI, in Nevada and Illinois.

4.      AAA Preservation has been a vendor of NCCI in a six county area pf Northern, Illinois since 2010.  AAA Preservation's personnel who perform a Loss Mitigation Service for NCCI are referred to as field representatives.

5.      AAA Preservation retains, on average, 3 to 6 individuals, including myself, to perform Loss Mitigation Service.

6.      I personally perform, conduct, and engage in Loss Mitigation Service for NCCI and other companies on a day to day basis, and have been doing so for over 4 years.

1

7. Based on my personal experience, Loss Mitigation Service entails picking up documents, packaging and placing the documents in a required order, and shipping the documents.

8. When I receive a Loss Mitigation Service assignment from NCCI, I will attempt to schedule a date and time to pick up, package and deliver loss mitigation documents with the loss mitigation individual.

9. When engaging in a pick up visit, I do not enter the loss mitigation individual's home, even if I am invited to enter the home, because the purpose of my visit is to only collect, pick up, and deliver documents.

10. At the onset of the pick up visit, I will verify the person is the loss mitigation individual, confirm receipt of the package from the bank, and confirm interest in the loan modification program.

11. If I am not able to make contact with the loss mitigation individual during a pick up visit, but I make contact with a third party, then I leave an Unauthenticated Contact Letter in sealed envelope, marked personal and confidential, and I depart the premises. I do not leave the Unauthenticated Letter if no contact is made with anyone.

12. If I confirm contact has been made with the loss mitigation individual, but he or she is not interested or shows any sign of negativity at any point during a pick up visit, I do not pressure him or her in any way. I simply end the visit, leave an Opt-Out Letter, depart the premises, and I do not make any further visits.

13. If the loss mitigation individual is interested during the pick up visit, I will review the documents filled out by the loss mitigation individual only to confirm that the documents are filled out and signed by the loss mitigation individual. I do not review the information provided by the loss mitigation individual for accuracy, nor do I validate the truthfullness of the information filled out by the loss mitigation in any way. I simply review to see if all information is filled out and signed by the loss mitigation individual.

14.     If the loss mitigation individual choses to submit documents at the time of my pick up visit, I will reference an inventory checklist only to identify that the required documents for a complete loss mitigation package have been provided by the loss mitigation individual. I do not review or analyze the contents of the documents provided by the loss mitigation individual.

15.     If the loss mitigation package is complete, I will place all documents in a required order per the inventory checklist, then have the loss mitigation individual place the completed loss mitigation package into a FedEx envelope and seal it.

16.     I will then take the sealed FedEx envelope to the nearest shipping or mailing location for delivery to the financial institution, for example, Bank of America.

17.     After I send off completed loss mitigation package to the financial institution, I have no further loss mitigation contact or communication with any loss mitigation individual unless I am sent out for Loss Mitigation Service to pick up and deliver mortgage modification documentation again.

18.     If the loss mitigation package is incomplete, a subsequent visit(s) for the same Loss Mitigation Service may be required to pick up additional documents to complete the loss mitigation package, and I will try to set up a date and time to pick up the additional documents. Throughout the mortgage modification process, multiple pick ups and deliveries may be necessary and required to complete the process.

19.     If the loss mitigation package is incomplete and it is my third pick up visit with the loss mitigation individual, I will leave the Incomplete Document Letter in a sealed envelope with the loss mitigation individual and depart the premises.

20.     If a loss mitigation individual has any questions at any point in time during any pick up visit regarding loss mitigation or any matter related to his or her mortgage, I simply state that I am not authorized to discuss the matter with the loss mitigation individual and I state that all questions should be referred to the financial institution.

3

21.     Within 24 hours, I complete the Field Interview/Inspection Worksheet and submit the information into NCCI's portal to show and confirm that loss mitigation contact was actually made with the loss mitigation individual. Competitors of NCCI have similar worksheets and documents that I submit.

22.     I personally performed a Loss Mitigation Service at 1167 Sebring Drive, Elgin, Illinois with Plaintiff Bounlap Matmanivong's ("Plaintiff") in August of 2011 and October 2012 consistent with the Loss Mitigation Service process described above.

23.     On August 29, 2011, I conducted a Loss Mitigation Service at Plaintiff's residence at 1167 Sebring Drive, Elgin, Illinois regarding his mortgage modification package by picking up documents, packaging the documents in a required order, and sending the documents to the bank.

24.     On October 10, 2012, I attempted to conduct a Loss Mitigation Service with Plaintiff at 1167 Sebring Drive, Elgin, Illinois regarding his mortgage modification package, but was unsuccessful.

25.     On October 15, 2012, I went back to Plaintiff's residence at 1167 Sebring Drive, Elgin, Illinois and successfully picked up documents, packaged documents, and sent the documents to the bank.

26.     I did not collect or receive payment on any debt from Plaintiff in 2011 or 2012.

27.     I did not attempt to collect payment or seek payment of any debt from Plaintiff in 2011 or 2012.

28.     I did not direct or induce payment submission of money on any debt or attempt to direct or induce payment submission of money on any debt from Plaintiff in 2011 or 2012.

29.     I did not discuss or attempt to discuss payment, payment options, payment plans, repayment options, or foreclosure options with Plaintiff in 2011 or 2012.

30.     I did not analyze information regarding Plaintiff's financial status for a mortgage modification in 2011 or 2012.

31.     I did not conduct a comprehensive interview of Plaintiff to assess, analyze, or determine financial status for a mortgage modification or mortgage modification qualifications in 2011 or 2012.   The only questions I asked were questions on the Field Interview/Inspection Worksheet to confirm and demonstrate that a loss mitigation contact was actually made with Plaintiff.

32.     I did not conduct any assessment, take part in any assessment, or influence any assessment of Plaintiff's qualifications for a mortgage modification in 2011 or 2012.

33.     I did not determine, take part in the determination, or influence the determination, concerning Plaintiff's qualification for a mortgage modification in 2011 or 2012.

34.     I did not discuss or consult with NCCI or the bank on next steps if Plaintiff was declined a mortgage modification in 2011 or 2012.

35.     I did not discuss or consult with NCCI or the bank on the collection process if Plaintiff was declined a mortgage modification in 2011 or 2012.

36.     In August 2011 and October 2012, I only collected and picked up mortgage modification documents from Plaintiff, packaged the documents in an certain order, and shipped the documents to the bank.

I declare under penalty of perjury according to the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of July 2014, at Henderson, NV.

Marc Rieck

5

9

LEXSEE

**JASON SENNE, on behalf of himself and all others similarly situated, Plaintiff, vs. VILLAGE OF PALATINE, Defendant.**

**Case No. 10 C 5434**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2013 U.S. Dist. LEXIS 168677**

**November 27, 2013, Decided**
**November 27, 2013, Filed**

**PRIOR HISTORY:** Senne v. Vill. of Palatine, 695 F.3d 597, 2012 U.S. App. LEXIS 16328 (7th Cir. Ill., 2012)

**CORE TERMS:** ticket, personal information, disclosure, parking tickets, driver, printed, windshield, disclose, height, motor vehicle, summary judgment, placement, inclusion, recipient, clerk, commander, date of birth, plain view, actually used, gender, void, buy, driver's license, license number, face down, identification, license, finance, bulk, sex

**COUNSEL:** [*1] For Jason M Senne, Plaintiff: Martin Joseph Murphy, Martin J. Murphy, Attorney at Law, Long Grove, IL.

For Village Palatine, Defendant: James Roland Griffin, LEAD ATTORNEY, Patrick Thomas Brankin, Robert C. Kenny, Schain, Burney, Banks & Kenny, Ltd., Chicago, IL; Paul Alan Rettberg, LEAD ATTORNEY, Brandon K Lemley, Querrey & Harrow, Ltd., Chicago, IL; William Charles Barasha, LEAD ATTORNEY, Michael E. Kujawa, Judge, James & Kujawa, Ltd., Park Ridge, IL; Andrew G. Witik, Judge, James & Kujawa, LLC, Park Ridge, IL.

**JUDGES:** MATTHEW F. KENNELLY, United States District Judge.

**OPINION BY:** MATTHEW F. KENNELLY

**OPINION**

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Jason Senne has sued the Village of Palatine, alleging that its practice of printing on parking tickets personal information obtained from motor vehicle records violates the Driver's Privacy Protection Act (DPPA), 18 U.S.C. § 2721. The Village has moved for summary judgment. For the reasons stated below, the Court grants the Village's motion.

**Background**

On the night of August 19, 2010, Jason Senne parked his car in front of his house on East Heron Drive in Palatine, Illinois. The next morning, he noticed a parking ticket underneath one of his car's [*2] windshield wipers. The ticket, for $20, had been placed there at 1:35 A.M. the night before and was signed by Officer Joseph Christians. It said Senne had violated Section 18.86 of the Palatine Code of Ordinances, which prohibits parking for longer than fifteen minutes between 1:00 a.m. and 6:00 a.m. Printed on the ticket were Senne's name, driver's license number, date of birth, sex, height and weight, and license plate number. The ticket also listed for Senne an address other than the one where he resided. The parties dispute whether it should be considered "Senne's address." Senne testified in a deposition that the house at that address once belonged to his mother.

Christians testified during his deposition that he placed the ticket face down under one of the windshield wipers on Senne's car. The Village contends that some of the information on the ticket was obscured, including Senne's birthdate, operator license number, height, and

**Page 1**

2013 U.S. Dist. LEXIS 168677, *2

weight. Senne responds that this is only because the versions of the ticket that are in evidence are faded and of poor quality.

About one week after receiving the ticket, Senne filed suit in this Court under the DPPA. He alleged in his complaint that [*3] the Village "is knowingly obtaining, disclosing, and using personal information for an unpermitted purpose"--the distribution of personal information by placing it on parking tickets such as Senne's. Compl. at 7. Senne sought certification of the case as a class action on behalf of "[e]ach and every individual who received a parking citation in the Village of Palatine" during the previous four years, if the citation included the individual's personal information. *Id.*

On September 1, 2011, the Village moved to dismiss Senne's case for failure to state a claim. The Village argued first that the DPPA did not apply to its placement of personal information on parking tickets, because the placement fell under one of the "permissible uses" outlined in 18 U.S.C. § 2721(b). Senne responded that the Village's actions did not qualify for any of the exceptions listed in section 2721(b).

On September 22, 2010, this Court granted the Village's motion to dismiss. The Court concluded that the Village had not disclosed personal information within the meaning of the DPPA, because it had not turned over the information to anyone. In July 2011, a panel of the Seventh Circuit affirmed this Court's decision. [*4] The Seventh Circuit later vacated the panel's decision and granted an *en banc* rehearing. In August 2012, the Seventh Circuit reversed this Court's decision on the motion to dismiss. See *Senne v. Village of Palatine*, 695 F.3d 597 (7th Cir. 2012).

The Seventh Circuit first held that the Village's placement of the parking ticket on Senne's windshield constituted a "disclosure" for purposes of 18 U.S.C. § 2721. Because the statute does not allow a DMV to "knowingly disclose *or otherwise make available*" protected personal information, the court stated, there is "little doubt about the breadth of the transactions Congress intended to regulate." *Id.* at 602 (emphasis added). The court concluded that, given the sweep of the statute's language in its references to "disclosure," Congress intended the Village's action to fall within the reach of the statute. *Id.* at 602-03. The Seventh Circuit also addressed the Village's argument that the placement of the ticket was not a "disclosure" because no other

than Senne saw the ticket. The court disagreed, citing the "broad language employed by Congress" in section 2721, as well as the fact that the statute by default prohibits sharing of the information [*5] on the ticket, with a limited number of exceptions. The court stated:

> [t]he action alleged here, placing the information on the windshield of the vehicle in plain view on a public way, is certainly sufficient to come within the activity regulated by the statute regardless of whether another person viewed the information or whether law enforcement intended it to be viewed only by Mr. Senne himself.

*Id.* at 603. To hold otherwise, the court said, would be to "misunderstand[ ] the textual scheme that Congress has forged." *Id.*

Having held that the Village's placement of the ticket on Senne's car constituted a disclosure, the court then turned to whether the disclosure fell within the permissible uses of personal information under section 2721(b), as the Village contended. The court noted that the Village had not "describe[d] in any length how all the information printed on the ticket served either purpose; instead, it maintains, in effect, that the statute does not require that analysis." *Id.* at 605. The court rejected this position. It noted that each of the cited exceptions under section 2721(b) includes the phrase "[f]or use" and stated that these words "perform a critical function in the [*6] statute and contain the necessary limiting principle that preserves the force of the general prohibition while permitting the disclosures compatible with that prohibition." *Id.* at 606. Therefore, "the actual information disclosed--i.e., the disclosure as it existed in fact--must be information that is *used* for the identified purpose." *Id.* In addition, "[t]he disclosure actually made under the exception must be compatible with the purpose of the exception." *Id.* To reemphasize this point, the court said that in light of Congress's stated concern with privacy and security issue, "the disclosed information actually must be used for the purpose stated in the exception." *Id.* at 609. The court added, however, that it did not construe "use" in the statute "to mean 'necessary use,' nor do we require the Village to adopt some form of 'best practices' not commanded by the statute." *Id.* at 606 n.12.

2013 U.S. Dist. LEXIS 168677, *6

The Seventh Circuit went on to conclude that whether the Village's uses of the information actually complied with § 2721(b) could not be resolved on review of a motion to dismiss and that "[f]urther proceedings will permit the parties to explore this question." *Id.* at 608. The court added, however, that [*7] "[w]ith respect to some of that information [on Senne's ticket], it is difficult to conceive, even on a theoretical level, how such information could play a role in the excepted law enforcement purposes." *Id.*

The Village filed the present motion for summary judgment on August 5, 2013.

## Discussion

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, a court must "constru[e] all facts and draw[ ] reasonable inferences in the light most favorable to . . . the non-moving party." *Mullin v. Temco Machinery, Inc.*, 732 F.3d 772, 776 (7th Cir. 2013). "To determine whether genuine issues of material fact exist, we ask if 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 449 (7th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

The Village has moved for summary judgment against Senne, arguing first that its "use" of the information [*8] it printed on Senne's parking ticket was permissible under 18 U.S.C. §§ 2721(b)(1), (b)(2), and (b)(4), citing the testimony of its police chief to describe a variety of ways the Village uses the information. Second, the Village contends that it did not "disclose" the information for two reasons: the ticket was placed face down on Senne's car underneath his wiper blade and thus its information was not disclosed to anyone, and some of the information on the ticket was obscured and also was not disclosed for that reason.

Senne responds that the Village forfeited its right to raise "new" issues in support of its motion. He also contends that the Village's arguments about section 2721(b) are irrelevant, because his suit is filed under section 2721(c), and the issuing officer and his department's finance department do not "use" the information printed on the ticket. Finally, Senne argues that the Seventh Circuit already rejected the Village's arguments that it did not disclose the information for the purposes of the DPPA.

### 1. Forfeiture

Senne argues that the Village makes "new claims" to support its motion that "were not developed timely [sic] and are, waived [sic]." Pl.'s Resp. at 14. Specifically, [*9] he contends that the Village "could have, but failed to, raise" several of the arguments in its brief at the motion to dismiss phase, including during appeals to the Seventh Circuit and Supreme Court. *Id.* at 3.

This argument does not pass the straight-face test. Senne cites no case holding that a party forfeits an argument at summary judgment if it does not make the argument as part of a motion to dismiss. Furthermore, the Seventh Circuit directly suggested that the parties further develop the facts on the questions presented here. *See Senne*, 695 F.3d at 608.

### 2. Disclosure

The Village advances two reasons why its inclusion of drivers' personal information on parking tickets did not constitute a disclosure under the DPPA. First, it contends that the information on the ticket on Senne's windshield was not "in plain view," a point the Seventh Circuit had referenced. *See Senne*, 695 F.3d at 603 ("The action alleged here, placing the information on the windshield of the vehicle in plain view on a public way, is certainly sufficient to come within the activity regulated by the statute . . . ."). Because the ticket was face down on Senne's windshield, the Village says, the information on the [*10] ticket was not in plain view and therefore not "made available" to the public. Def.'s Mem. at 11-13. Though the Village concedes that passers-by could have lifted the ticket off the car to read it, this, the Village argues, would constitute criminal theft or tampering with a motor vehicle. In response, Senne argues that the Seventh Circuit already decided this question when it determined that the Village disclosed his personal information in the manner regulated by the DPPA. He argues that "it is the act of leaving the information on an unattended vehicle which makes it available and not whether the information can be read without exerting some effort." Pl.'s Resp. at 10.

**Page 3**

The Court agrees with Senne. The Seventh Circuit did not rest its conclusion that the Village had disclosed Senne's information solely on the fact that the information was "in plain view." Rather, the court considered and rejected essentially the same argument the Village makes now: it did not disclose Senne's information because no one else saw it. The court stated:

> First, such an interpretation ignores the broad language employed by Congress to define and regulate disclosures. Second, such a reading turns the statutory [*11] structure on its head. The default rule of the statute is that the DMV, and any person or entity authorized to view its records, is *prohibited* from sharing the information. The statute then *authorizes* specific disclosures--each of which, as we shortly shall examine, has a limited object and a limited class of recipients. *See* 18 U.S.C. § 2721(b). To suggest that the meaning of the term "disclose" is so limited as to take the act of *publication* of protected information outside the statute's reach because no specific recipient is proven simply misunderstands the textual scheme that Congress has forged.

*Senne*, 695 F.3d at 603. More to the point, the court stated that "it is clear that Congress intended to include within the statute's reach *the kind of publication* of information that occurred here, namely, the placement of the printed citation on Mr. Senne's windshield." *Id.* (emphasis added).

The same reasoning applies here. The simple act of placing a ticket face down on a windshield, rather than face up, is still a publication of the information and does not render it unavailable to the public. The ticket was still there in public view, with its information available to anyone who chose [*12] to pick it up. The fact that picking up the ticket might violate the law does not alter the fact that Village disclosed the information on the ticket within the meaning of the DPPA.

The Village's second argument is that it did not disclose "any 'personal information' because, other than Senne's name and gender, the remainder of Senne's 'personal information' was either incorrect or illegible." *Id.* at 14. With regard to the information that it argues

was legible--Senne's name and gender--the Village says the inclusion of such information on parking tickets "is incredibly common" in Illinois. *Id.* at 15. It further contends that Illinois Supreme Court Rule 572 requires tickets to include a person's name in order to be adjudicated and that Senne's gender was "obvious from his name alone." *Id.* Senne responds that a disclosure need not include all of the personal information named in the DPPA to violate the statute, and that any legible disclosures still constitute a violation.

The Village's claim of illegibility is not entirely accurate. It argues that "much of [Senne's] operator's license number, his date of birth and his height and weight" are "obscured and illegible" on the ticket. Def.'s [*13] Mem. at 14. The Village is correct that the height and weight figures are hard to read, but Senne's driver's license number and date of birth can be discerned with minimal effort. *See* Def.'s Ex. J (color copy of ticket). Further, the Village plainly concedes that at least some of the legible data on the ticket is personal information as the DPPA defines it. It admits that Senne's name could be read, and a person's name, along with his driver's license number, is "personal information" as defined in 18 U.S.C. § 2725(3).[1] The Village at no point argues that to violate the DPPA, a disclosure must include *all* of the types of personal information listed in section 2725(3). And although the Village argues that it is "incredibly common" in Illinois to "includ[e] so-called 'personal information' on parking tickets," Def.'s Mem. at 14-15, that does not excuse it from compliance with the DPPA.[2]

> 1  In addressing the Village's motion to dismiss, the Seventh Circuit said that "[t]he otherwise protected information actually disclosed here included Mr. Senne's full name, address, driver's license number, date of birth, sex, height and weight." *Senne*, 695 F.3d at 608. Gender, height, and weight are not [*14] specifically listed in section 2725(3) as constituting "personal information." It is conceivable that gender , height, and weight are covered as "information that identifies an individual" under that section, but the Court need not decide that issue in order to adjudicate the Village's motion.
>
> 2  The same is true of the Village's argument that Illinois Supreme Court Rule 572 mandates inclusion of personal information on a ticket. Rather, the Rule says only that a document charging an ordinance violation must include the

defendant's name and address and that a citation or ticket may be used as the charging document.

**3. Permissible use**

The Village argues that its practice regarding parking tickets does not run afoul of the DPPA because the information it prints on tickets "is actually used" for a variety of approved purposes under 18 U.S.C. § 2721(b). Def.'s Mem. at 4-6. The Village describes each of these purposes briefly, some in ways that do not immediately make clear that the information is "used" for the stated purpose, and others in more detail. In response, Senne contends that his suit against the Village is based on section 2721(c), not section 2721(b), and he says the Village has [*15] made no argument that its practices comply with section (c). Senne also argues that the uses the Village describes do not explain why the information is printed on parking tickets and that the officers who issue the tickets and the finance clerks who process them do not actually use the information printed on the ticket for any purpose.

Senne may be technically correct that his claim falls under section 2721(c), but that does not alter the outcome. Section 2721(a), the DPPA's baseline prohibition against distributing personal information, applies only to "[a] State department of motor vehicles" along with its officers, employees, and contractors. A DMV may not release such information "except as provided in subsection (b) of this section." 18 U.S.C. § 2721(a)(1). The Palatine police, by contrast, are more likely subject to section 2721(c), which governs the "[r]esale or [r]edisclosure" of personal information by "authorized recipient[s]." Id. § 2721(c). However, Senne's contention that his claim is not subject to section 2721(b) is incorrect. Under subsection (c), a resale or redisclosure of personal information is permitted "only for a use permitted under subsection (b)." By those [*16] terms, it is necessary to refer to the exceptions in subsection (b) to determine whether someone who rediscloses information has violated the DPPA.[3] The Court therefore will consider whether the uses the Village has listed comply with the permissible uses listed in section 2721(b).

3  In response to the Village's motion, Senne also refers to the requirement in section 2721(c) that authorized recipients of personal information who redisclose such information "must keep for a period of 5 years records identifying each person or entity that receives information and the

permitted purpose for which the information will be used and must make such records available to the motor vehicle department upon request." 18 U.S.C. §2721(c). Senne does not directly allege, however, that the Village failed to keep such information, nor was any such allegation included in his complaint. Furthermore, the DPPA does not appear to authorize an individual to file a civil action for breach of the statute's record-keeping requirement. Under 18 U.S.C. § 2724(a), liability applies only to one who knowingly obtains, discloses or uses personal information from a motor vehicle record.

Under subsection (b), personal [*17] information "may be disclosed" if the disclosure falls under one of fourteen different permissible uses. See Maracich v. Spears, 133 S. Ct. 2191, 2199, 186 L. Ed. 2d 275 (2013). The Village cites three of these. The first is (b)(1): "use by any government agency, including any court or law enforcement agency, in carrying out its functions." Under (b)(2), disclosure is permitted "[f]or use in connection with matters of motor vehicle or driver safety and theft," among other motor vehicle-related purposes. Finally, under (b)(4), disclosure is allowed "[f]or use in connection with any civil, criminal, administrative, or arbitral proceeding in any Federal, State, or local court or agency . . . including the service of process," among other purposes.

As the Court has indicated, in its earlier decision in this case, the Seventh Circuit ruled that "the actual information disclosed--i.e., the disclosure as it existed in fact--must be information that is *used* for the identified purpose" as set forth in section 2721(b). Senne, 695 F.3d at 606. In addition, "[t]he disclosure actually made under the exception [in § 2721(b)] must be compatible with the purpose of the exception." Id. "When a particular piece of disclosed [*18] information is not *used* to effectuate that purpose in any way, the exception provides no protection for the disclosing party." Id.

To support its argument that it actually uses the personal information on its parking tickets to carry out its functions, the Village points to the deposition testimony of John Koziol, the Village's chief of police. Koziol identified more than a dozen "law enforcement purpose[s]" for the inclusion of personal information on parking tickets. See Def.'s Ex. D at 36-50. Some of these purposes, in Koziol's telling, indicate that the personal

2013 U.S. Dist. LEXIS 168677, *18

information in question is useful to the police department, but not that its *inclusion on the ticket* is itself useful. For example, he testified that when officers "run this information"--i.e., learn who a driver is and where she lives by entering her license plate number into a data system--they can determine whether a car they encounter is stolen, or that the owner lives at a protected address, or that police have issued a "BOLO" (be on the lookout) order for a particular car, such as one with a dead body in the trunk. *See id.* at 36-37. He gave similar testimony in relation to service of process, saying that the police "want [*19] to make sure that we're properly serving someone." *Id.* at 39. These purposes might warrant obtaining the suspected vehicle owner's personal information in the first place, but they do not justify its disclosure on the parking ticket. What is at issue in this case is disclosure of personal information, not obtaining it in the first place, or using it before placing it on a ticket.

Some of the other purposes that Koziol identified suggest that including the suspected vehicle owner's information on a parking ticket has an *incidental* effect that is beneficial. Koziol testified that ticket recipients who see their information on the ticket "know that we know who they are and they're going to be held responsible . . . , so they are more likely to pay." *Id.* at 39. He said the same is true of a juvenile who receives a ticket while driving a parent's car and is inspired to pay the fine upon seeing the information on the ticket for fear that a notice of the violation will be sent to the parent. Koziol made similar comments with respect to rental car drivers and a ticket recipient who fears his credit rating will slide if he cannot prove it was he who paid the ticket. Koziol also said the information [*20] on the tickets can serve an error correction function, such as when someone buys a vehicle but the previous owner did not remove the license plates; the prior owner then receives tickets for violations incurred by the new owner. The tickets with the prior owner's information defeat the new owner's defense that he did not know the tickets were not credited to him. Koziol testified that this type of incident has happened "[a] lot of times." *Id.* at 46. None of this, however, would appear to concern use of personal information by a government agency to carry out its functions, use in connection with driver safety or theft, or use in connection with a court or administrative proceeding. *See* 18 U.S.C. § 2721(b)(1), (2) & (4). In short, the Court has a hard time seeing how these purposes identified by Koziol would establish that "the actual information disclosed . . . is *used* for the identified

purpose" as required by the Seventh Circuit's decision. *Senne*, 695 F.3d at 606.

Some of the purposes that Koziol identified do, however, indicate actual use of personal information that the Village prints on tickets. Koziol discussed how watch commanders at police stations use the information to consider [*21] whether to void tickets claimed to have been incorrectly issued to out-of-towners. A commander "operates off that complaining person's copy," and "can look and see that the address is from another area and he can determine if the guy is telling him the truth." *Id.* at 41. The commander learns that the person presenting the ticket is "probably the guy that got the ticket based on his physical description and what's on the citation." *Id.* Along with other information on the ticket, "[t]hat's all the watch commander has in front of him is that cardboard stock when someone comes in, so we find that important." *Id.* at 42. Koziol also testified that the information on the tickets serves the same identification purpose during traffic stops in which the driver has no identification but does have a parking ticket. In such cases, "many times" with non-English speakers, drivers "have a parking ticket in their glove box and hand that to you immediately because they have trouble communicating." *Id.* at 47. Then, "[t]he officer looks at that citation and he can take it back to his car, run that information to determine if the person is a licensed driver and that kind of a thing." *Id.* Koziol also said [*22] the information helps drivers when an officer issues a ticket to the wrong person. "They come in here and say I got this citation, I was there but this is not me," Koziol testified. *Id.* at 44. "[W]hen someone is that decent to come in--and they do it quite often--we automatically void the ticket out." *Id.*

Senne argues that the Village's stated uses for including the personal information on the tickets are "speculative," "uncorroborated," and otherwise inadequate. Pl.'s Resp. at 8; *see also* Pl.'s Resp. to Def.'s LR 56.1 Stat ¶¶ 42-55. He also argues that the Village did not use Senne's particular personal information for any of the stated purposes. Senne also opines, without citing evidence, that "[c]learly, the purpose of the envelope copy of the ticket being left on the car is to inform the vehicle's operator that they have violated an ordinance and that the vehicle owner may be financially indebted to the Village." *Id.* at 9. Senne further argues that Christians, the officer who issued the ticket, "didn't need or use the information printed on the envelope copy for anything."

**Page 6**

2013 U.S. Dist. LEXIS 168677, *22

*Id.* He also contends the same is true with "the clerks in the finance department," who merely use the ticket [*23] number from a parking ticket and not the personal information printed on it. *Id.* He also says "the cashier's [sic] do not look at any other information, such as address, operator license number, height, weight, or sex, written on the ticket." *Id.* Because "paid tickets" are "bundled up and sent over to records department [sic] so they can be destroyed immediately," Senne argues, "none of the information printed on the envelope copy is ever used by the issuing officer or cashier recording payment." *Id.*[4] From these factual assertions, Senne concludes that "the public does not use the information" and "Palatine never uses the personal information . . . for anything." *Id.* at 9-10.

> 4 None of these arguments in Senne's brief is supported by a citation. The Court was able to locate support for most of the arguments in Senne's <u>Local Rule 56.1</u> statement of facts. The Village is correct to observe, however, that the cited portion of the record does not support Senne's contention in his statement of facts that the Village police clerk his lawyer deposed, Mary Goluszka, was responsible for processing Senne's own ticket. *See* Def.'s Resp. to Pls.'s <u>LR 56.1</u> Stat. ¶ 15 (plaintiff's statement that "Mary [*24] Goluszka did not input Senne's driver's operator license number, date of birth, height, weight, or sex into the database, because she does not use that information" (citing Pl.'s Ex. A at 19:4-13, 40:1-43:4, Pl.'s Ex. A-5)).

Senne's contention that the Village's issuing officers, finance clerks, and cashiers do not use the information on the tickets is non-responsive to the Village's contention that other police officers use the information in a variety of ways. His contention therefore does not indicate the existence of a genuine issue of material fact. Indeed, the Village does not dispute Senne's factual statements about the processing of paid tickets by clerks in the police department. And even if Senne is correct that paid tickets are destroyed, that does not implicate any of the *unpaid* tickets that the Village contends are used for identification purposes during traffic stops, or when a watch commander voids a ticket for an out-of-town resident.

Nonetheless, Senne's arguments bring to the fore a basic question about exactly what is required for one who

discloses personal information covered by the DPPA to establish that its disclosure was permissible under <u>section 2721(b)</u>. The Seventh [*25] Circuit's decision, though it rejected the Village's arguments for purposes of its motion to dismiss, is less than clear regarding how a court should go about determining whether the disclosed information is actually used for the purpose stated in the statutory exception. *See <u>Senne, 695 F.3d at 609</u>*. For example, does a court evaluate the use of the information on a case-by-case basis, to see if the use in a given situation was warranted--or is a general policy justifying the use enough? Does <u>section 2721(b)</u> require proof that the information is *always* used for the identified purpose? Is it enough that it is sometimes used for that purpose? Or is the possibility of use for the particular purpose sufficient? Further, does the party claimed to have disclosed personal information have to establish that a permissible purpose motivated the disclosure in the first place, or is an after-the-fact justification or an incidental use sufficient?

The Court believes that the correct reading is that the *ultimate* or *potential* use of personal information qualifies as acceptable use under the DPPA if it is for a permissible purpose listed in <u>section 2721(b)</u>. As the Seventh Circuit has noted, "the DPPA [*26] as a whole . . . is concerned with the *ultimate* use or uses to which personal information contained in motor vehicle records is put." *<u>Graczyk v. West Publ'g Co., 660 F.3d 275, 279 (7th Cir. 2011)</u>* (emphasis added). In *Graczyk*, the plaintiffs alleged that West Publishing's resale of personal information to the public was not a permissible use under <u>section 2721(b)</u>, and that the DPPA requires that "the person requesting the records must have an immediate permissible use for them." *Id.* But because neither side denied that each "ultimate user" of the information had a permissible use under <u>section 2721(b)</u>, West was permitted to "obtain and store DMV records in bulk" so that it might later sell records to those with permissible uses. *Id.* In other words, the proper use was not required to be immediate or certain, and to determine otherwise "would undermine the statute's countervailing purpose, which is to allow legitimate users to access the records." <u>*Id.* at 280</u>.

Several courts have made similar conclusions when dealing with sales of personal information that a vendor has obtained from a state. In *<u>Taylor v. Acxiom Corp., 612 F.3d 325, 334 (5th Cir. 2010)</u>*, the plaintiffs claimed that a vendor's [*27] purchase of "the records in bulk with an

expectation and purpose of valid potential use is not a permissible use under the DPPA." The court held "that when a person obtains motor vehicle records in bulk for one of the permissible uses listed in 18 U.S.C. § 2721(b), and does not actually use, or intend to use, any of the information in a manner prohibited by section 2721(b), then that person does not" violate the statute. *Id.* at 337. To illustrate its reasoning, the Fifth Circuit observed that "[a] lawyer will never read all the opinions in all 1,000 volumes of Federal Second (and may likely never read anything in at least a few of the volumes). But he or she still buys the reporter set for the purpose of legal research." *Id.* Other circuits have likewise decided that such bulk purchasers of driver information do not violate the DPPA even though they may not specifically use each piece of information they buy. *See Cook v. ACS State & Local Solutions, Inc.,* 663 F.3d 989, 995 (8th Cir. 2011) ("[N]o language in the statute requires immediate use; the DPPA only requires that the information be obtained for a permissible purpose. Indeed, there is no suggestion of a temporal limit anywhere [*28] in the DPPA."); *Howard v. Criminal Info. Servs., Inc.,* 654 F.3d 887, 892 (9th Cir. 2011) ("The DPPA does not contain a temporal requirement for when the information obtained must be used for the permitted purpose. Nor is there a requirement that once the information is obtained for a permitted purpose that it actually be used at all.").

Another district court may have put it best when it determined that obtaining personal information for potential future acceptable use is acceptable under the DPPA: "A person buys an umbrella for use in the rain, even if the person is fortunate enough never to actually use it. A homeowner buys a fire extinguisher for use in a fire, even if there is no fire." *Welch v. Jones,* 770 F. Supp. 2d 1253, 1259 (N.D. Fla. 2011). The court further noted that "[h]ad Congress intended § 2721(b) to require actual use--rather than only a purpose to use when appropriate--it could have said so." *Id.*

This reasoning applies equally to this case. The Village does not contend that the personal information that was included on the parking ticket issued to Senne was actually used for the error correction or identification-related purposes that Koziol identified. And although it [*29] is conceivable that one of the incidental purposes that Koziol identified--the proposition that putting a person's name and identifying information on a ticket makes it more likely the person will pay--would apply in Senne's particular situation, that is less than

clear. The Village's primary justifications, however, are not ticket-specific. Rather, the Village essentially contends because personal information is useful, and actually used, in some situations involving parking tickets, its disclosure on all parking tickets is justified. When Senne contends that the Village's stated justifications are speculative, what he appears to mean is that they don't necessarily apply in any given situation, and there is no way of telling in advance the situations in which they actually will apply. Senne does not offer, however, any evidence that the Village officers do *not* sometimes use personal information printed on parking tickets to identify people driving without licenses, or that watch commanders do not use the ticket to identify its bearer and then void it.

The Court concludes that the justifications that the Village offers for its disclosure of DPPA-protected personal information are sufficient [*30] under subsection 2721(b)(1), though not under the other subsections the Village cites. As the Court has indicated, the Village has offered uncontradicted evidence that in some situations, it uses the personal information that it discloses on parking tickets to void erroneously issued tickets and to help identify drivers lacking other identification. Not all of the personal information disclosed on parking tickets in Palatine may be absolutely necessary for this purpose, but the Seventh Circuit's earlier decision in this case makes it clear that to be permissible, a use of protected information need not be "necessary" or a "best practice[ ]." *Senne,* 695 F.3d at 606 n.12. In line with that statement and those of other courts that have confronted similar issues, the Court is persuaded that the Village's potential or ultimate uses of personal information as described above are for uses by a government agency in carrying out its functions under section 2721(b)(1), and [*31] are thus in compliance with the DPPA. Those purposes justify the inclusion of personal information on parking tickets, irrespective of whether that information is actually used for those purposes in a given particular situation.

## Conclusion

For the foregoing reasons, the Court grants defendant Village of Palatine's motion for summary judgment [docket no. 112] and directs the Clerk to enter judgment in favor of the defendant. Plaintiff's motion for class certification is terminated as moot [docket no. 91].

/s/ Matthew F. Kennelly

**10**

LEXSEE

**PENNSYLVANIA CHIROPRACTIC ASSOCIATION, et al., Plaintiffs, vs. BLUE CROSS BLUE SHIELD ASSOCIATION, et al., Defendants.**

**Case No. 09 C 5619**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2013 U.S. Dist. LEXIS 159491**

**November 7, 2013, Decided
November 7, 2013, Filed**

**SUBSEQUENT HISTORY:** Summary judgment granted by Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n, 2013 U.S. Dist. LEXIS 159496 (N.D. Ill., Nov. 7, 2013)

**PRIOR HISTORY:** Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n, 2013 U.S. Dist. LEXIS 159331 (N.D. Ill., Nov. 7, 2013)

**CORE TERMS:** provider, patient, beneficiary, summary judgment, notice, faq, appeal rights, non-covered, deposition, recoupment, repayment, entity, fiduciary, permission, fact finder, administrator, overpayment, responded, arbitrary and capricious, chiropractor, recoup, manual, doctors, reply, capitation, health care providers, equitable relief, denial of benefits, anti-assignment

**COUNSEL:** [*1] For Pennsylvania Chiropractic Association, Plaintiff: Anthony F. Maul, D. Brian Hufford, PRO HAC VICE, Robert J. Axelrod, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, NY; Christopher M. Burke, PRO HAC VICE, ScottScott LLP, San Diego, CA; David W Stanley, PRO HAC VICE, Cuneo, Waldman & Gilbert, LLP, Washington, DC; John William Leardi, Paul Donald Werner, PRO HAC VICE, Buttaci & Leardi, LLC, Princeton, NJ; Joseph P. Guglielmo, ScottScott LLP, New York, NY; Kimberly A. Driggers, PRO HAC VICE, Brooks, LeBoeuf, Bennett, Foster & Gwartney, P.A., Tallahassee, FL; Leigh Handelman Smollar, Patrick Vincent Dahlstrom, Pomerantz Haudek Grossman & Gross LLP, Chicago, IL; Louis Carey Ludwig, Pomerantz Grossman

Hufford Dahlstrom & Gross LLP, Chicago, IL; Patrick J Sheehan, PRO HAC VICE, Whatley Drake & Kallas, Llc, Boston, MA; Vincent N Buttaci, Taylor, Colicchio & Silverman, LLP, Princeton, NJ.

For New York Chiropractic Council, Association of New Jersey Chiropractors, on their own behalf and in a representational capacity on behalf of their members and, Jay Korsen, D.C., Ian Barlow, Jeffrey P. Leri, D.C., Michelle M Askar, D.C., Mark Barnard, D.C., Barry A Wahner, D.C., Anthony Fava, [*2] D.C., David R Barber, D.C., Larry Miggins, D.C., Andrew Reno, D.C., on their own behalf and on behalf of all others similarly situated, Plaintiffs: Anthony F. Maul, D. Brian Hufford, PRO HAC VICE, Robert J. Axelrod, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, NY; Christopher M. Burke, PRO HAC VICE, ScottScott LLP, San Diego, CA; David W Stanley, PRO HAC VICE, Cuneo, Waldman & Gilbert, LLP, Washington, DC; Joseph P. Guglielmo, ScottScott LLP, New York, NY; Kimberly A. Driggers, PRO HAC VICE, Brooks, LeBoeuf, Bennett, Foster & Gwartney, P.A., Tallahassee, FL; Leigh Handelman Smollar, Patrick Vincent Dahlstrom, Pomerantz Haudek Grossman & Gross LLP, Chicago, IL; Louis Carey Ludwig, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, Chicago, IL; Patrick J Sheehan, PRO HAC VICE, Whatley Drake & Kallas, Llc, Boston, MA.

For Peri Dwyer, D.C., Florida Chiropractic Association, Katherine Hopkins, Plaintiffs: Anthony F. Maul, D. Brian Hufford, PRO HAC VICE, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, NY; Louis Carey Ludwig, Pomerantz Grossman Hufford Dahlstrom &

2013 U.S. Dist. LEXIS 159491, *2

Gross LLP, Chicago, IL; Leigh Handelman Smollar, Pomerantz Haudek Grossman & Gross LLP, Chicago, IL.

For [*3] Eric Thompson, D.C., Plaintiff: Anthony F. Maul, PRO HAC VICE, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, NY; Louis Carey Ludwig, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, Chicago, IL; Leigh Handelman Smollar, Pomerantz Haudek Grossman & Gross LLP, Chicago, IL.

For International Chiropractors Association, Brenda Tomanek, D.C., Extended Care Treatment, Inc. d/b/a/ Transitions Recovery Program, Plaintiffs: Anthony F. Maul, PRO HAC VICE, D. Brian Hufford, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, NY; Leigh Handelman Smollar, Pomerantz Haudek Grossman & Gross LLP, Chicago, IL; Louis Carey Ludwig, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, Chicago, IL.

For Blue Cross Blue Shield of Rhode Island, Defendant: Amy Graham Doehring, Bryan Matthew Webster, Christopher Mac Neil Murphy, Elizabeth Brooke Herrington, John Andrew Litwinski, Michael A. Pope, McDermott, Will & Emery LLP (Chicago), Chicago, IL; Michael M. Conway, Foley & Lardner, Chicago, IL.

For Blue Cross and Blue Shield of Georgia, Inc., Defendant: Amy Graham Doehring, Bryan Matthew Webster, John Andrew Litwinski, McDermott, Will & Emery LLP (Chicago), Chicago, IL; Martin J. Bishop, Michael [*4] M. Conway, Rebecca R. Hanson, Foley & Lardner, Chicago, IL; Michael J Tuteur, PRO HAC VICE, Foley & Lardner LLP, Boston, MA.

For Blue Cross and Blue Shield of Kansas, Defendant: Amy Graham Doehring, Bryan Matthew Webster, John Andrew Litwinski, McDermott, Will & Emery LLP (Chicago), Chicago, IL; John Louis Litchfield, Martin J. Bishop, Michael M. Conway, Rebecca R. Hanson, Foley & Lardner Llp, Chicago, IL.

For Blue Cross and Blue Shield of Kansas City, Blue Cross and Blue Shield of North Carolina, The Regence Group, Defendants: Amy Graham Doehring, Bryan Matthew Webster, John Andrew Litwinski, McDermott, Will & Emery LLP (Chicago), Chicago, IL; David J. Stetler, Mariah E Moran, Stetler, Duffy & Rotert, Ltd., Chicago, IL; Emily M Yinger, Nathaniel Thomas Connally, PRO HAC VICE, Hogan Lovells US LLP, McLean, VA; Michael M. Conway, Foley & Lardner Llp, Chicago, IL.

For Excellus Blue Cross and Blue Shield, Defendant: Michael A. Pope, LEAD ATTORNEY, Amy Graham Doehring, Bryan Matthew Webster, John Andrew Litwinski, Christopher Mac Neil Murphy, Elizabeth Brooke Herrington, McDermott, Will & Emery LLP (Chicago), Chicago, IL; Michael M. Conway, Foley & Lardner, Chicago, IL.

For Independence Blue [*5] Cross, Defendant: Charles Clark Jackson, LEAD ATTORNEY, Charis A. Runnels, Deborah S. Davidson, Kirsten Ann Milton, Michael M. Conway, Morgan Lewis & Bockius, LLP, Chicago, IL; Amy Graham Doehring, Bryan Matthew Webster, John Andrew Litwinski, McDermott, Will & Emery LLP (Chicago), Chicago, IL; Jay H. Calvert , Jr., PRO HAC VICE, Morgan, Lewis & Bockius LLP, Philadelphia, PA.

For WellPoint, Inc., Defendant: Amy Graham Doehring, Bryan Matthew Webster, John Andrew Litwinski, McDermott, Will & Emery LLP (Chicago), Chicago, IL; Martin J. Bishop, Michael M. Conway, Rebecca R. Hanson, Foley & Lardner, Chicago, IL.

For Blue Cross and Blue Shield of Michigan, Defendant: Amy Graham Doehring, Bryan Matthew Webster, John Andrew Litwinski, McDermott, Will & Emery LLP (Chicago), Chicago, IL; Joseph A. Fink, Dickinson Wright PLLC, Lansing, MI; Michael M. Conway, Foley & Lardner, Chicago, IL; Patrick B. Green, Dickinson Wright Pllc, Detroit, MI.

For Anthem Blue Cross of California, Anthem Health Plans of Virginia, Inc., Empire Blue Cross Blue Shield, Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield of Connecticut Anthem Ohio, Defendants: Michael M. Conway, LEAD ATTORNEY, Rebecca R. [*6] Hanson, Martin J. Bishop, Michael J Tuteur, Foley & Lardner, Chicago, IL; Bryan Matthew Webster, McDermott, Will & Emery LLP (Chicago), Chicago, IL.

For Miggins & Miggins, Inc., doing business as HealthSource Chiropractic of Sealttle, Washington, Third Party Defendant: Robert J. Axelrod, LEAD ATTORNEY, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, NY.

For Katherine Hopkins, Intervenor Plaintiff: D. Brian Hufford, PRO HAC VICE, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, NY.

For Tri3 Enterprises LLC, Intervenor Plaintiff: Leigh Handelman Smollar, Pomerantz Haudek Grossman & Gross LLP, Chicago, IL.

For The Regence Group, ThirdParty Plaintiff, Counter Claimant: Bryan Matthew Webster, McDermott, Will & Emery LLP (Chicago), Chicago, IL; David J. Stetler, Mariah E Moran, Stetler, Duffy & Rotert, Ltd., Chicago, IL; Emily M Yinger, Nathaniel Thomas Connally, Hogan Lovells US LLP, McLean, VA; Michael M. Conway, Foley & Lardner, Chicago, IL.

For Miggins & Miggins, Inc., Counter Defendant: Leigh Handelman Smollar, LEAD ATTORNEY, Pomerantz Haudek Grossman & Gross LLP, Chicago, IL.

For Larry Miggins, D.C., Counter Defendant: Robert J. Axelrod, LEAD ATTORNEY, Pomerantz Grossman [*7] Hufford Dahlstrom & Gross LLP, New York, NY; D. Brian Hufford, PRO HAC VICE, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, NY; David W Stanley, Cuneo, Waldman & Gilbert, LLP, Washington, DC; Joseph P. Guglielmo, ScottScott LLP, New York, NY; Kimberly A. Driggers, Brooks, LeBoeuf, Bennett, Foster & Gwartney, P.A., Tallahassee, FL; Leigh Handelman Smollar, Patrick Vincent Dahlstrom, Pomerantz Haudek Grossman & Gross LLP, Chicago, IL; Patrick J Sheehan, PRO HAC VICE, Whatley Drake & Kallas, Llc, Boston, MA.

For Miggins & Miggins, Inc., Counter Defendant: Robert J. Axelrod, LEAD ATTORNEY, Pomerantz Grossman Hufford Dahlstrom & Gross LLP, New York, NY.

**JUDGES:** MATTHEW F. KENNELLY, United States District Judge.

**OPINION BY:** MATTHEW F. KENNELLY

**OPINION**

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

The plaintiffs in this case have sued a number of Blue Cross and Blue Shield entities for violations of the Employee Retirement Income Security Act (ERISA). Defendants Anthem Health Plans of Virginia, Inc. and WellPoint, Inc. moved for summary judgment against

plaintiff Andrew Reno in May 2012. The Court denied defendants' motion in October 2012. Defendant Independence Blue Cross also moved for summary [*8] judgment against plaintiffs Mark Barnard and Barry Wahner in May 2012, and the Court likewise denied that motion. Reno has now moved for summary judgment against Anthem and WellPoint, and Barnard and Wahner have moved for summary judgment against Independence. For the reasons stated below, the Court grants both motions in part and denies both in part.

**Background**

**A. General background**

The plaintiffs in this case are chiropractors and several associations that represent chiropractors. The defendants are Blue Cross and Blue Shield of America (BCBSA) and individual Blue Cross and Blue Shield entities (BCBS entities), including WellPoint, Anthem Virginia, and Independence Blue Cross. BCBSA is a national umbrella organization that facilitates the activities of individual BCBS entities. Individual BCBS entities insure and administer health care plans for Blue Cross and Blue Shield customers (BCBS insureds) in various regions.

Plaintiffs allege that defendants improperly took money belonging to plaintiffs. They allege that they provided medical services to BCBS insureds. Defendants would initially reimburse plaintiffs for these services. Sometime afterward, plaintiffs allege, defendants would [*9] make a false or fraudulent determination that the payments had been made in error. Defendants then would demand that plaintiffs repay the supposedly overpaid amounts immediately. If plaintiffs refused to do so, defendants would forcibly recoup the amounts they sought by withholding payment on other, unrelated claims for services plaintiffs provided to other BCBS insureds.

Plaintiffs allege further that when defendants made these repayment demands, they typically did not provide adequate information regarding the reason for the demands or procedures for challenging the demands. Plaintiffs allege that defendants sometimes failed to offer any appeal process at all. When an appeal process was available, plaintiffs allege, defendants refused to provide details about which patients, claims, and plans were claimed to be the subject of overpayment or "effectively ignored" plaintiffs' appeals. Fourth Am. Compl. ¶ 18.

Plaintiffs contend that this conduct deprived them of their right to a "full and fair review" under ERISA. 29 U.S.C. § 1133.

Plaintiffs assert their ERISA claims in three counts in the fourth amended complaint. In count one, plaintiffs seek to recover the unpaid benefits they allege [*10] defendants improperly recouped. *See* Fourth Am. Compl. ¶¶ 507-17. Plaintiffs bring this claim under section 502(a)(1)(B) of ERISA, which permits a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

In counts two and four, plaintiffs request injunctive and other equitable relief under section 502(a)(3) of ERISA. *Id.* ¶¶ 518-25, 531-35. That provision authorizes a plan participant, beneficiary, or fiduciary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

Reno, Barnard, and Wahner each make nearly identical demands for relief. They request (1) return of the money the defendants recouped from them, with interest; (2) an injunction barring the defendants "from seeking to recover any further funds arising from [*11] [the] retroactive benefit denial"; and (3) equitable relief under ERISA, requiring each defendant to reform its policies "to ensure that [the plaintiffs'] rights are not again violated." Reno Mem. at 2; Barnard & Wahner Mem. at 2.

**B. Facts relating to Reno's claims**

Reno is a chiropractor in Virginia who has a contract with Anthem VA, a Virginia-based subsidiary of WellPoint, to provide medical services to participants in Anthem's health plans. During the period relevant to this litigation from 2004 to 2006, Reno provided to patients, among other services, spinal decompression treatment on a machine called the DRX-9000. Such machines fall under the category of "Vax-D" treatment, an acronym for "vertebral axial decompression." Pls.' Joint LR 56.1 Stat. ¶ 39.

In 2006, Anthem informed Reno that it was conducting a review of payments it had made to him for services he provided to twenty-four patients. In 2007, Anthem wrote to Reno stating that it had found numerous errors after examining the bills for his services. In particular, it told Reno that there were 170 claims that had no documentation, fifty-four claims for services that were not covered, four claims for services that were billed [*12] at a higher level than was supported by documentation, and 133 claims for services that had not been correctly coded. Anthem calculated from this that of the original $18,000 it had paid to Reno for these services, it had paid more than $10,000 wrongfully. Anthem extrapolated from this survey of twenty-four patients and concluded that during the period of time covered by the audit, it had overpaid Reno about $110,000 for all of his Anthem patients. Anthem demanded that Reno repay the $110,000.

Instead of paying, Reno retained legal counsel to dispute the repayment demand. He also made use of a chiropractic claims coding expert, though the parties dispute whether Anthem considered the expert's report. After Reno's counsel exchanged several letters with Anthem, Anthem reduced the amount it was demanding to $46,000. It calculated this reduced amount by waiving any claim for repayment on the coding and documentation errors and demanding repayment only for the claims that it contended were for services not covered by Anthem's policies because they were "not medically necessary." *See* Anthem & WellPoint Resp. to Pls.' LR 56.1 Stat. ¶ 47. The non-covered services involved Vax-D treatments.

Early [*13] in 2008, Reno offered to resolve the dispute by paying about $9,000. Anthem rejected that offer. Reno then offered to pay about $25,000, and Anthem accepted. Anthem characterizes this as a settlement, but Reno contends that it was calculated as the amount he had actually received for non-covered spinal decompression procedures. Reno signed a promissory note for the payment and agreed to pay the $25,000 in twenty-four monthly installments. Reno's attorney mailed the note to Anthem, including with it a letter stating that "[a] properly executed promissory note from Dr. Reno is enclosed. I'll assume this ends all matters concerning Anthem's audit of Dr. Reno's claims." Anthem & WellPoint Ex. N.

Reno made all of the payments due on the

2013 U.S. Dist. LEXIS 159491, *13

promissory note. At his deposition, Reno testified that he did not seek additional payment from any of the patients from whose services Anthem had recouped money. Thus those patients did not pay any additional amounts out of pocket because of Anthem's recoupment.

Reno's office had at least some patients fill out a chiropractic registration and history form, which included a section under an insurance heading entitled "Assignment and Release." *See, e.g.*, Anthem [*14] & WellPoint Ex. U. Patients would sign under a statement in which they agreed to "assign directly" to Reno "all insurance benefits, if any, otherwise payable to me for services rendered." *Id.* The agreement also contained this statement: "I understand that I am financially responsible for all charges whether or not paid by insurance." *Id.* Reno contends that he obtains such agreements from patients "[a]s a matter of course." Reno LR 56.1 Stat. ¶ 36. Anthem disputes this characterization, citing testimony from one Reno employee who could not remember if Reno had patients execute such agreements and from another, Bernice Castro, who testified that such agreements "were mostly used for Medicare patients." Anthem & WellPoint Ex. I at 28. [1]

> 1 Anthem does not, however, acknowledge other testimony from the same page of that deposition, where Castro testifies that an Anthem patient would be "informed that their insurance didn't cover. And if they chose to proceed, then, you know, they were willing to take responsibility for that." Ex. I at 28.

At some point during Reno's interactions with Anthem, an Anthem provider agreement was stamped with Reno's name, office address, and phone numbers. This [*15] particular copy of the agreement, which Anthem and WellPoint have provided in response to Reno's summary judgment motion, does not include a date or signature page. *See* Anthem & WellPoint Ex. N. During his deposition, Reno was asked about this document:

> Q. So I'm putting before you this huge document, which you've produced, which has been marked as Exhibit 20. I don't expect you to read the whole thing.
>
> A. I've tried.
>
> Q. But do you understand this? I

mean you've produced this. This is your provider agreement. Do you see that?

> A. Yes. Yes, it is.
>
> Q. And you see that it's a provider agreement, it's got your name at the top, HealthSource, Dr. Andrew Reno, D.C.; right?
>
> A. Yes, it does.

Anthem & WellPoint Ex. C at 151. In another exchange, Reno was asked, "And so your understanding, this is an agreement between you and Anthem Health Plans of Virginia, doing business as, Anthem Blue Cross and Blue Shield?" His response was, "Yes, it is." *Id.* at 152.

The agreement tendered by Anthem and WellPoint contains a section entitled, "What Network Providers Can Collect as Payment." Anthem & WellPoint Ex. N at RENO003622. This section states that a network provider can collect payment for non-covered medical [*16] services "only if the provider advises the member in writing before the services are rendered that the specific service to be provided will be non-covered and that the member will be responsible for payment." *Id.* The section adds that "[a] general statement that the members shall be responsible for all charges not covered by the member's insurance carrier or health maintenance organization is not sufficient." *Id.*

The parties dispute the role that WellPoint played in the administration of Reno's provider insurance claims as described above. WellPoint owns health insurance entities in fourteen states, one of which is Anthem Virginia. An investigator for Anthem named Wendy Bohannon worked on Reno's case. In addition, Anthem and WellPoint do not dispute that a WellPoint employee named Alanna Lavelle, the company's director of special investigations, reviewed the audit of Reno's insurance claims. *See* Anthem & WellPoint Resp. to Pls.' LR 56.1 Stat. ¶ 65. Anthem and WellPoint do not dispute Reno's statement that "the policies applied to Dr. Reno were uniform throughout all of the WellPoint, Inc. subsidiaries," *id.* ¶ 86, although it is unclear whether the policy applied to Reno originated with [*17] WellPoint or Anthem.

**C. Facts relating to Barnard and Wahner's claims**

2013 U.S. Dist. LEXIS 159491, *17

Wahner and Barnard are chiropractors in Pennsylvania, each with separate practices. Both became participating health care providers with Independence in 1997. Independence paid both of them for services they rendered to participants in Independence's plans.

On December 2, 2008, Independence sent letters to both Barnard and Wahner. Each letter noted that in the past eighteen months, Independence had "issued letters regarding erroneous overpayments that our records show were made to you for physical medicine and rehabilitation services included in the HMO Short Term Rehabilitation Therapy Capitation Program." Pls.' Exs. 49 and 50 at 1. Each letter said that Independence had resolved certain inquiries and that it would now "resume recovery of these overpayments." *Id.* In both cases, Independence attached charts listing patients' names, account numbers, diagnosis codes, dates of service, billed amounts, paid amounts, and estimated overpaid amounts. Independence told Barnard in the letter that the overpayment amount for his practice was less than $500, and it stated that "this letter serves as notice that within the next [*18] 30 days we will satisfy this overpayment through a retraction of the overpayment amount from your daily remittance[s] until the balance is satisfied." Pls.' Ex. 49 at 1. The letter to Barnard further stated he could contact his Network Coordinator with "any questions." *Id.* The letter to Wahner was slightly more detailed, as it offered him four options for repayment: the ability to pay in a lump sum, or in installments, or to withhold payments from his remittances over ten months, or to offset the amount against future remittances. Independence asked Wahner to contact a person named Lynada Harmon within ten business days of the date of the letter, but it warned that it would begin subtracting payments from his remittances if he did not respond within thirty days of the date of the letter.

In February 2009, Wahner faxed a proposed repayment agreement to Linda Paterson of Independence. He wrote that he "concedes under duress to pay" Independence in monthly installments until a lawsuit or the State Insurance Commissioner "determines the legality of IBC's attempted recoupment of funds." Pls.' Ex. 57 at 1. About a month later, Jill Panek of Independence responded by rejecting Wahner's proposal [*19] and also informing him that his contract with Independence forbade him from "balance billing your members" for the amounts. Pls.' Ex. 58 at 1. The letter from Panek attached an agreement for Wahner to sign, in

which he would agree to pay $340.72 a month for the next fifteen months. In none of these communications did Independence reference its appeal procedure. Wahner responded to Independence's March 2009 communication in an undated letter in which he rejected Independence's proposed contract: "I feel that agreeing to your contract is an admission on my part of errors I made in billing." Pls.' Ex. 59 at 1. In his undated letter, Wahner also referenced prior notices that Independence apparently produced to him, "two letters dated August 2007," neither of which are in evidence here. He told Independence he had seen neither letter before. *Id.* Wahner concluded by "formally requesting an appeal and or arbitration in accordance with my contract with IBC." *Id.* at 2.

In May 2009, DeeDee Fitzgerald of Independence wrote Wahner to inform him that, "[a]fter careful consideration of this appeal and all information provided, we have decided to *uphold* the decision to recover the overpayments." Pls.' [*20] Ex. 60. The letter provided a one-paragraph rationale, informing Wahner that he had treated patients under procedure codes that "are not eligible for reimbursement when submitted by a provider type that does not meet capitation criteria," and that Independence's decision was further supported by earlier communications "advising of our intended recovery effort" about the erroneous overpayment. *Id.* (Those earlier communications are not in evidence here.) Finally, the letter told Wahner he could request a "Second Level Claim Payment Appeal" within sixty days from Independence's Provider Appeal Review Board (PARB). *Id.*

Wahner did request such an appeal in September 2009. He told the PARB that he had not received notice of the recoupment before the December letter, and he asked "that when this review is to be heard, I am notified and a date is set that I may attend with any representatives I may wish to have with me." Pls.' Ex. 61 at 1-2. In April 2010, Wahner received a letter, again from Fitzgerald, informing him that "the PARB has decided to *uphold* the original claim determination." Pls.' Ex. 62. This letter also contained a one-paragraph rationale, reproducing nearly verbatim the four [*21] sentences of the original rationale, but changing the word "dispute" to "appeal," deleting the formal title of Independence's medical policy 00.03.03c, and adding "the" in the phrase "does not meet capitation criteria." *Id.* The letter also included three additional sentences. They explained that policy 00.03.03c does not allow

Page 6

"outpatient short-term rehabilitation services" to qualify "for fee-for-service reimbursement consideration," because such services are "reimbursed on a monthly basis," and because certain procedure codes were "not eligible for reimbursement when submitted by a provider type that does not meet the capitation criteria." *Id.* The rationale did not indicate anything specific about Wahner's provider type or the services he provided to his patients. The letter further informed Wahner that "[t]he PARB's decision concludes the appeal process for the aforementioned claim(s)" and thanked him for his cooperation and participation. *Id.*

One month later, Tressa Harley, another Independence employee, sent another letter, this time apologizing to Wahner for not addressing his request to attend the PARB meeting on his second-level appeal. "Because of the nature of this review, [*22] Provider participation will not assist in the decision making process," Harley wrote, "and as such, Providers do not participate." Pls.' Ex. 63. Harley added that PARB meetings were not recorded, so Independence could not give Wahner notes of the proceeding. Finally, Harley told Wahner that she was enclosing details on Independence's appeal process, and she also provided links to web versions of the process.

At some point, Independence issued a document entitled "Professional Provider Agreement" to both Barnard and Wahner. Barnard signed the execution page for the agreement on June 9, 1997; Wahner did so on June 2, 1997. Among other provisions, the agreement requires providers to "render Covered Services to Beneficiaries of the Benefit Programs and Benefit Program Agreements, in accordance with . . . grievance, appeals and other policies and procedures of the particular Benefit Program under which the Covered Medical Services, as detailed in the Provider Manual . . . are published." Independence Ex. A-23 at IBC0003160. During his deposition, Wahner testified that he signed the agreement; Barnard testified that he "had a provider agreement" with Independence "[a]t [*23] least as far as '97." Independence Ex. A at 174. Wahner also testified that he understood that the contract referred to Independence's provider manual.

The 2007 version of Independence's provider manual includes a ten-page section on appeals, which lists five different categories of appeals and outlines a "Provider Claim Payment Appeal Process." Independence Ex. E-6

at IBC0003427. Before describing the nuts and bolts of this process, the manual states that it "is available to PA and DE providers who agreed to the court-approved Class Action settlement in the consolidated cases of Gregg, et al. vs. Independence Blue Cross et al. Good [sic] vs. Independence Blue Cross, et al. and Pennsylvania Orthopaedic Society vs. Independence Blue Cross, et al." *Id.* Neither party has stated whether Barnard and Wahner were among those within this category who are covered by the described procedures. The section states that the process applies to payment disputes related to coding and claims processing issues and provides phone numbers and addresses for providers to send inquiries and appeals. Specifically, providers who disagree with a payment decision can send an appeal as well as a second-level appeal [*24] if the first appeal is denied. A 2009 version of the manual lacks the proviso about Independence's class action cases but includes similar language on the two-tier appeal process. Neither party has offered an earlier version of the manual as evidence.

The provider agreement offered by Independence also covers situations where a provider "provides a non-Covered Service to Beneficiary." Independence Ex. A-23 at IBC0003161. In these situations, the provider has to tell the beneficiary what the service is, that Independence will not pay for it, and that the beneficiary will be liable for doing so. *Id.* [2] It is undisputed that neither Wahner nor Barnard ever attempted to bill their patients to recover any of the amounts they had to repay to Independence, although they contend that they could have done so.

> 2 Independence also cites the provider manual discussed above for a similar provision, stating that providers have to get "member consent for financial responsibility from a patient" who wants to receive non-covered services. Independence LR 56.1 Stat. ¶ 8. However, the pages Independence cites for this provision are not included in the exhibit it references.

## D. The Court's October 12, 2012 [*25] ruling

On May 11, 2012, WellPoint and Anthem moved for summary judgment against Reno, and Independence moved for summary judgment against Barnard and Wahner. The Court issued a decision on October 12, 2012 denying both motions. *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n, 903 F. Supp. 2d 604 (N.D. Ill. 2012).*

To support their motion, WellPoint and Anthem argued that Reno lacked standing because his patients did not assign him ERISA appellate rights and because he had not suffered an adverse benefit determination. Defendants further argued that Reno had already "pursued a successful appeal" of Anthem's review of his billing and that he had received an "accord and satisfaction" with Anthem that had settled all issues between the parties. Anthem Mem. at 1 (docket no. 618).

The Court rejected these arguments. First, the Court observed that the defendants had apparently conceded that Reno was a beneficiary for purposes of ERISA because his patients, as plan participants, assigned him their rights to payment under their health plans. Because the plain language of ERISA provides notice and appeal rights to beneficiaries, Reno was entitled to those rights. The Court proceeded to [*26] deny summary judgment to defendants on the question of whether Reno had experienced an adverse benefit determination, because "[a] reasonable fact finder . . . could conclude that Anthem did deny specific claims involving specific patients" and because Reno could have sought to bill his patients for amounts that insurance did not cover. *Pa. Chiropractic Ass'n*, 903 F. Supp. 2d at 613-14. Finally, the Court determined that a reasonable fact finder could conclude that Reno did not receive ERISA-compliant notice and appeal and that defendants failed to show that a Virginia "accord and satisfaction" statute barred Reno's claims.

In Independence's summary judgment motion, it contended that Barnard and Wahner lacked standing on three separate grounds. First, Independence argued that the great majority of Barnard and Wahner's patients had anti-assignment provisions in their health plans, thus preventing them from assigning benefits to Barnard and Wahner and precluding the doctors from having beneficiary status. Second, Independence contended that Barnard and Wahner's patients did not suffer adverse benefit determinations, because the doctors did not bill their patients for Independence's recoupments [*27] and their provider agreements did not allow them to do so. Finally, Independence argued Barnard and Wahner lacked ERISA standing because they had not sought "Authorized Representative Status" for any Independence insured. Independence Mem. at 13 (docket no. 626).

In denying Independence's motion for summary judgment, the Court first determined that a reasonable

fact finder could conclude that Barnard and Wahner had valid assignments from at least some patients with claims relevant to the case, which would provide the doctors with status as beneficiaries. Thus Independence was not entitled to an overall grant of summary judgment, the only relief it sought. On the adverse benefit determination argument, the Court noted that although Barnard and Wahner did not bill their patients for the recouped amounts, their patients acknowledged in agreements that they were liable for amounts that their insurance plans did not pay. Furthermore, the Court observed that the cited provision of the doctors' provider agreement with Independence related only to "Covered Services," which a reasonable fact finder could determine did not apply to the services in question. Therefore, a reasonable fact finder [*28] could conclude that both Barnard and Wahner could have billed their patients for the services in question, which made Independence's repayment demands adverse benefit determinations under ERISA.

### Discussion

On a motion for summary judgment, the Court "view[s] the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653, 656 (7th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, a court may grant summary judgment "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

### A. Reno's summary judgment motion against Anthem and WellPoint

Reno contends he is entitled to summary judgment against WellPoint and Anthem because he was illegally denied ERISA notice and appeal rights and because the retroactive benefit denial was improper.

#### 1. Standing

Anthem and WellPoint argue that Reno does [*29] not have standing to sue for equitable relief in this case because he is not an ERISA beneficiary "for all purposes under Section 503." Anthem & WellPoint Resp. at 13.

2013 U.S. Dist. LEXIS 159491, *29

They also contend that a Department of Labor Frequently Asked Questions website page does not permit those providers receiving assignments of benefits from patients to sue on those patients' behalf. Reno replies that he is indeed a beneficiary for purposes of ERISA, which entitles him to full ERISA-compliant notice and appeal rights and confers standing to sue.

Under 29 U.S.C. § 1132(a)(1)(B), a participant or beneficiary of a benefits plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." In _Kennedy v. Conn. Gen. Life Ins. Co._, 924 F.2d 698 (7th Cir. 1991), the Seventh Circuit examined the question of whether an assignment of benefits to a health care provider confers status as a "beneficiary" under ERISA. The court examined the plain language of the statute, including the provision defining "beneficiary" as "a person designated by a participant, or by the terms [*30] of an employee benefit plan, who is or may become entitled to a benefit thereunder." _Id._ at 700 (quoting 29 U.S.C. § 1002(8)). In _Kennedy_, the plan participant had assigned to her chiropractor the right to her benefits. The court concluded that as a result, the chiropractor qualified as a "beneficiary." _Id._ The court confirmed its approach to the question by citing _Firestone Tire & Rubber Co. v. Bruch_, 489 U.S. 101, 117-18, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989), in which the Supreme Court held that a "participant" is "for jurisdictional purposes anyone with a colorable claim to benefits." _Kennedy_, 924 F.2d at 700. The chiropractor had a colorable claim for benefits that was not frivolous; the court therefore concluded that "§ 1132(a)(1)(B) supplies jurisdiction when a provider of medical services sues as assignee of a participant." _Id;_ _see also Central States, Se. & Sw. Areas Health & Welfare Fund v. Neurobehavioral Assocs., P.A._, 53 F.3d 172, 173 (7th Cir. 1995) ("A medical care provider who receives benefits from the fund at the behest of a participant is a beneficiary."); _Se. Decatur Memorial Hosp. v. Conn. Gen. Life Ins. Co._, 990 F.2d 925, 927 (7th Cir. 1993) ("An assignee of benefits under an ERISA plan becomes [*31] a statutory 'beneficiary' and thus may use 29 U.S.C. § 1132(a)(1)(B) to collect.").

WellPoint and Anthem concede that "Dr. Reno may have a colorable basis to receive plan benefits under Section 502(a)(1)(B)." Anthem & WellPoint Resp. at 12. But they argue that the assignments he received from his patients do not entitle him to "receiv[e] notice of an adverse benefit determination or pursu[e] an appeal of such determination" under ERISA section 503, also known as 29 U.S.C. § 1133. _Id._ WellPoint and Anthem contend, based on a Frequently Asked Questions page on the Department of Labor website, that "[a] provider may have a right to receive notice or pursue an appeal on behalf of a patient only if the patient made the provider his or her designated ERISA representative" and that Reno's patients did not give him this designation. _Id._ The FAQ contains a heading in the form of a question, asking, "Does an assignment of benefits by a claimant to a health care provider constitute the designation of an authorized representative?" _FAQs About the Benefit Claims Procedure Regulation_ at B-2, http://www.dol.gov/ebsa/faqs/faq_claims_ proc_reg.html (last visited Nov. 5, 2013). Under that heading, the [*32] FAQ notes that "[t]ypically, assignments are not a grant of authority to act on a claimant's behalf in pursuing and appealing a benefit determination under a plan." _Id._ For his part, Reno argues that the Court's ruling on this question on WellPoint and Anthem's summary judgment motion confirms that he has standing. _See Pa. Chiropractic Ass'n_, 903 F. Supp. 2d at 611-12.

In its October 2012 decision, the Court examined the plain language of sections 502 and 503. It observed that ERISA regulations define "claimants" as "participants and beneficiaries" and "expressly confer notice and appeal rights upon a person who is a 'claimant.'" _Id._ at 611 (citing 29 C.F.R. § 2560.503-1(g) & (h)). The Court also noted that "the language of ERISA itself defines a beneficiary as a person 'who is or may be entitled to a benefit.'" _Id._ (citing 29 U.S.C. § 1002(7)). Therefore, "the plain language of ERISA and its regulation provides beneficiaries notice and appeal rights." _Id._ At the time, the Court pointed out that Anthem and WellPoint had not presented authority to the effect that a particularized assignment of notice and appeal rights is necessary for a beneficiary to be entitled to such rights.

Little [*33] has changed in the parties' arguments since the Court's October 2012 decision. Under 29 U.S.C. § 1132, beneficiaries may sue, and the Seventh Circuit's _Kennedy_ decision makes plain that providers such as Reno have status as beneficiaries. Furthermore, under the terms of section 1132(a), beneficiaries may seek equitable relief; the statute entitles beneficiaries to bring a civil action "to enjoin any act or practice" that violates ERISA, and "to obtain other appropriate equitable relief." The Court concludes that Reno is a beneficiary for

Page 9

2013 U.S. Dist. LEXIS 159491, *33

purposes of ERISA and thus has standing, conferred on him by section 1132, to bring his claims.

**2. Denial of notice and appeal rights**

Reno argues that Anthem's refusal to cover the Vax-D services he provided to patients was an adverse benefit determination under ERISA, because Anthem informed him the services were not medically necessary and thus not covered under its insurance plans. He argues that such a determination entitled him to notice and appeal rights as an ERISA beneficiary, which he did not receive.

Anthem and WellPoint respond that there was no adverse benefit determination in this case, and thus no right to ERISA notice and appeal, because [*34] none of its members "incurred any financial liability as a result of Dr. Reno's repayment of Vax-D claims." Anthem & WellPoint Resp. at 6. That proposition follows from Anthem and WellPoint's contention that ERISA does not apply if a "provider has no recourse against the claimant" for money that the insurer does not pay. *Id.* at 7 (citing *FAQs About the Benefit Claims Procedure Regulation* at A-8).

Though the Court concluded in its October 2012 decision that a reasonable fact finder could conclude Reno could have billed his patients for these amounts, WellPoint and Anthem now contend that "further discovery" has shown he could not have done so. *Id.* at 8. WellPoint points to a claimed admission by Reno during his deposition "that he did not obtain this permission from the patients involved in the audit." *Id.* (citing WellPoint's LR 56.1 Stat. ¶ 6). WellPoint and Anthem also argue that Reno's provider agreement with Anthem forbids him from billing a patient for non-covered services unless he informs the patient in advance about the specific service for which the patient will be financially responsible.

To support their argument that Reno admitted during his deposition that he failed to obtain [*35] advance permission from his patients to bill them directly for Vax-D services, WellPoint and Anthem cite paragraph six of their statement of additional facts. However, no deposition is cited in that paragraph; it cites exhibits containing assignment agreements between Reno and patients, and Anthem's provider manual, but not a deposition. *See* WellPoint Exs. U, V, & N. WellPoint and Anthem do, however, cite a deposition of Reno from

March 2013 in paragraph nine of their statement of additional facts. In the cited passage, Reno testified that he did not "go back and charge people" for the payments WellPoint recouped. Contrary to Anthem and WellPoint's contention, however, Reno did not testify that he failed to obtain permission to make such charges. *See* Anthem & WellPoint Ex. W at 29. The excerpt of the deposition in the exhibit makes reference to the fact that Reno had "gotten [an] HS-1 signed," but the excerpt provides no insight regarding what an "HS-1" is. *Id.* Although the Court is required to construe the evidence in the light most favorable to the nonmovants—WellPoint and Anthem in this case—WellPoint and Anthem simply provide no evidence from which a reasonable fact finder could [*36] conclude that Reno admitted he failed to seek repayment from his patients. Indeed, in light of the assignment agreements in the record where Reno acquired exactly that permission, no reasonable fact finder could conclude on the record before the Court that Reno failed to seek permission to bill his patients. *See* Anthem & WellPoint Exs. U & V (signed agreements where patients agree "that I am financially responsible for all charges whether or not paid by insurance").

WellPoint and Anthem also argue that Reno's provider agreement required him to seek permission in advance from his patients to bill them for non-covered services but that he did not do so. In response, Reno first contends that WellPoint's argument is based on a Department of Labor FAQ, discussed above, that does not apply in his situation, because it refers to contractual disputes and not "conflict[s] over coverage under an ERISA plan." Reno Repl. at 6. WellPoint and Anthem cite a section of the FAQ with this heading: "Do the requirements applicable to group health plans apply to contractual disputes between health care providers (e.g., physicians, hospitals) and insurers or managed care organizations [*37] (e.g., HMOs)?" *FAQs About the Benefit Claims Procedure Regulation* at A-8. The FAQ answers the question in the negative, stating:

> "The regulation does not apply to requests by health care providers for payments due them—rather than due the claimant—in accordance with contractual arrangements between the provider and an insurer or managed care organization, *where the provider has no recourse against the claimant for amounts*, in whole

**Page 10**

or in part, not paid by the insurer or managed care organization."

*Id.* (emphasis added). Reno contends that the paragraph does not cover the facts of this case, because it refers to "an INET fee schedule in a provider contract." Reno Repl. at 6. He says this case is different because it is "about WellPoint's interpretation of his patients' healthcare plans and their retroactive decision that the services he provided were not covered." Reno Repl. at 6.

Regardless of whether Reno's dispute with Anthem was contractual, the FAQ's provision is operative only in cases "where the provider has no recourse against the claimant for amounts, in whole or in part, not paid by the insurer or managed care organization." Anthem and WellPoint argue that Anthem's provider agreement [*38] forbade Reno from seeking repayment for non-covered services from his patients. But if they are incorrect, and Reno *was* permitted to seek recoupment against his patients for non-covered services, the FAQ provision by its terms does not apply. [3]

> [3] WellPoint and Anthem argue that the FAQ is "entitled to deference" based on one of the Court's prior decisions in this case. *See Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 286 F.R.D. 355, 365 (N.D. Ill. 2012) (concluding that the FAQ "is entitled to deference"). Reno does not argue here that the FAQ in question lacks the force and effect of law or is not entitled to deference.

Reno does not dispute the terms of the agreement. He contends, however, that Anthem and WellPoint are estopped from arguing that the agreement governed his conduct. In the relevant time period, Reno argues, "he was paid, in every instance, by WellPoint" for the disputed Vax-D services. Reno Repl. at 7. He therefore "had every reason to believe that these services were covered" and thus had at the time "no reason to inform his patients that such services would, in fact, *not be covered* by insurance." *Id.* Reno thus contends that the reason he did not seek the [*39] advance permission that Anthem and WellPoint argue he was required to get was that he was acting "in direct reliance on WellPoint's conduct" of paying the claims at the time. *Id.* Reno's estoppel argument, however, was made only in his reply brief. Though it is unquestionably a proper and responsive argument, WellPoint and Anthem have not

had an opportunity to respond to it. Given these circumstances, the Court finds it inappropriate to grant Reno summary judgment on this ground.

Reno also contends that Anthem and WellPoint "cannot show that this provision of the provider agreement was effective during the relevant time frame as the evidence already before the Court shows the contrary." Reno Resp. to Anthem & WellPoint's LR 56.1 Stat ¶ 2. In the complaint, Reno specified the relevant time frame as the period from January 2, 2004 to April 19, 2006. If the agreement that Anthem and WellPoint cite in opposing summary judgment was not effective during that period, the agreement is irrelevant and inadmissible and cannot save WellPoint from summary judgment.

As its foundation for the agreement, Anthem and WellPoint cite Reno's testimony, in which he affirmed that the document was his provider [*40] agreement. In a deposition, Reno was asked, "This is your provider agreement. Do you see that?" He responded, "Yes. Yes, it is." Anthem & WellPoint Ex. C at 151. He was also asked, whether he saw that the agreement has "got your name at the top, HealthSource, Dr. Andrew Reno, D.C.; right?" Again, he responded, "Yes, it does." *Id.* Finally, he was asked, "And so your understanding, this is an agreement between you and Anthem Health Plans of Virginia, doing business as, Anthem Blue Cross and Blue Shield?" He responded, "Yes, it is." *Id.* at 152.

"To defeat a summary judgment motion . . ., a party may rely only on admissible evidence." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Only relevant evidence is admissible. Fed. R. Evid. 402. Federal Rule of Evidence 901 governs authentication of evidence, which is "a special aspect of relevancy." Fed. R. Evid. 901 advisory committee's note to subdivision (a). The rule states that the proponent of a piece of evidence "must produce evidence sufficient to support a finding that the item is what the proponent claims it is," Fed. R. Evid. 901(a), in this case, the provider agreement in effect at the relevant time. The rule lists [*41] several examples of evidence that meet that test, the first of them being "Testimony of a Witness with Knowledge," which is "[t]estimony that an item is what it is claimed to be." *Id.* (b)(1). The accompanying note to the rule states that the example "contemplates a broad spectrum," which includes "testimony of a witness who was present at the signing of a document." Fed. R. Evid. 901 advisory

2013 U.S. Dist. LEXIS 159491, *41

committee's note to subdivision (b), example (1).

The copy of the provider agreement that Anthem and WellPoint submitted as evidence does not contain any dates from the relevant period (nor does it contain a signature page). Five of the excerpt's six pages contain the date April 1, 2008, as the date upon which the excerpted guidelines were revised. *See* Anthem & WellPoint Ex. N at RENO003621-22, RENO003628, RENO003642, RENO003674. By itself, this rather clearly shows that the agreement postdates the relevant period, which was from January 2004 to April 2006. The pages from the agreement that WellPoint and Anthem have provided in response to Reno's motion do not contain any other dates. Reno refers the Court to a copy of the Anthem provider agreement that he submitted as evidence in June 2012, when [*42] he made a similar argument in his response to Anthem and WellPoint's statement of facts supporting its own motion for summary judgment. That copy, unlike the one Anthem and WellPoint have submitted here, features no exhibit tag marking it as "Reno 20" from November 23, 2010. It does, however, feature the same stamp with Reno's name, address, and phone numbers, as well as the same Bates number stamping (starting with page number RENO003568). *See* Reno Resp. to Anthem & WellPoint's LR 56.1 Stat. ¶ 4, Ex. 1 [docket no. 660]. That makes it clear that it is the selfsame agreement that Anthem and WellPoint have offered on the current summary judgment motion. This version of the agreement contains dates on several of its pages: an introductory letter dated August 28, 2009 from John B. Syer, Jr., Anthem's vice president of health services, and a page entitled "Ancillary Professional Provider Agreement" with an August 28, 2009 "package code" and a September 15, 2009 "modification." *Id.* at RENO003569, RENO003577. Many of the pages in the earlier version include dates, such as April 1, 2008 (*id.* at RENO003578), Oct. 19, 2007 (*id.* at RENO003584), and January 2006 (*id.* at RENO003585). Again, these [*43] dates, in context, indicate that the agreement postdates the relevant period.

Reno's deposition testimony, in which he responded "Yes it is" when asked whether the agreement was his agreement with Anthem tends to show only that it was an agreement between the parties at that particular point in time, i.e., at the time of the deposition. Indeed, all of the questions were asked at Reno's deposition in 2010, and all were in the present tense (e.g., "This *is* your provider agreement. Do you see that?). This testimony quite plainly does not permit a finding that the agreement was in effect during the relevant period. The Court notes that the need to provide evidence showing that the agreement in question was in effect at the relevant time should come as no surprise to Anthem and WellPoint. Both defendants have been on notice of this since at least June 2012, when Reno first argued that this provider agreement postdated the time period cited in the complaint and thus had no bearing on the parties' dispute.

To summarize, WellPoint and Anthem have failed to lay the proper foundation for the admission of the agreement upon which they rely. Because WellPoint and Anthem's argument that Reno had [*44] to seek advance permission to bill patients for the services in question turns on the terms of this irrelevant agreement, the Court concludes Anthem and WellPoint have failed to show a triable issue on this point.

In sum, there is no admissible evidence before the Court that Reno was bound during the relevant period to seek advance permission from patients in order to bill them for non-covered services to them. Because Reno was able to seek repayment from his patients for the services in question, they--and he--suffered an adverse benefit determination for purposes of ERISA. The Court therefore concludes that Reno is entitled to summary judgment as to liability on his claim that Anthem denied him the notice and appeal rights to which he was entitled under ERISA. The only matter that remains for determination on that claim is the appropriate relief.

### 3. Denial of benefits[4]

> 4  The Court likely it could end its discussion of Reno's claims right here and award him the recouped payments under *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 629 n. 3 (7th Cir. 2005) (court stating "it is unnecessary for us to consider" plaintiffs arbitrary-and-capricious denial argument after determining [*45] defendant violated ERISA for failing to give plaintiff adequate notice). For the sake of completeness, however, the Court will also address Reno's denial of benefits claim.

Reno's other claim is that Anthem's recoupment of benefit payments from him was improper under ERISA under either *de novo* or arbitrary and capricious review. "Judicial review of an ERISA administrator's benefits determination is de novo unless the plan grants the

**Page 12**

administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)). If the administrator has such authority, review is under an arbitrary and capricious standard, which is "highly deferential" and looks to ensure whether the administrator's decision "has rational support in the record." *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009) (internal quotation marks omitted).

Reno contends that the information required for the Court to decide which standard to use is unavailable. He argues that "the [*46] vast majority of the plans at issue are unknown," because "WellPoint extrapolated its repayment demand from 24 patients to Dr. Reno's entire patient cohort." Reno Mem. at 15. It is therefore unclear, Reno argues, whether the administrators of the plans in question had discretionary authority. Reno contends that because Anthem and WellPoint could not produce evidence of their discretion over the plans, the Court should review the benefit denials *de novo*. Reno then contends that the Court should grant him summary judgment because Anthem and WellPoint's actions were improper and had "no valid basis" under either standard of review. Reno Repl. at 11. Because Anthem and WellPoint "did not reach an individualized determination" on whether Reno's services were medically necessary for each of his patients, he argues, they made an improper blanket determination that was not backed by evidence. Reno Mem. at 16.

Anthem and WellPoint have not responded to Reno's denial-of-benefits claim, at least not directly. In a section discussing Reno's reference to a recent decision by another court, *Blue Cross & Blue Shield of R.I. v. Korsen*, C.A. No. 09-317L, 945 F. Supp. 2d 268, 2013 U.S. Dist. LEXIS 72463, 2013 WL 2247460 (D.R.I. May 22, 2013), Anthem [*47] and WellPoint argue that "Reno miscoded his claim for Vax-D services." Anthem & WellPoint Resp. at 16-17. They contend that "[b]ecause Dr. Reno miscoded his DRX-9000 claims, expert witness chiropractor Dr. Don R. Wakefield concluded that Dr. Reno was not entitled to payment for those claims." *Id.* at 17 (citing Anthem & WellPoint's LR 56.1 Stat. ¶ 26-27). Reno responds that any miscoding was "irrelevant," because "Defendants would not have covered his services regardless of which code he used." Reno Repl. at 12 n.12

(citing Anthem & WellPoint Resp. Reno LR 56.1 Stat. ¶ 49). In fact, Anthem and WellPoint admitted just this in their response to the plaintiffs' joint statement of facts: "Anthem Virginia would not pay claims coded as S9090 [the correct code for Vax-D services] as the treatment it describes is not medically necessary." Anthem & WellPoint Resp. Reno LR 56.1 Stat. ¶ 49.

Reno bases his claim for improper denial of benefits on the defendants' blanket determination that Vax-D services were not medically necessary, arguing such a conclusion was improper because it was not individualized for each patient. Anthem and WellPoint have not responded to that contention and have forfeited [*48] the point. The Court therefore grants summary judgment to Reno against Anthem as to liability on this claim as well.

**4. Whether WellPoint is a proper defendant**

In response to Reno's motion, Anthem and WellPoint argue that WellPoint is not a proper defendant in this case. Though Anthem and WellPoint do not make a cross-motion for summary judgment, they argue that "WellPoint is entitled to summary judgment rather than Dr. Reno," because "all of the facts underlying Dr. Reno's complaint related to the actions of Anthem Virginia, not WellPoint." Anthem & WellPoint Resp. at 5-6. Specifically, Anthem and WellPoint contend that WellPoint is "a holding company, and is not an insurance company and did not contract with Dr. Reno." Anthem & WellPoint Resp. to Pls.' LR 56.1 Stat. ¶ 4.

Under 29 U.S.C. § 1002(21)(A)(iii), an entity that possesses "any discretionary authority or discretionary responsibility in the administration" of an ERISA plan is an ERISA fiduciary. WellPoint meets this definition, Reno contends, because it owns Anthem, its director of special investigations Alanna Lavelle reviewed the audit of Reno, and its uniform policy determined Anthem's actions to recoup payment from Reno. *See* [*49] Reno Repl. at 1-2. To support his argument, Reno cites two Supreme Court cases affirming that entities with discretionary authority over ERISA plans are fiduciaries and also two out-of-circuit cases (one of them not about ERISA) supporting the proposition that a parent company can be sued for the deeds of its subsidiary.

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under a

plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226, 120 S. Ct. 2143, 147 L. Ed. 2d 164 (2000). To show that an entity meets that standard, the plaintiff "must show that [the entity] was a fiduciary as that term is defined in the statute and that [the entity] was acting in its capacity as a fiduciary at the time it took the actions that are the subject of the complaint." *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 471-72 (7th Cir. 2007). Furthermore, a person or entity who is the "ultimate decisionmaker" on whether benefits [*50] will be issued "must be a fiduciary" for ERISA purposes. *Aetna Health Inc. v. Davila*, 542 U.S. 200, 220, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004).

On the basis of the evidence both parties have presented, summary judgment on the question of WellPoint's status is inappropriate. A reasonable finder of fact could conclude that WellPoint had no discretionary authority over Anthem's recoupment determination over Reno. Given the limited facts the parties have provided, however, a reasonable finder of fact could also find the opposite. WellPoint is incorrect that "all of the facts underlying Dr. Reno's complaint related to the actions of Anthem Virginia, not WellPoint." Anthem & WellPoint Resp. at 5. WellPoint and Anthem have conceded that WellPoint's director of special investigations reviewed the Reno audit and that the same policy applied in Reno's case is operative in each of its subsidiaries. On the current record, there is a genuine issue of material fact on whether WellPoint was the "ultimate decisionmaker" with regard to Anthem's plan.

The Court notes, however, that it has granted summary judgment in Reno's favor on his claims against Anthem, which should result in an award of appropriate relief irrespective of WellPoint's [*51] status as a defendant. The Court questions what more Reno hopes to gain from pursuing his claim against WellPoint and thus whether Reno's claim against WellPoint ought to be the subject of a trial. Reno should be prepared to articulate an answer to this question at the upcoming status hearing.

## B. Barnard and Wahner's summary judgment motion against Independence Blue Cross

In support of their motion for summary judgment, Barnard & Wahner argue that Independence made an adverse benefit determination against them and

proceeded to deny them ERISA-compliant notice and appeal rights. They contend that they have standing as ERISA beneficiaries to sue Independence on this claim. Barnard and Wahner also argue that Independence's denial of benefits to them was arbitrary and capricious. [5]

> 5  Independence argues in its response to Barnard and Wahner's motion that the motion lacks specifics on several points and that "[t]hese deficiencies mean that their motion should be denied outright" under Local Rule 56.1. Independence Resp. at 3. Barnard and Wahner have adequately responded to this argument. Their factual submission complies with the rule, and the areas where Independence asserts that they lack [*52] specificity do not warrant summary rejection of their motion. Any shortcomings of Barnard and Wahner's factual submissions do not resemble those in the cases Independence cites.

## 1. Standing

Barnard and Wahner contend that they are beneficiaries for ERISA purposes and thus have standing to assert claims that Independence denied them ERISA-compliant notice and appeal. First, they argue that they are beneficiaries with standing under ERISA because the relevant employee benefit plans "each provide that participating providers are paid by the plan directly." Barnard & Wahner Mem. at 8. Therefore, they contend, they are "designated . . . by the terms of an employee benefit plan" as individuals "who . . . may be entitled to a benefit thereunder." *Id.* (citing 29 U.S.C. § 1002(8)). This argument is premised on the notion that the payment Independence makes to health care providers "*is* the 'benefit' payable under an insurance plan." Barnard & Wahner Repl. at 6. Second, Barnard and Wahner say that their patients gave them "standard assignments" that "assign them benefits payable for their services." *Id.* Finally, in their reply, Barnard and Wahner argue that Independence has "waived any right to [*53] contest Plaintiffs' assignments or to assert anti-assignment clauses," because Independence paid for the claims in contention here, then sought recoupment from Barnard and Wahner, not their patients. Barnard & Wahner Repl. at 8. Citing a previous decision of this Court, they contend that "[a] plan can waive its right to enforce an anti-assignment provision by engaging in conduct inconsistent with the provision." *Id.* (citing *Pa.*

2013 U.S. Dist. LEXIS 159491, *53

*Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, No. 09 C 5619, 2011 U.S. Dist. LEXIS 148689, 2011 WL 6819081 at *7 (N.D. Ill. Dec. 28, 2011)).

Independence counters that Barnard and Wahner do not have standing simply "because IBC pays them"; it says that its provider agreements with the plaintiffs define "beneficiary" to mean "a member or a subscriber--not a provider." Independence Resp. at 10. Independence also contends that Barnard and Wahner "twist language of IBC's benefit program agreements" to assert standing as beneficiaries, because employers who contract with Independence for health care "would indeed be surprised to learn" that Barnard and Wahner are also beneficiaries. *Id.* at 11. In response to Barnard and Wahner's argument about their assignments from patients, Independence [*54] argues that many of their patients' agreements contain anti-assignment provisions that negate these assignments for all but three of the patient claims at issue, "2 as to Wahner and 1 as to Barnard--totaling $315.00." Independence Resp. at 11. Finally, Independence appears to have anticipated Barnard and Wahner's waiver argument to some extent. Independence contends, citing the same prior decision of this Court reference above, that "direct payment to a provider does not waive reliance on a plan's anti-assignment provision if the plan also authorizes direct payment." *Id.* at 10 (quoting *Pa. Chiropractic*, 2011 U.S. Dist. LEXIS 148689, 2011 WL 6819081 at *6).

Because the waiver argument, though appropriately responsive to Independence's arguments about anti-assignment provisions, was made only in Barnard and Wahner's reply brief, Independence has not had an adequate opportunity to respond. The Court therefore concludes that it is inappropriate to grant summary judgment to Barnard and Wahner on this ground, and the issue remains for trial.

**2. Adverse benefit determination**

Barnard and Wahner argue that they received adverse benefit determinations from Independence that triggered their rights to ERISA-compliant notice and [*55] appeal. *See* 29 C.F.R. § 2560.503-1(g)(1). The Court also concludes that summary judgment is inappropriate on this point.

Similar to Anthem and WellPoint's argument regarding Reno, Independence contends that its interactions with Barnard and Wahner were governed by

a provider agreement that prevented them from billing their patients directly for non-covered services, and thus there was no adverse benefit determination. Barnard and Wahner argue that they had agreements with their patients that permitted them to balance-bill. They also make two arguments similar to those that Reno made on the same question: the Department of Labor FAQ that Independence cites does not apply to this dispute, and Independence is estopped from arguing the provider agreement required Barnard and Wahner to notify their patients about non-covered services.

The provider agreement in question states that providers must inform beneficiaries in advance of the administration of non-covered services or else hold them harmless from payment for such services. As with Reno's motion, Barnard and Wahner make the estoppel argument about this provision for the first time in their reply brief, in response to Independence's [*56] argument about the provider agreement. As was the case with Reno, Barnard and Wahner's estoppel argument was appropriately responsive. Independence, however, has not had an opportunity to respond to the argument. The Court therefore concludes that it is inappropriate to grant summary judgment to Barnard and Wahner based on the estoppel argument. That issue will remain for trial.

**3. Adequacy of notice and appeal rights and exhaustion**

Barnard and Wahner also contend that after Independence made adverse benefit determinations by recouping their benefits, the notice and appeal procedure Independence offered them did not comport with ERISA's requirements. Independence responds that Barnard and Wahner did not exhaust Independence's "internal dispute resolution procedures," as ERISA requires, and that those procedures were adequate for ERISA purposes. Independence Resp. at 4. Barnard & Wahner reply that the procedures Independence did offer "did not substantially comply with ERISA," and for that reason they did not have to utilize them, because inadequate procedures "are deemed to have been exhausted." Barnard & Wahner Resp. at 8. In particular, plaintiffs say that Independence admits its original [*57] notice was inadequate and that Independence failed to inform them they had the right to appeal the recoupment decision.

ERISA requires a denial of benefits to be accompanied by "adequate notice in writing" including

**Page 15**

"the specific reasons for such denial." 29 U.S.C. § 1133(1). In addition, employee benefit plans must provide participants and beneficiaries with "full and fair review by the appropriate named fiduciary of the decision denying the claim." Id. § 1133(2). ERISA regulations likewise require plans to "maintain reasonable procedures governing . . . notification of benefit determinations, and appeal of adverse benefit determinations." 29 C.F.R. § 2560.503-1(b). The same regulation provides, however, that "a claimant shall be deemed to have exhausted" a plan's administrative remedies if the plan fails "to establish or follow claims procedures consistent with the requirements of this section." Id. § 2560.503-1(l).

In interpreting the requirement that plans maintain reasonable notice and appeal procedures, the Seventh Circuit has held that "substantial compliance [with ERISA] is sufficient." Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 690 (7th Cir. 1992) (internal quotation marks [*58] omitted). A plan administrator may still be in substantial compliance with ERISA even if the administrator "violate[s] a technical rule under ERISA, such as the regulation governing the contents of letters denying claims for benefits." Edwards v. Briggs & Stratton Ret. Plan, 639 F.3d 355, 361-62 (7th Cir. 2011). This inquiry is "fact-intensive," Ponsetti v. GE Pension Plan, 614 F.3d 684, 693 (7th Cir. 2010), and it is "guided by the question of whether the beneficiary was provided with a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position sufficient to permit effective review." Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 775 (7th Cir. 2003).

The Court notes first that Independence undercuts its non-exhaustion argument with regard to Wahner when it argues that "Wahner exhausted [Independence's] procedures and received a full and fair review of his fees claims." Independence Resp. at 8. (It makes no similar argument about Barnard. [6] ) The Court accepts that admission and thus need not further address Independence's exhaustion argument with respect to Wahner.

> 6 Though Independence also argues in its [*59] brief that "Barnard resorted to IBC's internal claims procedures regarding his fees and received interim relief," it appears that Independence meant to refer to Wahner. Five of the seven paragraphs it cites from the plaintiffs' joint

statement of facts refer to Wahner only, and not Barnard; the other two refer to neither Barnard nor Wahner. See Independence Resp. to Pls.' LR 56.1 Stat. ¶¶ 138, 142-45 & 155-56.

Regardless, whether either plaintiff exhausted Independence's procedures is of no consequence if neither of them received ERISA-compliant notice and appeal rights. See 29 C.F.R. § 2560.503-1(l). The Court will therefore evaluate that question next. Barnard and Wahner argue, and Independence does not dispute, that the notices it sent to both doctors omitted multiple elements that are required by ERISA regulations regarding notice of benefit determinations. (Independence does dispute that these were demand letters.) The letters each declared that several of the doctors' insurance claims "require adjustment for overpayment," but they did not say why. See Pls.' Exs. 49 & 50. ERISA requires inclusion of "[t]he specific reason or reasons for the adverse determination," as well as "[r]eference [*60] to the specific plan provisions on which the determination is based." 29 C.F.R. § 2560.503-1(g)(1)(i)-(ii). In addition, each letter informed the recipient that he had thirty days from the date of the letter before Independence would begin recouping payment. ERISA regulations, however, require "at least 60 days" after notification "within which to appeal the determination." 29 C.F.R. § 2560.503-1(h)(2)(i). The letters also contained no reference to how the recipients might challenge the determination within Independence itself or to their right to file suit in court after using Independence's internal appeal procedures. But ERISA requires that a benefit determination include "[a] description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review." Id. § 2560.503-1(g)(1)(iv).

In defending the notice that Barnard and Wahner were given, Independence argues that "Barnard and Wahner always knew how to identify the applicable ERISA plan for every patient," because they had patients fill out a certain form, and could [*61] learn this information from patients' insurance cards. Independence Resp. at 6. In other words, Independence contends that its letters provided information from which Barnard and Wahner should have been able to figure out the basis for the denials. This misunderstands ERISA's requirements. The statute and regulations put the onus on the plan

administrator to provide the required information, not on the beneficiary or claimant to seek it out. Independence does not cite any authority that holds otherwise.

Indeed, Seventh Circuit authority on what it means to be in "substantial compliance" with ERISA goes the other way, starting with *Halpin*, which Independence itself cites. In that case, although the Seventh Circuit held that "substantial compliance" with ERISA notice and appeal requirements was sufficient, it also warned that "[b]are conclusions [as reasons for a denial] are not a rationale," as notice must "contain specific reasons" for a denial, and any defects in the initial denial cannot be "cured by the later correspondence." *Halpin, 962 F.2d at 693* (citations omitted). Independence included no reasons, specific or otherwise, in its letters to Barnard and Wahner. Rather, it merely [*62] stated that it would begin recouping payment soon--or, in Wahner's case, offered a choice of ways in which it would recoup payment. The Seventh Circuit has consistently held that such a "statement of reasons" is necessary "to permit effective review." *Schneider, 422 F.3d at 628*. In *Schneider*, the letter the plaintiff received failed to include specific reasons for the termination of his benefits, any "specific plan provision on which the denial was based," or any method of appeal. *Id.* This notice "was indefensible as a matter of statute, regulation and case law." *Id.*

The Court makes a similar determination here. The original notice that Barnard and Wahner received lacked any explanation for Independence's decision, and it gave them next to nothing to go on in the event that they wished to appeal. No reasonable fact finder could conclude that the substantially complied with ERISA. The Court therefore rules, pursuant to *Federal Rule of Civil Procedure 56(g)*, that Barnard and Wahner did not receive adequate notice under ERISA and that Independence's exhaustion defense fails.

**4. Denial of benefits**

In addition to their claim regarding notice and appeal rights under ERISA, Barnard and Wahner [*63] claim that the recoupments Independence made were arbitrary and capricious. Like Reno, Barnard and Wahner argue that Independence "made no effort to examine what particular services Drs. Barnard or Wahner had billed" under particular provider codes. Barnard & Wahner Mem. at 17. They contend that this practice "was plainly insufficient," because "IBC determined that virtually every service provided by Drs. Barnard and Wahner was

subject to exclusion under a major subset of IBC's plans, even though Drs. Barnard and Wahner were contracted providers within IBC's network." *Id.* Independence's method, they argue, "simply treats every service billed under a broad swath of CPT codes as 'rehabilitation therapy services'" and thus ineligible for coverage under Independence's policies. *Id.* at 16. Finally, they say that Independence's decision to decide to recoup payments it had already made to Barnard and Wahner "is the epitome of arbitrary and capricious behavior," as it came "after years of inducing doctors to perform services for its members." *Id.* at 17.

As with Anthem and WellPoint's response to Reno's motion, Independence does not directly respond regarding Barnard and Wahner's claim concerning [*64] improper denial of benefits. In fact, Independence does not address the claim at all in its response brief. In its response to the plaintiffs' joint statement of facts, Independence does not dispute that it based its decision to recoup payments from Barnard and Wahner on the proposition that they used certain procedure codes that "are not eligible for reimbursement when submitted by a provider type that does not meet capitation criteria." Independence Resp. to Pls.' LR 56.1 Stat. ¶ 142 (citing Pls.' Ex. 60). Independence adds that the same cited exhibit also mentions that its decision was "supported by the communication distributed to the provider community advising of our intended recovery effort due to Independent Blue Cross erroneously remitting payment for the impacted procedure codes." *Id.* Independence says elsewhere in the same response that the plaintiffs relied on only one insurance plan for the fact that certain providers who give specific rehabilitation services are uniformly excluded from payment. *Id.* ¶ 130. In Barnard and Wahner's reply, they argue that Independence nonetheless admits that it based its actions against them "on the uniform policy that the services at issue [*65] were excluded under its plans." Barnard & Wahner Repl. at 13.

Barnard and Wahner are correct to observe that Independence does not answer their primary contention on the denial of their benefits: that Independence unreasonably used a uniform method, rather than an individualized one, to decide that it would recoup payments for certain categories of services. Independence's responses to the plaintiffs' statement of facts confirm that the decision to recoup the funds was based on its coding system and not on the circumstances

2013 U.S. Dist. LEXIS 159491, *65

or purposes of each treatment. It marked as "undisputed" plaintiffs' statement that "[e]ach of the codes included in IBC's Rehabilitation Therapy Capitation program are not eligible for coverage when submitted by a provider, such as Drs. Barnard and Wahner, who are not contracted to receive capitation payment." Independence Resp. to Pls.' LR 56.1 Stat. ¶ 132. Independence also confirmed that the codes came from its own medical policy, as noted in a letter it sent to Wahner. In addition to pointing to its coding, Independence references a passage from that letter noting that its recoupment decision was also supported by some previous "communication" which "advis[ed] [*66] of our intended recovery effort due to Independence Blue Cross erroneously remitting payment for the impacted procedure codes." *See* Pls.' Ex. 60. But that passage is not responsive to the plaintiffs' argument that the lack of individualized determination based on those codes was arbitrary and capricious; Independence does not even specify what if any details the previous communication contained. Further, none of these statements in Independence's factual submissions responds to the plaintiffs' other argument on the denial of their claims: that its decision to recoup payment "after years of inducing" the plaintiffs to provide the services in question was itself arbitrary and capricious.

Considering Independence's effective lack of a direct and viable response to Barnard and Wahner's contentions, the Court grants Barnard and Wahner summary judgment as to liability on the claim that Independence's recoupments from them were arbitrary and capricious.

**Conclusion**

For the foregoing reasons, the Court grants plaintiff Reno's motion for summary judgment [docket no. 793] on the question of liability as to defendant Anthem Health Plans of Virginia, Inc. but denies the motion with regard to defendant [*67] WellPoint, Inc. The Court grants plaintiffs Barnard & Wahner's motion for summary judgment [docket no. 795] as to liability on their claim against defendant Independence Blue Cross for improper denial of benefits but denies in part plaintiffs' motion on their claim that Independence denied them the appropriate notice and appeal rights, while making findings in plaintiffs' favor on certain points pursuant to Rule 56(g). At tomorrow's status hearing, counsel should be prepared to discuss what further proceedings are required on the claims of these plaintiffs.

/s/ Matthew F. Kennelly

MATTHEW F. KENNELLY

United States District Judge

Date: November 7, 2013

**11**

Get a Document - by Citation - 2012 U.S. Dist. LEXIS 112795
Case: 1:13-cv-05247 Document #: 54-8 Filed: 10/09/14 Page 54 of 67 PageID #:544
Page 1 of 7

*2012 U.S. Dist. LEXIS 112795, **

NICHOLAS MARTIN and DAVID MACK, on behalf of themselves and others similarly situated, Plaintiffs, v. LEADING EDGE RECOVERY SOLUTIONS, LLC and CAPITAL ONE BANK (USA), N.A., Defendants.

No. 11 C 5886

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

2012 U.S. Dist. LEXIS 112795

August 10, 2012, Decided
August 10, 2012, Filed

**SUBSEQUENT HISTORY:** Transferred by In re Capital One Tel. Consumer Prot. Act Litig., 2012 U.S. Dist. LEXIS 177693 (J.P.M.L., Dec. 10, 2012)

**CORE TERMS:** phone, cell, dialing, automated, prerecorded, automatic, unwanted, telephone, matter jurisdiction, telephone numbers, concrete, message, privacy, automatic telephone, failure to state a claim, standing to bring, monetary loss, consumer, invasion, nuisance, minutes, telephone calls, consumer protection, actual damages, emotional distress, collection, subscribers, voicemail, assigned, times

**COUNSEL: [*1]** For Nicholas Martin, David Mack, on behalf of themselves and others similarly situated, Plaintiffs: Alexander Holmes Burke, LEAD ATTORNEY, Burke Law Offices, LLC, Chicago, IL.

For Leading Edge Recovery Solutions, LLC, Defendant: David M Schultz, LEAD ATTORNEY, James Constantine Vlahakis, Hinshaw & Culbertson, Chicago, IL.

For Capital One Bank (USA) N.A., Defendant: Aaron Daniel Van Oort, Erin L. Hoffman, Faegre Baker Daniels LLP, Minneapolis, MN; Ernest Summers, III, Baker & Daniels LLP, Chicago, IL; Mindy Anne Finnigan, Shawn Michael Doorhy, Trina K Taylor, Faegre Baker Daniels LLP, Chicago, IL.

**JUDGES:** JOAN HUMPHREY LEFKOW, United States District Judge.

**OPINION BY:** JOAN HUMPHREY LEFKOW

**OPINION**

**OPINION AND ORDER**

Nicholas Martin and David Mack filed this putative class action against Leading Edge Recovery Solutions, LLC and Capital One Bank (USA), N.A., alleging violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.* [1] Before the court are Leading Edge's and Capital One's motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the following reasons, the motions [#38, 57] will be denied.

**FOOTNOTES**

**1** Martin also asserted a claim in his individual capacity against **[\*2]** Leading Edge for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.* Martin and Leading Edge agreed to settle the FDCPA claim and therefore the court need not consider Leading Edge's argument that the FDCPA claim must be dismissed pursuant to Rule 12(b)(6).

## FACTS²

### FOOTNOTES

**2** Unless otherwise noted, the following facts are taken from plaintiffs' second amended complaint and are presumed true for the purpose of resolving the pending motions. Defendants argue that certain allegations in the complaint must be disregarded because they are alleged upon information and belief. Even after *Iqbal* and *Twombly*, however, there is no prohibition on alleging claims based on information and belief, particularly where the facts that support the allegations are within the defendant's knowledge or control. *See Trs. of the Auto Mechs.' Indus. Welfare & Pension Funds Local 701 v. Elmhurst Lincoln Mercury*, 677 F. Supp. 2d 1053, 1054-55 (N.D. Ill. 2010); 2-8 James Wm. Moore et al., *Moore's Federal Practice — Civil* § 8.04 (3d ed.). The court has considered these allegations together with the other facts alleged in the complaint.

Leading Edge is a debt collection company; Capital One **[\*3]** is a national bank that issues credit cards. In 2010, both companies used equipment that allowed them to dial and call telephone numbers that had been pre-loaded by their employees into an automatic dialing system. They also used automatic dialing software manufactured by Aspect Software. (*See* Compl. Ex. A.)

Leading Edge used automatic dialing equipment, along with Aspect Software, to call Martin's and Mack's cell phones in 2010. Leading Edge called Mack's cell phone ten times during September 2010 and left one or more prerecorded voice messages. **3** Leading Edge called Martin at least once using automatic dialing equipment. Leading Edge had received Martin's and Mack's cell phone numbers from Capital One, which requested Leading Edge to collect on an account for Julie Mack, who is Mack's mother and Martin's aunt. **4**

### FOOTNOTES

**3** Plaintiffs alleged the specific number of times Leading Edge called Mack's phone, and that Mack received unwanted voice messages, for the first time in their in responses to defendants' motions to dismiss. The court may consider these facts because they are consistent with the allegations in plaintiffs' complaint and do not have the effect of amending the complaint to assert **[\*4]** a new claim. *See, e.g., Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999); *Jones v. Sabis Educ. Sys., Inc.*, No. 98-4252, 1999 U.S. Dist. LEXIS 19449, 1999 WL 1206955, at \*3 (N.D. Ill. Dec. 13, 1999).

**4** Plaintiffs first alleged that Julie Mack was the original account holder in response to defendants' motions to dismiss. The court considers this fact for the reasons stated in footnote 3.

Capital One or its affiliate also called Martin's and Mack's cell phones sometime between 2007 and 2011 in connection with a debt collection. Some or all of these calls were made using predictive dialing equipment and used a prerecorded or artificial voice message.

Neither Martin nor Mack gave their cell phone numbers to Leading Edge or Capital One. Martin and Mack were annoyed by the calls, which used air time from their cell phone plans and forced them to attend to unwanted calls.

**LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The burden of proof is on the party asserting jurisdiction. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003). **[*5]** In determining whether subject matter jurisdiction exists, the court must accept all well-pleaded facts alleged in the complaint and draw all reasonable inferences from these facts in the plaintiff's favor. *Sapperstein v. Hager*, 188 F.3d 852, 855 (7th Cir. 1999). "Where evidence pertinent to subject matter jurisdiction has been submitted, however, 'the district court may properly look beyond the jurisdictional allegations of the complaint . . . to determine whether in fact subject matter jurisdiction exists.'" *Id.* (quoting *United Transp. Union v. Gateway W. Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996)).

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). In ruling on a motion to dismiss, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Dixon v. Page*, 291 F.3d 485, 486 (7th Cir. 2002). In order to survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice **[*6]** of the claim's basis, but must also establish that the requested relief is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 687, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The allegations in the complaint must be "enough to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories. *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). Rather, it is the facts that count.

**ANALYSIS**

Leading Edge and Capital One argue that the complaint must be dismissed for lack of subject matter jurisdiction because plaintiffs have not established "injury in fact," a requirement for standing under Article III. Leading Edge argues that, in the alternative, plaintiffs' complaint must be dismissed under Rule 12(b)(6) for failure to state a claim.

**I. Article III Standing**

To have Article III standing, plaintiffs must allege (1) an injury in fact, (2) a causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). **[*7]** An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations and quotations omitted). Such an injury may exist by virtue of a violation of statutorily-created legal rights, so long as the plaintiff is within the class of persons who are given a statutory right to relief and alleges a "distinct and palpable injury to himself." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); *see also Summers v. Earth Island Inst.*, 555 U.S. 483, 555 U.S. 488, 497, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009) (although Congress can create procedural rights, Article III still requires the party bringing suit to show that the action "injures him in a concrete and personal way" (citation omitted)). A plaintiff need not suffer a substantial injury in order to establish Article III standing, however. *See, e.g., Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 656 (7th Cir. 2011) ("The magnitude, as distinct from the directness, of the injury is not critical to the concerns that underlie the requirement of standing."); *Doe v. Cnty. of Montgomery, Ill.*, 41 F.3d 1156, 1159 (7th Cir. 1994) **[*8]** ("[A]n identifiable trifle is enough for standing to fight out

a question of principle; the trifle is the basis for standing and the principle supplies the motivation." (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973)). Even a diminution in a legally-protected interest, such as being denied the opportunity to watch wildlife, is sufficient injury. *Am. Bottom Conservancy*, 650 F.3d at 656. A plaintiff likewise has standing to bring suit for a violation of a consumer protection statute that caused "little measurable injury" so long as the suit would clearly redress "an injury of some sort." *Crabill v. Trans Union, LLC*, 259 F.3d 662, 665 (7th Cir. 2001) (discussing the Fair Credit Reporting Act).

Applying these principles, plaintiffs have alleged a particularized injury that is sufficient to establish standing. Plaintiffs allege that defendants violated interests that are protected by the TCPA. The TCPA prohibits the use of automatic telephone dialing systems or an artificial or prerecorded voice to make "any" non-emergency call to a telephone number assigned to a mobile phone without the **[*9]** called party's consent. 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA prevents nuisance telephone calls to cell phones precisely in situations such as the one described by plaintiffs, *i.e.* where a bill collector has been hired by a creditor and then repeatedly calls a number that previously belonged to the creditor's customer. *See Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 638-39 (7th Cir. 2012). Congress referred to the interest protected by the TCPA as a "privacy" interest, noting that "[e]vidence . . . indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." TCPA, 105 Stat. 2394, note following 47 U.S.C. § 227 (Congressional statement of findings); *see also Mims v. Arrow Fin. Servs., LLC*, ___ U.S. ___, 132 S. Ct. 740, 745, 181 L. Ed. 2d 881 (2012) (quoting and discussing Congressional findings). The TCPA also protects a limited property interest, even where a consumer has prepaid for a certain number of minutes on his cell phone plan. *See Soppet*, 679 F.3d at 638-39 ("[A]n automated call to a cell phone adds expense to annoyance. . . . Bystander **[*10]** is out of pocket the cost of airtime minutes and has had to listen to a lot of useless voicemail."); *In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 14115 (Jul. 3, 2003) (reaffirming that it is unlawful to make "any call" to a cell phone using an automatic dialing system and noting that even where wireless subscribers purchase a large "bucket" of minutes at a fixed rate, the "bucket" could be exceeded more quickly if consumers receive numerous unwanted calls). Plaintiffs' allegations that they were forced to tend to unwanted calls and that the calls used airtime from their cell phone plans establishes a violation of both the privacy and property interests that are protected by the TCPA.

In addition, plaintiffs' alleged injuries "reasonably can be said to have resulted, in a[] concretely demonstrable way, from [defendants'] alleged . . . statutory infractions." *Warth*, 422 U.S. at 504. Plaintiffs' injuries are not conjectural or hypothetical, unlike some of the cases cited by Leading Edge where plaintiffs asserted a "procedural injury" that did not result in the deprivation of any concrete interest. *Cf. Summers*, 555 U.S. at 496-97 **[*11]** (plaintiffs did not have standing to enjoin United States Forest Service from enforcing regulations that related to salvage-timber sales where they had failed to allege that any particular timber sale or other project would impede a specific plan to enjoy the National Forests); *Lujan*, 504 U.S. at 563-64 (plaintiffs had not established injury in fact by asserting that they intended to visit areas affected by rule interpreting the Endangered Species Act, where they did not describe any concrete plans for the visits). Plaintiffs, by contrast, were directly injured by defendants' violations of the TCPA because they had to spend time tending to unwanted calls and their cell phone minutes were depleted. This is enough to establish "injury in fact" under Article III. *See Kane v. Nat'l Action Fin. Servs., Inc.*, No. 11-11505, 2011 U.S. Dist. LEXIS 141480, 2011 WL 6018403, at *5 (E.D. Mich. Nov. 7, 2011) (plaintiff's allegation that he received several hundred phone calls on his cell phone was sufficient to establish standing to bring claim under TCPA); *Anderson v. AFNI, Inc.*, No. 10-4064, 2011 U.S. Dist. LEXIS 51368, 2011 WL 1808779, at *6 (E.D. Pa. May 11, 2011) (plaintiff had demonstrated injury in fact by alleging that she had received nearly fifty **[*12]** calls to her residential number from an automated dialer); *Mitchem v. Ill. Collection Serv., Inc.*, No. 09-7274, 2010 U.S. Dist. LEXIS 76581, 2010 WL 3003990, at *1-2 (N.D. Ill. Jul. 29, 2010) (plaintiff demonstrated injury in fact by alleging that defendant used an automated dialer to call his cell phone without his consent); *cf. Crabill*, 259 F.3d at 664 (plaintiff did not

have standing to bring suit under the of the Fair Credit Reporting Act where he had failed to show that defendant's violation of the Act resulted in loss of credit or any other harm).

Defendants argue that "injury in fact" should be equated with "actual damages," and that plaintiffs' failure to allege actual damages indicates that they lack standing. Leading Edge asserts that plaintiffs must allege that they were charged in excess of their usual monthly plan or that they suffered some emotional distress. Capital One asserts that plaintiffs must allege that they suffered a concrete monetary loss, answered the unwanted cell phone calls, were called a certain (unspecified) number of times, or actually listened to the prerecorded voice messages. The issue of standing, however, is distinguishable from the merits of plaintiffs' claims. *See, e.g., Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 89, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) **[*13]** ("Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action in which petitioners could actually recover." (citation omitted)). To determine whether plaintiffs have standing under Article III, the relevant question is "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *See Discovery House, Inc. v. Consolidated City of Indianapolis,* 319 F.3d 277, 279 (7th Cir. 2003) (quoting *Warth,* 422 U.S. at 500). As discussed above, plaintiffs plainly suffered injuries to interests that are protected by the TCPA. Defendants have cited no case holding that monetary loss or emotional distress is a prerequisite for Article III standing. *Cf., e.g., Lujan,* 504 U.S. at 562-63 ("the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing"); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 374, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982) (black "tester" plaintiff had standing to bring for violations of the Fair Housing Act where she "alleged injury **[*14]** to her statutorily created right to truthful housing information"). [5]

## FOOTNOTES

[5] In their motions to dismiss, defendants repeatedly assert that the court's analysis must be governed by the Supreme Court's anticipated decision in *Edwards v. First American Corporation,* 610 F.3d 514 (9th Cir. 2010), *cert. granted* 131 S. Ct. 3022, 180 L. Ed. 2d 843 (2011). After briefing was complete, the Supreme Court dismissed the writ of certiorari in *Edwards* as improvidently granted. *See* 132 S. Ct. 2536, 183 L. Ed. 2d 611 (2012). Therefore the Ninth Circuit's opinion, which holds that a plaintiff has standing to file suit under the anti-kickback provision of the Real Estate Settlement Procedures Act even if she is not overcharged as a result of the violation, is still good law. *Edwards* is not binding on this court, but it provides significant persuasive authority in support of the conclusion that plaintiffs need not allege actual damages in order to establish injury in fact.

Moreover, neither the text nor legislative history of the TCPA supports defendants' position. Plaintiffs need not allege monetary loss in order to bring suit for violations of the TCPA. *See* discussion *infra* at p. 10-11; *see also* 47 U.S.C. § 227(b)(3) (stating that a person may **[*15]** recover "actual monetary loss" from the violation *or* $500 per violation, whichever is greater). Moreover, Congress concluded that "any" automated or prerecorded call would be an invasion of the called party's right to privacy, and its findings indicate that even a *de minimis* number of automated calls or voicemails would not be condoned. *See* note following 47 U.S.C. § 227 ("*Banning* such automated or prerecorded telephone calls to the home . . . *is the only effective means of protecting telephone consumers* from this nuisance and privacy invasion." (emphasis added)). Nothing in the statute indicates that Congress sought to protect only those consumers who listened to the prerecorded voicemails, answered the unwanted calls, or received a specified number of calls. Finally, Congress stated that one of the purposes of the TCPA was to protect telephone subscribers from the "nuisance" of unwanted calls, *see id.,* further undermining Leading Edge's position that plaintiffs are required to allege emotional distress.

For all of these reasons, plaintiffs have sufficiently alleged that they suffered "injury in fact"

required for Article III standing. Defendants do not contest that plaintiffs have **[\*16]** satisfied the other requirements for standing, namely causation and redressability. Defendants' motions to dismiss for lack of subject matter jurisdiction will be denied.

## II. Failure to State a Claim

Leading Edge argues that, even if plaintiffs have standing, the complaint must be dismissed for failure to state a claim because plaintiffs have failed to allege that the calls were made by an automatic dialing system or that they resulted in additional charges to plaintiffs. Neither contention has merit.

### A. Automatic Dialing System

The TCPA defines the term "automatic telephone dialing system" as "equipment that has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." *Id.* § 227(a)(1). Plaintiffs allege that Leading Edge called their cell phones using equipment that automatically dialed numbers that were pre-loaded in batches by employees. They have attached, as an exhibit to their complaint, Leading Edge's 2009 application for registration of an Automatic Dial Announcing Device ("ADAD") with the Public Utility Commission of Texas. (Compl. Ex. A.) Plaintiffs' allegations and exhibits are more than sufficient **[\*17]** to give rise to the inference that Leading Edge called them using an "automatic telephone dialing system" as that term is defined in the TCPA.

### B. Charges for Calls

Plaintiffs claim that defendants violated 47 U.S.C. § 227(b)(1)(A)(iii), which provides that it shall be unlawful to use an automatic telephone dialing system to make non-emergency calls "to any telephone number assigned to a paging service, *cellular telephone service*, specialized mobile radio service, *or other radio common carrier service, or any service for which the called party is charged for the call.*" (emphasis added). Another court in this district concluded that the phrase "for which the called party is charged for the call" only modifies the phrase "any service" and that therefore the TCPA is violated even if the called party does not incur a charge that is specifically linked to the automated call. *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1009-10 (N.D. Ill. 2010). The statute, read as a whole, supports this conclusion. *See Abbas v. Selling Source, LLC*, No. 09-3413, 2009 U.S. Dist. LEXIS 116697, 2009 WL 4884471, at *3 (N.D. Ill. Dec. 14, 2009). Congress amended the TCPA in 1992 to provide that the Federal Communications **[\*18]** Commission ("FCC") may issue rules or orders that "exempt . . . calls to a telephone number assigned to a cellular telephone service that are not charged to the called party." *See* 47 U.S.C. § 227(b)(2)(C). If the TCPA only prohibited calls to cell phones that result in a charge to the called party, then it would be unnecessary to create exemptions for uncharged calls. *Abbas*, 2009 U.S. Dist. LEXIS 116697, 2009 WL 4884471, at *3. "Courts avoid such ineffective statutory construction." *Id.* (citing *In re Merchants Grain, Inc.*, 93 F.3d 1347, 1353-54 (7th Cir. 1996)).

Leading Edge does not cite to any section of the TCPA or its legislative history to support its position that a plaintiff must allege that he was charged for a call in order to state a claim under the Act. The only case cited by Leading Edge, *Knutson v. Reply!, Inc.*, No. 10-1267, 2011 U.S. Dist. LEXIS 7887, 2011 WL 291076, at *1 (S.D. Cal. Jan. 27, 2011), simply asserts without citation to authority that a plaintiff must plead that it was charged for the call in order to state a claim under the TCPA. In that case, the plaintiff specifically alleged that he was charged for incoming calls and the court did not analyze the issue in detail. *Knutson* is not persuasive.

The plain language **[\*19]** of the statute supports plaintiffs' position that an automated call is prohibited by the TCPA even if the called party does not incur a charge that is specifically linked to that call. Taking all of the allegations in the complaint as true, plaintiffs have successfully alleged that Leading Edge violated the TCPA by using automated dialing equipment to call their cell phones. Leading Edge's motion to dismiss for failure to state a claim will be denied.

Get a Document by Citation 2012 U.S. Dist. LEXIS 112795
Case: 1:13-cv-05247 Document #: 54-8 Filed: 02/03/14 Page 60 of 67 PageID #:560
Page 7 of 7

## CONCLUSION AND ORDER

For the foregoing reasons, Leading Edge's and Capital One's motions to dismiss [#38, 57] are denied. Defendants are directed to answer the second amended complaint by August 24, 2012.

Dated: Aug. 10, 2012

Enter: /s/ Joan Humphrey Lefkow

JOAN HUMPHREY LEFKOW

United States District Judge

Service: **Get by LEXSEE®**
Citation: **2012 U.S. Dist. LEXIS 112795**
View: Full
Date/Time: Wednesday, July 9, 2014 - 4:09 PM EDT

* Signal Legend:
- ⚫ - Warning: Negative treatment is indicated
- 🅀 - Questioned: Validity questioned by citing refs
- ⚠ - Caution: Possible negative treatment
- ◆ - Positive treatment is indicated
- 🅐 - Citing Refs. With Analysis Available
- 🅘 - Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

 LexisNexis®   About LexisNexis   | Privacy Policy   | Terms & Conditions   | Contact Us
Copyright © 2014 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**12**

LEXSEE

**KELLEY BENTON, Plaintiff, vs. ERIC K. SHINSEKI, Secretary, United States Department of Veterans Affairs, Defendant.**

**No. 12 C 3075**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**2013 U.S. Dist. LEXIS 147364**

**October 11, 2013, Decided**
**October 11, 2013, Filed**

**CORE TERMS:** training, disability, hostile, work environment, discrimination claim, online, summary judgment, severe, e-mail, reasonable jury, supervisor, job training, reasonable accommodation, accommodation, actionable, pervasive, network, Rehabilitation Act, attend, coworker, surgery, testing, travel, blood, able to perform, material fact, harassment, genuine, sickle cell, work-from-home

**COUNSEL:** [*1] For Kelly Benton, Plaintiff: Michael T. Smith, Michael T. Smith & Associates, Roselle, IL.

For Eric K. Shinseki, Secretary, United States Department of Veteran Affairs, Defendant: LaShonda Annette Hunt, LEAD ATTORNEYS, United States Attorney's Office (NDIL), Chicago, IL.

**JUDGES:** MATTHEW F. KENNELLY, United States District Judge.

**OPINION BY:** MATTHEW F. KENNELLY

**OPINION**

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Kelley Benton has sued Eric Shinseki, in his capacity as Secretary of the United States Department of Veterans Affairs, under the Rehabilitation Act of 1973, 29 U.S.C. § 794a. She alleges that the Department of Veterans Affairs (VA), her former employer, discriminated against her

based upon her disability when she was denied the opportunity to attend a training conference. Benton further alleges that her supervisor created a hostile work environment based on her disability. Shinseki has moved for summary judgment on both claims. For the following reasons, the Court grants the motion.

**Background**

Three decades before her employment began at the VA, Benton was diagnosed with sickle-cell thalassemia, a disease that disrupts the blood flow to her extremities and incapacitates her for variable [*2] periods of time. Benton says the sickle cell crises (episodes) that she experiences can last from an hour up to three weeks and can be triggered by a host of events, including overexertion, rain, stress, moderate walking, shoveling snow, the common cold, swimming, and humidity.

In 2005, Benton began working as an information technology specialist for the VA in the agency's office in Tuscaloosa, Alabama. She transferred to the VA's Maywood, Illinois office in 2007. Benton was part of a team of five IT specialists who worked in different VA locations across the country. Their supervisor, Donald Kachman, worked out of his home in Battle Creek, Michigan.

Benton first told Kachman about her disability in August 2008, when she wrote him an e-mail informing him she had just been in the hospital with a sickle cell crisis. In November 2008, Benton had shoulder surgery related to her sickle cell condition. Because the surgery required Benton to take pain medication, Benton's doctor

2013 U.S. Dist. LEXIS 147364, *2

wrote a note to the VA requesting that she be allowed to work from home for two weeks after the surgery. The request was approved, and Benton ended up working from home for approximately one month.

Just over a year after [*3] Benton first informed Kachman about her condition, she made a formal request for an accommodation, specifically, to perform her duties from home on an indefinite basis. Benton's first request was returned for insufficient documentation; her second (this time with documentation) was denied. The denial, written by Kachman in December 2009, advised Benton that the ability to work at the office was essential:

> [t]he position you currently occupy is a full time position that, due to the functions and equipment necessary to perform all of the essential functions of your position, requires you to be physically located in the area/location you are currently assigned. This is essential in order for SD & Core to provide the services required to fulfill and meet the mission and goals of our Service.

Def.'s Ex. E at 11.

In an exchange of memos and e-mails, Benton challenged Kachman's decision, noting that she had worked from home without incident after her shoulder surgery. Kachman replied that Benton was "not required to perform some of the essential functions of your position" during her work-from-home period. *Id.* at 26, 29-31. Kachman provided a list of five job functions that he said required [*4] Benton's presence in the office. These included testing multiple configurations of machines, having "reliable network connectivity and a constant connection" for specific tasks, scanning machines on the VA network that were not accessible via virtual private network (VPN), working with staff on site in the Maywood facility, and having "[a]ccess to a multitude of equipment" with "the space, power, and network connectivity for each of those devices." *Id.* at 30-31. Kachman said later during his deposition that the ability of an employee in Benton's position to test machines is difficult when the employee is not directly on the network, and that it is important to be able to test solutions on a variety of equipment on site and to act quickly in doing so.

In a response to Kachman's memo, Benton did not

dispute the existence of any of the duties Kachman mentioned or his statement that they could not be performed adequately from home. Instead, she argued that Kachman did not comprehend her disability, disputed that she had a pattern of absences, and stated that she was "able to do my job 100%." *Id.* at 36-38. She also said, "I understand that [Kachman] is saying that my job is not qualified [*5] to be a work from home job," and, "I want to reiterate that I understand that my job does not qualify as a work from home job." *Id.*

Kachman did offer Benton some accommodations. In response to Benton's request for a private office at the Maywood facility, Kachman pointed to the office's compliance with health and safety standards and instead offered her a parking spot close to the building. Benton rejected this offer, stating that "all of my coworkers will notice that I'm parking in front and will ask me why." *Id.* at 38. Soon after that exchange, Kachman permitted Benton to forego a planned change in her hours to conform with those of other team members so that she would be able to submit blood to a testing lab before she came into work. On the other hand, Benton also resubmitted her work-from-home request, this time asking to do so two or three times a week or on an as-needed basis. Kachman denied this request.

In subsequent weeks and months, Benton and Kachman had several e-mail exchanges regarding Benton's performance, duties, and attendance at work. Topics included team conference calls Benton was required to join, her progress on various assignments, and her knowledge related to [*6] various tasks she was required to perform and "milestones" she was required to achieve. In another e-mail exchange, a coworker praised Benton for her contribution on a project, and Kachman responded by asking the coworker what Benton had done. Kachman's response was arguably worded in a way that suggested he doubted that Benton had actually contributed anything. The coworker responded with specifics, and Kachman did not respond.

During this time, in the first half of 2010, Kachman had taken notice of various work tasks that Benton was not completing, including "very basic tasks; building servers, manipulating group policies, and active directories." Def.'s Ex. B at 34. When Benton would have these issues, Kachman would tell her "that she needed to work on these problems herself rather than going to other employees." *Id.* at 35. In April 2010, three months after

**Page 2**

denying Benton's request to work from home, Kachman sent Benton a memo entitled "Warning Notice of Unacceptable Performance/Opportunity to Improve." Def.'s Ex. I. The memo informed Benton that her performance "since early Nov 2009" had been "unacceptable" in three "critical elements" of her position. *Id.* at 1. Kachman noted multiple [*7] incidents in which Benton had performed poorly, such as failing to meet requirements in lab testing, failing to complete tasks without assistance, demonstrating lack of knowledge on specific projects, and including errors in submitted projects. The memo informed Benton she would be placed on a ninety-day plan to improve performance. The next month, Kachman sent Benton an e-mail asking about some of her apparent absences from the Maywood office. Benton told Kachman his query was "ridiculous," that he was "obviously retaliating against me and trying to find anything you can," and that he was "creating a very hostile work environment" which was damaging her health. Pl.'s Ex. 2 at 39-40.

In May 2010, Kachman e-mailed Benton to inform her that she could not attend an upcoming Microsoft training conference in New Orleans called TechEd. Kachman's e-mail stated that he wanted to help her find online training instead of traveling to New Orleans, "to accommodate your training needs as well as your need for FMLA," referring to her recent request for time off under the Family and Medical Leave Act. *Id.* at 29-30. Kachman told Benton to cancel her hotel booking in New Orleans. He provided the URL [*8] for a Microsoft website where she could pick online training courses to take. "Please take a look and decide which courses would benefit your technical advancement," Kachman wrote. "Once you have a list, we can review together and submit them to management." *Id.*

Although Benton replied to Kachman's e-mail, apparently with an attachment listing the classes she wished to take, that list was not submitted as an exhibit by either party in this case. Benton never took the online courses, however. In an affidavit made after her disability retirement, Benton stated that she selected classes from the list Kachman sent out of fear that he "would have retaliated against me"; she also acknowledged that she had never completed the training. *See* Pl.'s Ex. 5 at 8.

Kachman explained to a VA investigator that he had denied Benton's travel to the conference because she "had advised me that her condition could flare up during air

travel and cause her to have complications." Def.'s Ex. B at 24. In an internal investigation of the denial of training, Kachman told an investigator that "[t]he online training provided was directly from Microsoft and would have been similar to what she would have seen in the [*9] labs during the conference." Def.'s Ex. B at 24. Kachman also told the investigator that only one of his employees had gone to the New Orleans conference. During her deposition, Benton acknowledged that she was offered online training but argued she should have been able to attend the conference "[b]ecause I wanted to go. I should make that decision." Def.'s Ex. A at 66-67. Benton has offered no evidence, however, contradicting Kachman's statement that the online training was similar to what Benton would have gotten during the conference.

The next month, Benton took leave under the FMLA after she was hospitalized for a blood clot. She later took disability retirement and did not return to employment at the VA.

## Discussion

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court must give "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP, 719 F.3d 785, 794 (7th Cir. 2013)*. "A genuine issue of material fact exists only if [*10] there is enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party." *Peele v. Burch, 722 F.3d 956, 958 (7th Cir. 2013)*.

Shinseki has moved for summary judgment on both of Benton's claims. On Benton's Rehabilitation Act discrimination claim, Shinseki argues that Benton was not qualified to perform the essential functions of her position and that Benton did not suffer an adverse employment action in being denied the opportunity to attend the New Orleans training conference. On Benton's hostile work environment claim, Shinseki contends that the cited behavior by Benton's supervisor did not rise to the severe or pervasive level required for a finding of a hostile environment, nor was it connected to her disability.

## 1. Disability discrimination claim[1]

2013 U.S. Dist. LEXIS 147364, *10

1 Benton has not asserted a claim of failure to accommodate arising from the VA's denials of her requests to work at home.

Although Benton sued Shinseki under the Rehabilitation Act, a discrimination claim under that law is evaluated under the same standards in the Seventh Circuit as a claim under the Americans with Disabilities Act (ADA). *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 756 n.12 (7th Cir. 2006). [*11] The Court thus will evaluate Benton's claim under ADA standards. To survive a motion for summary judgment, "an ADA plaintiff must identify a genuine issue of material fact as to whether (1) she is disabled; (2) she is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013).

Shinseki does not dispute that Benton can prove that she is disabled. He contends, however, that Benton cannot show that she could perform the essential functions of her position without the accommodation of working from home, which Shinseki argues is not a reasonable accommodation. He further claims that Benton was not subject to an actionable adverse employment action.

### a. Essential Functions and Reasonable Accommodations

Much ink is spilled in the parties' arguments regarding Benton's discrimination claim on whether she "would have been able to perform the essential functions of her job with a reasonable accommodation," an element of her discrimination claim. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). Shinseki's [*12] arguments focus on whether allowing Benton to work at home would have been a reasonable accommodation that would have permitted her to perform her job's essential functions.

This is a non-issue, in the Court's view. Given the narrowing of the claim to the denial of training, the question is whether, *at the time of the denial of training*, Benton was able to perform the essential functions of her job. A reasonable jury could so find; indeed, the question is not close. Benton was working at the office at the time (May 2010) and was performing her job's essential functions, at least based on her April 2010 performance

review. The fact that she might not have been able to continue to work entirely from the office in the longer term is immaterial with regard to her narrowed discrimination claim, which focuses on a single incident.

### b. Adverse employment action

In her summary judgment response brief, Benton narrows her discrimination claim to a single alleged adverse employment action: Kachman's refusal to allow her to travel to the New Orleans TechEd training conference in 2010. Benton argues that the denial qualifies, without more, as actionable adverse action: "Plaintiff does not have to show [*13] that the denial of job training affected her compensation, benefits, hours worked, job title, or ability to advance to be an adverse action in the context of her ADA discrimination claim. . . . Under the ADA, if she was denied training, she has suffered an adverse job action." Pl.'s Mem. at 13.

The ADA lists the following areas in which employers may not discriminate against qualified individuals on the basis of their disabilities: "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Seventh Circuit has indicated that the express inclusion of "job training" among the subjects protected by the ADA relieves plaintiffs of the obligation to show that a denial of job training was materially adverse. *See Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 574-77 (7th Cir. 2001) (applying rule in case with direct evidence of discrimination).

The problem with Benton's argument is that the evidence shows she was not denied training. Although Kachman did not let her travel to New Orleans for the in-person TechEd training conference, Benton does not dispute [*14] that she was offered the opportunity to choose online training courses as an alternative. The online training was from Microsoft, the same entity responsible for the TechEd conference. Benton has not argued, and she has offered no evidence, that the online training Kachman offered her was in any way inferior to what she would have received had she traveled to New Orleans for TechEd. In short, Shinseki has offered undisputed evidence that the training that Kachman offered to Benton "was directly from Microsoft and would have been similar" to TechEd. Def.'s Ex. B at 24. What is important from an ADA/Rehabilitation Act

**Page 4**

2013 U.S. Dist. LEXIS 147364, *14

perspective is what the training involved, not where it took place.

Benton's case does not resemble *Hoffman*, in which a one-handed employee was denied altogether the ability to train on a specific device because her employer thought she was incapable of operating it. See *Hoffman*, 256 F.3d at 570-71. Nor is it like *Shaner v. Synthes*, 204 F.3d 494, 503-04 (3d Cir. 2000), one of the few other appellate cases to address denial of job training in an ADA context. There, a supervisor would not allow an employee to receive training on Microsoft Excel because it was not germane to [*15] his job. *Id.*

Because Benton has not offered evidence from which a reasonable jury could find that she was actually denied training, her discrimination claim cannot proceed.

## 2. Hostile work environment claim

In general, a plaintiff making a hostile environment claim under the ADA "must follow the methodology already established in the parallel area of Title VII litigation." *Silk v. City of Chicago*, 194 F.3d 788, 804 (7th Cir. 1999).[2] As applied here and in other disability cases, the test for hostile work environment has four parts: "(1) the plaintiff must be the object of unwelcome harassment; (2) the harassment must be based on disability; (3) it must be sufficiently severe and pervasive so as to alter the conditions of employment; and (4) there must be a basis for employer liability." *Bellino v. Peters*, 530 F.3d 543, 551 (7th Cir. 2008).

> 2   The Seventh Circuit has "not decided whether allowing a hostile work environment is actionable under the ADA." *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009). Shinseki has not argued, however, that Benton's claim is not legally viable on this basis, and thus he has forfeited that point for purposes of summary judgment.

Benton contends [*16] that after Kachman denied her work-from-home accommodation request, his treatment of her changed in a way that made her work environment pervasively hostile, due to her disability. Benton identifies over a dozen instances of conduct on Kachman's part. See Pl.'s Mem. at 14-15. These instances can be grouped in several categories: the denial of Benton's more limited work-at-home request; criticism regarding absenteeism; enhanced scrutiny of her work;

pushing or requiring her to work on her own without seeking assistance from Kachman or co-workers; the previously-referenced denial of attendance at the New Orleans training conference; and putting her on the performance improvement plan.

Benton concedes that no individual incident was severe but argues that together they satisfy the requirement of pervasiveness. The requirement of "severe or pervasive" conduct "'is disjunctive--'one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts.'" *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013) (internal quotation marks omitted). "[C]onduct that is not particularly severe but that is an incessant part of the workplace environment may, [*17] in the end, be pervasive enough and corrosive enough that it meets the standard for liability." *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). As the Seventh Circuit stated in *Silk*, "the whole can be greater than the sum of the parts, and . . . it is quite appropriate for a plaintiff to ask the trier of fact to draw an inference of discrimination from a pattern of behavior when each individual act might have an innocent explanation." *Silk*, 194 F.3d at 807.

Benton must show that Kachman's behavior was both offensive to her personally, and that the environment was one that "'a reasonable person would find hostile or abusive.'" *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)). In assessing this, a court examines the totality of the circumstances, including the frequency and severity of the conduct in question, "whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). The bottom-line test is whether the conduct alleged "alter[ed] the [*18] conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

The Court concludes that no reasonable jury could find that the actions alleged meet the objective, reasonable-person component of this standard. Benton cites no case, nor is the Court aware of any, that indicates that enhanced scrutiny by a supervisor, even combined with criticism of job performance, can amount to an

2013 U.S. Dist. LEXIS 147364, *18

actionable hostile work environment. Although the Court certainly can imagine a case in which a supervisor constantly rides herd on a particular employee such that her work environment becomes pervasively hostile, no reasonable jury could find this to be such a case. The conduct that Benton cites did not pervade the workplace, nor was it incessant. Rather, it amounted to a couple handfuls of incidents over a period of a number of months. In addition, Benton has admitted that Kachman at times acted favorably toward her during the relevant period, which cuts against her claim of "pervasive" harassing conduct. For example, though Kachman denied Benton's requests to work from home, he did offer her the accommodation of a parking spot closer to her work building, which she turned [*19] down. Kachman also gave Benton a positive performance rating in April 2010, and he allowed her to miss early conference calls when she had to submit blood for testing. Finally, the performance improvement plan was not onerous, and there is no basis for an inference that it imposed upon Benton any new job duties or requirements.

In sum, the alleged adverse incidents that Benton cites were sporadic and were insufficiently severe to permit a reasonable jury to find that they altered the conditions of her employment. Though Benton herself plainly believed she was being harassed, a jury could not reasonably find that her claim meets the objective element of the test for a hostile work environment. Shinseki is therefore entitled to summary judgment on this claim as well.

**Conclusion**

For the reasons stated above, the Court grants defendant's motion for summary judgment [docket no. 13] and directs the Clerk to enter judgment in favor of the defendant.

/S/ Matthew F. Kennelly

MATTHEW F. KENNELLY

United States District Judge

Date: October 11, 2013

**Page 6**