# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

BOUNLAP MATMANIVONG,       )
                                      )
        Plaintiff,          )
                                       )
     vs.                    )        No. 13 C 5347
                                       )
NATIONAL CREDITORS CONNECTION, INC.,)
                                       )
        Defendant.        )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Bounlap Matmanivong has sued National Creditors Connection, Inc. (NCCI) alleging that the company failed to provide the required validation and dispute notice within five days of its initial communication to him, in violation of the Fair Debt Collection Practices Act (FDCPA). 15 U.S.C. § 1692g. NCCI has moved for summary judgment on all of Matmanivong's claims. Matmanivong has cross moved for summary judgment on the issue of liability. For the reasons stated below, the Court denies NCCI's motion for summary judgment and grants Matmanivong's cross motion for summary judgment.

### Background

Unless otherwise noted, the following facts are undisputed. NCCI is hired by mortgage servicers, including Bank of America, to perform loss mitigation contacts on their behalf. A loss mitigation contact "is an attempt to help a debtor avoid a foreclosure." Pl.'s LR 56.1(a)(3) Stmt. ¶ 1. Bank of America assigns NCCI particular borrowers to contact about loss mitigation and loan modification options. After NCCI

receives an assignment, an NCCI field representative goes to the borrower's home and "verif[ies] the person is the homeowner, confirm[s] receipt of the loss mitigation package from the bank, and confirm[s] interest in the loan modification program." Def.'s LR 56.1(a)(3) Stmt. ¶ 16. The representative also conducts a face-to-face interview with the borrower to find out information about his or her financial and payment status, inspects and photographs the property, and reports information about its occupancy and condition to Bank of America.

If the homeowner is interested in loss mitigation, the NCCI representative confirms that the debtor completes the loan modification application and includes the appropriate documents. The representative then ships the completed package to Bank of America. If the borrower is not interested in loss mitigation, the field representative must end the visit and may not return. If the field representative does not make direct contact with the borrower, he or she leaves a letter on the premises.

NCCI limits what field representatives can do during home visits. Field representatives are not allowed to enter borrowers' homes. They may not answer questions about loss mitigation or about borrowers' mortgages; instead, they must refer borrowers to Bank of America to answer any questions. NCCI does not collect or receive payment, discuss payment options or plans, or analyze borrowers' financial information. Additionally, NCCI does not own the borrower's debt.

Bounlap Matmanivong took out a mortgage to purchase his home in Elgin, Illinois. Bank of America services his mortgage. Sometime before 2011, Matmanivong defaulted on the mortgage. In August 2011, Bank of America assigned NCCI to help determine if Matmanivong was interested in loss mitigation. An NCCI field

representative visited his home on August 29, 2011 and sent him a disclosure letter within five days. Matmanivong applied for loan modification at that time.

NCCI again conducted a loss mitigation service with Matmanivong in 2012. Matmanivong complains that the 2012 communications, not the 2011 communications, violated his rights under the FDCPA.[1] On October 4, 2012, Bank of America sent a letter asking him to contact NCCI to discuss loan and assistance options. Matmanivong contacted NCCI by telephone on October 9, 2012. A field representative visited his home on October 10 or October 11, 2012.

NCCI sent Matmanivong the disclosure letter at issue in the complaint on October 12, 2012. (NCCI and Bank of America agreed that NCCI would use the five-day letter requirements of the FDCPA as guidance for the letter.) NCCI has produced two versions of the disclosure letter. The parties are not certain which version of the disclosure letter was sent to Matmanivong, although the letters are similar. *Compare* Am. Compl., App. A (NCCI 58), *with* Pl.'s Mem. in Supp. of Cross Mot. for Summ. J., App. 2 (NCCI 667).[2] Matmanivong is not fluent in English and admits that he was unable to read the letter. He stated during his deposition that his daughter opens and reads his mail for him, although neither he nor his daughter recalls seeing NCCI's disclosure letter. For purposes of the parties' cross motions, the Court assumes that

---

[1] It is not clear why NCCI was assigned to visit Matmanivong on two occasions or whether he was approved for loan modification. NCCI's legal counsel, Rick Bellows, described NCCI's 2012 assignment as a "follow-up visit," which was listed as a separate transaction in NCCI's records. Pl.'s Mem. in Supp. of Cross Mot. for Summ. J., App. 1 (Bellows Dep.), at 60:5–61:10.

[2] NCCI's counsel stated during his deposition that the company switched to NCCI 58 in late 2012 or early 2013 and that he believed the earlier version, NCCI 667, was sent to Matmanivong. Pl.'s Mem. in Supp. of Cross Mot. for Summ. J., App. 1 (Bellows Dep.), at 27:17–31:25.

Matmanivong did not read or see the letter.

After the letter was sent, Matmanivong completed a second application for loan modification.  An NCCI field representative picked up the completed application and sent it to Bank of America.

In addition to those communications, NCCI admits that a field representative took photographs of Matmanivong's residence and completed a report for Bank of America, which included information about his payment history, whether he was in bankruptcy, and the property's occupancy and condition.  Def.'s Resp. to Pl.'s LR 56.1(a)(3) Stmt. ¶ 6.  Additionally, NCCI "admits that the field representative verified plaintiff's identification; whether he was in the armed services; and whether he received the Fed Ex package."  *Id.*  The only activity NCCI disputes is Matmanivong's contention that the "field representative asked if plaintiff wanted to save his home and why or why not."  *Id.* The Court will assume for present purposes that the field representative did not make that statement.

Matmanivong alleges that the October 12, 2012 letter did not include the required validation notice and was confusing, in violation of 15 U.S.C § 1692g.  His original complaint also alleged that NCCI improperly contacted third parties in violation of 15 U.S.C. § 1692c.  That claim was dismissed on April 1, 2014.  Each party requested that the Court grant summary judgment in its favor.  Matmanivong has also moved for class certification.

## Discussion

A party is entitled to summary judgment if it shows that there is no genuine issue of material fact and it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

On a motion for summary judgment, the Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. On cross motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). "As with any summary judgment motion, we review cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

## A.     Standing

Matmanivong has standing to pursue his claim for statutory damages under the FDCPA. To satisfy the minimum constitutional requirements for standing, Matmanivong must establish that he suffered an injury in fact, the injury must be "fairly traceable to the challenged action of the defendant," and "it must be likely that the injury will be redressed by a favorable decision." *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

NCCI contends that Matmanivong lacks standing because he did not suffer an injury in fact. To satisfy the injury in fact requirement, there must be "an invasion of a legally protected interest which is (a) concrete and particularized" and "(b) actual or

imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). Matmanivong acknowledges that he did not suffer actual damages; he seeks to recover only statutory damages. Under the FDCPA, a prevailing plaintiff can recover statutory damages of up to $1,000. 15 U.S.C. § 1692k(a). (In the case of a class action, class members other than the named plaintiff may recover up to "the lesser of $500,000 or 1 per centum of the net worth of the debt collector." *Id.* § 1692k(a)(2)(B).) "The FDCPA does not require proof of actual damages as a precursor to the recovery of statutory damages." *Keele v. Wexler*, 149 F.3d 589, 593 (7th Cir. 1998). And contrary to NCCI's argument, a debt collector can be liable under § 1692g even if the plaintiff did not read the challenged validation notice. *See Bartlett v. Heibl*, 128 F.3d 497, 499 (7th Cir. 1997) (concluding that a plaintiff need not have read the letter to recover statutory damages).

NCCI contends that the Seventh Circuit erred when it held in *Keele* that an FDCPA plaintiff has standing to sue even if he did not suffer actual damages. *See Keele*, 149 F.3d at 594. But the Supreme Court has allowed plaintiffs to pursue claims when a federal statute creates legal rights, the violation of which constitutes a redressible injury. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982). The Court has stated that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Id.* at 373 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Put differently, "Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Sterk*, 770 F.3d at 623 (internal quotation marks omitted).

6

Applying this rationale, the Supreme Court has held that "testers," or "individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices," have standing to sue under section 804(d) of the Fair Housing Act. *Havens*, 422 U.S. at 373–74. Because the statute "establishes an enforceable right to truthful information concerning the availability of housing," an individual can suffer an injury in fact under the statute even if he or she did not intend to purchase or rent—in other words, even if that person suffered no actual harm or damage. *Id.* In so holding, the Court emphasized that the relevant statutory provision applied to misrepresentations made to "'*any person*'" and that Congress had created cause of action to enforce that provision. *Id.* at 373 (quoting 42 U.S.C. § 3604(d)).

Like section 804(d) of the Fair Housing Act, the FDCPA creates legally protected interests, the violation of which constitutes an injury in fact. The statute provides that, subject to certain exceptions, "any debt collector who fails to comply with any provision of this subchapter with respect to *any person* is liable to such person . . . ." 15 U.S.C. § 1692k(a) (emphasis added). As the Seventh Circuit has observed, "the Act is blind when it comes to distinguishing between plaintiffs who have suffered actual damages and those who have not." *Keele*, 149 F.3d at 593. Thus, "[n]otwithstanding [a plaintiff's] lack of a claim for actual damages, []he still has standing" to sue under the FDCPA. *Id.* at 594; *see also Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 307 (2d Cir. 2003); *Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 777 (9th Cir. 1982).

NCCI's reliance on *Crabill v. Trans Union, LLC*, 259 F.3d 662 (7th Cir. 2001), is misplaced. There, the court held that a consumer did not have standing to recover

attorney's fees and costs under the Fair Credit Reporting Act because he had not alleged an actual injury. *Id.* at 666–67. But the court distinguished the Fair Credit Reporting Act, which does not contain a statutory damages provision, from the FDCPA, which allows plaintiffs to recover statutory damages. *Id.* at 665–66. The court focused on the principle that attorney's fees cannot be awarded unless the plaintiff is afforded some relief by the court. *Id.* at 666–67 (citing *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 602–10 (2001)). Because the plaintiff could not recover damages, the court could not consider his request for fees and costs. *Id.* Under the FDCPA, unlike the Fair Credit Reporting Act, a plaintiff can obtain statutory damages without suffering actual damage. *See Keele*, 149 F.3d at 593. Thus, *Crabill* is not applicable.

In sum, Matmanivong has standing under the Constitution based on NCCI's alleged violations of the FDCPA. NCCI admits that the FDCPA authorizes Matmanivong's suit, a requirement sometimes referred to as "statutory standing." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388, 1388 n.4 (2014) (holding that a company fell within the class of plaintiffs Congress authorized to sue under § 43(a) of the Lanham Act and noting that this inquiry has been referred to as "statutory standing"). Thus, Matmanivong has standing to sue NCCI.

**B.      The FDCPA and the federal mortgage servicing regulations**

NCCI argues that the FDCPA's requirements do not apply to entities that perform services related to loss mitigation. Contrary to NCCI's argument, however, the FDCPA applies to mortgage servicers and their agents.

Matmanivong applied for loan assistance through the Home Affordable

Modification Program (HAMP), established by the Treasury Department to assist homeowners in default or at risk of default. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 556–57 (7th Cir. 2012) (describing HAMP loan modification and the steps a borrower must follow to obtain loan modification). In addition to the Treasury Department's directives regarding HAMP, the Consumer Financial Protection Bureau (CFPB) has promulgated rules that govern the mortgage servicing industry, including regulations concerning loan modification and other loss mitigation options. These regulations were intended to protect consumers who fell behind on their mortgage payments. *See* Consumer Fin. Prot. Bureau, *Summary of the Final Mortgage Servicing Rules* (Jan. 17, 2013), http://files.consumerfinance.gov/f/201301_cfpb_servicing-rules_summary.pdf (last visited Feb. 6, 2015).

The regulations require mortgage servicers to disclose certain information to borrowers in default. *See, e.g.*, 12 C.F.R. § 1026.41 (requiring mortgage servicers to send borrowers periodic statements and to include additional disclosures if the borrower is more than forty-five days delinquent). Many of these regulations describe loss mitigation procedures that servicers must follow when a borrower's mortgage loan is secured by his principal residence. *See, e.g.*, *id.* § 1024.31 (defining loss mitigation as "an alternative to foreclosure offered by the owner or assignee of a mortgage loan that is made available through the servicer to the borrower"); *id.* § 1024.39 (requiring mortgage servicers to attempt to establish live contact with a delinquent borrower "not later than the 36th day of the borrower's delinquency" and to inform the borrower via written notice about the availability of loss mitigation options if appropriate); *id.* § 1024.40(a) (requiring the servicer to make personnel available to answer delinquent

borrowers' inquiries and assist borrowers with available loss mitigation options); *id.* § 1024.41 (describing required loss mitigation procedures).

Given that the FDCPA and the mortgage servicing regulations both regulate mortgage servicers' communications with borrowers, the Court must assess whether the later regulations implicitly repeal the FDCPA.[3] "When two federal statutes address the same subject in different ways, the right question is whether one implicitly repeals the other—and repeal by implication is a rare bird indeed." *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004). "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari*, 417 U.S. 535, 550 (1974).

The FDCPA has not been repealed by implication, because there has been no affirmative showing that Congress or any agency intended repeal by implication, and an entity can comply with both disclosure schemes. NCCI argues that the purpose of the mortgage servicing regulations would be frustrated if loss mitigation was governed by the FDCPA. According to NCCI, HAMP's enabling statute and the FDCPA "serve separate, opposite and competing goals—maintaining homeownership (12 U.S.C. § 5219) versus debt collection (the FDCPA)." Def.'s Mem. in Supp. of Mot. for Summ. J. at 5. But NCCI fails to explain why these goals are at odds. The purpose of HAMP and the mortgage servicing regulations is to help borrowers maintain home ownership, whereas the purpose of the FDCPA "is to protect consumers from abusive, deceptive,

---

[3] A mortgage servicer is considered a debt collector under the FDCPA if the debt was in default when the servicer obtained or purchased it. A servicer is not a debt collector "if the debt he seeks to collect was not in default at the time he purchased (or otherwise obtained) it." *Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 387 (7th Cir. 1998).

and unfair debt collection practices." *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1324 (7th Cir. 1997).  Although the laws address different subjects, their goals are not mutually exclusive.

NCCI observes that the servicing regulations require mortgage servicers to regularly communicate with borrowers, even if a borrower has requested debt collection efforts to cease under the FDCPA.  *See* 15 U.S.C. § 1692c(c).  In other words, a servicer cannot comply with the mortgage servicing requirements without violating the FDCPA.  However, the CFPB has resolved the tension between the two laws.  The regulation that outlines early intervention requirements for delinquent borrowers states that "[a] servicer subject to the Fair Debt Collections Practices Act . . . is exempt from the requirements of this section with regard to a mortgage loan for which the borrower has sent a notification [requesting the debt collector to cease communications] pursuant to FDCPA section 805(c)."  12 C.F.R. § 1024.39(d)(2) (citing 15 U.S.C. § 1692c(c)).  In its guidance regarding other regulations, the CFPB concluded that "a servicer that is considered a debt collector under the FDCPA . . . that provides disclosures to and communicates with the borrower pursuant to [certain] provisions [of the mortgage servicing regulations] . . . , notwithstanding a 'cease communication' instruction sent by the borrower, is not liable under the FDCPA."  Pl.'s Reply in Supp. of Cross Mot. for Summ. J., Ex. A at 6.  The CFPB only exempted mortgage servicers from FDCPA liability when a borrower has "instructed the servicer to cease communicating with them."  *Id.*  Matmanivong did not request that NCCI or Bank of America cease communications.  Thus, none of those exemptions apply in this case.  By specifying instances in which the FDCPA does not apply, the CFPB clearly intended the FDCPA to

apply to mortgage servicers that are debt collectors in all other instances.

The FDCPA also does not conflict with HAMP. The Seventh Circuit has held that HAMP and its enabling statute do not preempt otherwise viable state law claims. *Wigod*, 673 F.3d at 576–81. In that case, Wells Fargo Bank made arguments similar to NCCI's and contended that allowing individuals to pursue state-law claims "would frustrate Congressional objectives in enacting [the 2008 Act] . . . to stabilize the economy and provide a program to mitigate 'avoidable' foreclosures." *Id.* at 578 (internal quotation marks omitted). The court disagreed, saying, "There is no indication that Congress meant to foreclose suits against servicers for violating state laws that impose obligations parallel to those established in a federal program." *Id.* at 580. As support, the court cited the "Treasury's own HAMP directive[, which] states that servicers must implement the program in compliance with state common law and statutes." *Id.* (quoting Supplemental Directive 09–01). That same directive is relevant in this case. The directive states that "[e]ach servicer . . . must be aware of, and in full compliance with, all federal, state, and local laws . . . including . . . the Fair Debt Collection Practices Act." U.S. Dep't of the Treasury, Supplemental Directive 09–01, at 12 (April 6, 2009), https://www.hmpadmin.com//portal/programs/docs/hamp_servicer/sd0901.pdf (last visited Feb. 6, 2015). It is therefore clear that the Treasury Department intended the FDCPA to apply to communications related to HAMP loan modifications.

In sum, HAMP and the mortgage servicing regulations do not preclude liability under the FDCPA. The FDCPA thus applies to NCCI's communications with Matmanivong provided the Act's other criteria are met.

**C.    Application of the FDCPA**

NCCI contends that the FDCPA does not apply because it is not a debt collector and its practices are not communications in connection with debt collection. "For the FDCPA to apply, [ ] two threshold criteria must be met." *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 384 (7th Cir. 2010). "First, the defendant must qualify as a 'debt collector,'" and "[s]econd, the communication by the debt collector that forms the basis of the suit must have been made 'in connection with the collection of any debt.'" *Id.* (quoting 15 U.S.C. §§ 1692a(6), 1692c(a)–(b), 1692e, 1692g). Based on the undisputed facts, NCCI is a debt collector, and its communications with Matmanivong were made in connection with the collection of a debt.

**1.    "Debt collector"**

NCCI is a debt collector under the FDCPA. The Act defines "debt collector" as

> [1] any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or [2] who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6).

NCCI contends that it is not a debt collector because it merely acts as a messenger by delivering and picking up documents on behalf of Bank of America. NCCI cites decisions finding that messenger and printing services are not debt collectors under the FDCPA. *See Aquino v. Credit Control Servs.*, 4 F. Supp. 2d 927, 929 (N.D. Cal. 1998) (concluding that Western Union, a company that provided a message delivery service to debt collectors, was a "messenger for debt collectors" rather than a debt collector); *Trull v. Lason Sys., Inc.*, 982 F. Supp. 600, 607–08 (N.D. Ill. 1997) (ruling that a printing and mailing service was not a debt collector); *Laubach v.*

*Arrow Serv. Bureau, Inc.*, 987 F. Supp. 625, 631 (N.D. Ill. 1997) (finding that a company that printed and mailed debt collection letters was not a debt collector because the company "does not provide follow-up collection services, such as calling the debtors," and "has no relationship with the debtors' creditors").

Even assuming the Seventh Circuit would recognize an exception to the FDCPA for printing and mailing services, an issue the court has not addressed, NCCI does more than print and deliver documents. It is undisputed that in addition to confirming that documents are completed and shipping them to Bank of America, field representatives interview borrowers about their financial and payment status and inspect and photograph their properties. NCCI regularly provides information about borrowers to Bank of America and other mortgage companies, which helps the bank determine whether they are interested in loan modification. If a borrower's loan is modified, he will be more likely to make payments. Thus, by helping promote loan modification, NCCI facilitates the collection of debts.

In an unpublished opinion, the Third Circuit concluded that a company that performed services similar to NCCI was a debt collector under the FDCPA. *Siwulec v. J.M. Adjustment Servs., LLC*, 465 F. App'x 200, 204 (3d Cir. 2012). There, the plaintiff alleged that the defendant was hired by a mortgage lender to visit him at his home and obtain financial information about him. In addition to delivering letters, "representatives [were] instructed to urge alleged debtors, in person, to call the creditor while they watched. They were to gather contact information from the debtors directly, to speak with their neighbors, and to conduct a visual assessment of their properties." *Id.* Based on these allegations, the court determined that the company was "no mere messenger

service for debt collectors," and thus the plaintiff had sufficiently alleged that the defendant was a debt collector under the FDCPA. *Id.*

A court in this district cited the Third Circuit when it concluded that a plaintiff had adequately alleged that a company that contracted with mortgage servicers to communicate with delinquent borrowers was a debt collector. *Simpson v. Safeguard Props., LLC*, No. 13 C 2453, 2013 WL 2642143, at *2 (N.D. Ill. June 12, 2013) (citing *Siwulec*, 465 F. App'x at 204). There, the company "communicat[ed] with delinquent borrowers on behalf of mortgage companies, contact[ed] mortgagors to request that they call mortgage companies, and report[ed] back to mortgage companies whether it ha[d] made contact with mortgagors and regarding the condition of mortgaged properties." *Id.* The court concluded that it was reasonable to infer that the defendant regularly facilitates the collection of debts and therefore "indirectly" attempts to collect debt under the FDCPA. *Id.* (quoting 15 U.S.C. § 1692a(6)). The Court finds *Simpson* persuasive.

NCCI is more like the defendants in *Simpson* and *Siwulec* than the printing and messenger services in the cases it cites. Indeed, in its second brief on the cross motions, NCCI seems to have virtually abandoned the argument that it is not a debt collector. It argues that whether it is a debt collector is "beside the point," because Matmanivong "cannot demonstrate that NCCI's communication with him was made in connection with the collection of a debt." Def.'s Reply in Supp. of Mot. for Summ. J. at 9. That aside, however, NCCI's argument that it is not a debt collector lacks merit. Based on the undisputed facts, NCCI is a debt collector within the meaning of the FDCPA. No reasonable jury could find otherwise.

15

## 2.    Communication "in connection with the collection of any debt"

A communication from a debt collector to a debtor is not governed by the FDCPA unless it is made "in connection with the collection of any debt."  15 U.S.C. § 1692g(a); *Gburek*, 614 F.3d at 382.

The Seventh Circuit has determined that communications like those NCCI sent to Matmanivong are made in connection with the collection of a debt.  In *Gburek*, a borrower sued his mortgage servicer, alleging that letters sent by the servicer and another company on behalf of the servicer violated the FDCPA.  *Id.* at 382–83.  The court identified a number of factors that courts may consider in determining whether a communication was made in connection with the collection of a debt, including whether payments were past due, whether the debt collector demanded payment, whether the communication was made to induce the debtor to settle the debt, and the relationship between the parties.  *Id.* at 384–86.  The court made it clear that a debt collector need not demand payment for the FDCPA to apply.  *Id.* at 385.

The *Gburek* court applied those factors to communications that were similar to NCCI's.  Titanium, the company that sent the second letter to the debtor, was "a firm that partners with mortgage-loan servicers . . . and attempts to facilitate communication between servicers and homeowners on the brink of foreclosure."  *Id.* at 383.  Although Titanium was not a defendant, the court nonetheless analyzed whether the company's letter was sent in connection with the collection of a debt:  "Although the letter states that Titanium was not authorized to accept any 'mortgage payment or any other type of payment' from Gburek, the purpose of the letter was to encourage Gburek to contact [the mortgage servicer] to discuss debt-settlement options."  *Id.* at 386.  Based on the

allegations in the complaint, the court concluded that the letter was "made to induce the debtor to settle a debt" and further noted, "[t]hat the letter was sent by a third party rather than the debt collector does not affect this conclusion." *Id.*

Applying the factors outlined in *Grubek* to this case, it is undisputed that Matmanivong's payments were past due; the purpose of NCCI's communication was to help Matmanivong complete a loss mitigation application, which would allow him to pay his debt; and NCCI and Matmanivong had no relationship apart from the debt collection. These factors all point to the conclusion that NCCI's communications were made to collect a debt. *Id.* at 384–86. No reasonable fact-finder could find otherwise. It is immaterial that NCCI did not expressly demand payment. *Id.* at 385.

In sum, NCCI was a debt collector and its communications with Matmanivong were made in connection with the collection of a debt.

## D.    NCCI's disclosure letter

Matmanivong is entitled to summary judgment because neither letter produced by NCCI satisfied the requirements of 15 U.S.C. § 1692g(a).

### 1.    15 U.S.C. § 1692g(a)(1)

Neither letter stated the amount of debt as required under the FDCPA. 15 U.S.C. § 1692g(a)(1). NCCI 58 includes a blank space for the amount of the debt, but nothing in the record suggests that the space was filled out in the version sent to Matmanivong. NCCI 667 does not include the amount of the debt at all. Matmanivong is entitled to summary judgment based on this violation alone. *See Miller v. McCalla,* 214 F.3d 872, 875 (7th Cir. 2000) (holding that the defendants violated § 1692g(a)(1) when the letter listed only the unpaid principal balance and therefore did not accurately state the

amount of the debt).  The fact that Matmanivong may not have read the letter does not preclude liability.  *See Bartlett*, 128 F.3d at 499 ("If reading were an element of the violation, then Bartlett would have to prove that he read the letter.  But it is not.  The statute . . . requires only that the debt collector 'send the consumer a written notice containing' the required information." (quoting 15 U.S.C. § 1692g(a)).

Given that NCCI failed to send a validation notice that complied with § 1692g(a), the Court's analysis could end here.  "Statutory damages are subject to a cap of $1,000 per suit, 15 U.S.C. § 1692k(a)(2)(A), no matter how many violations of the Act a given debt collector commits."  *Smith v. Greystone Alliance, LLC*, 772 F.3d 448, 449 (7th Cir. 2014).  Because NCCI has committed at least one violation of the FDCPA, Matmanivong is entitled to summary judgment on the issue of liability.

Nonetheless, the Court will analyze the additional alleged violations of the FDCPA, as this analysis may be relevant in determining statutory damages.  *See* 15 U.S.C. § 1692k(b) (listing the factors that should be considered in determining damages, including "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional"); *Hartman v. Meridian Fin. Servs., Inc.*, 191 F. Supp. 2d 1031, 1046 (W.D. Wis. 2002) ("Although finding one violation is enough to grant summary judgment in favor of plaintiffs as to liability, the number of violations is used to determine statutory damages up to a maximum of $1000.").

### 2.    15 U.S.C. § 1692g(a)(3)–(5)

Matmanivong complains that NCCI's letters violated the FDCPA because they stated that Bank of America, rather than the debt collector, would assume the validity of

the debt if undisputed, would verify the debt, and would provide information about the original creditor.

In order for validation notice to satisfy the FDCPA, it must include the following statements:

> (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid *by the debt collector*;
>
> (4) a statement that if the consumer notifies *the debt collector* in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer *by the debt collector*; and
>
> (5) a statement that, upon the consumer's written request within the thirty-day period, *the debt collector* will provide the consumer with the name and address of the original creditor, if different from the current creditor.

15 U.S.C. § 1692g(a)(3)–(5) (emphasis added). The statute requires that the notice state that the *debt collector* will assume the validity of the debt unless disputed, the *debt collector* will obtain verification of the debt if disputed, and the *debt collector* will provide information about the original creditor. *Id.* NCCI did not comply with the Act because the letters stated that *Bank of America* would assume the debt's validity and would provide information about the debt and the original creditors.

Although the Seventh Circuit has not expressly held that a violation of section 1692g(a)(3), (a)(4), or (a)(5) can form the basis for liability, other circuits have found liability for these types of violations. *See, e.g.*, *Frey v. Gangwish*, 970 F.2d 1516, 1519 (6th Cir. 1992) (concluding that the FDCPA was violated when a communication did not include the information required by § 1692g(a)(3) and (a)(4)). Given that a debt collector is liable if he fails to state the amount of the debt, s*ee Miller*, 214 F.3d at 875, the Court concludes that NCCI is also liable for failing to comply with the other

requirements in § 1692g(a).

The Court finds additional support for this conclusion from the Seventh Circuit. The Seventh Circuit has suggested, in dicta, that a defendant can be held liable for failing to include any of the information listed in § 1692g(a).  The court described the statute as follows:

> The required information includes the amount of the debt, the name of the creditor, and, of particular relevance here, a statement that unless the debtor "disputes the validity of the debt" within thirty days the debt collector will assume that the debt is valid but that if the debtor notifies the collector in writing within thirty days that he is disputing the debt, "the debt collector will obtain verification of the debt [from the creditor] . . . and a copy of [the] verification . . . will be mailed to the consumer."  A similar provision requires that the debtor be informed that upon his request the debt collector will give him the name and address of his original creditor, if the original creditor is different from the current one.

*Bartlett*, 128 F.3d at 498–99 (quoting 15 U.S.C. § 1692g(a)) (internal citations omitted). After describing the statute, the court stated, "If the statute is violated, the debtor is entitled to obtain from the debt collector, in addition to any actual damages that the debtor can prove, statutory damages not to exceed $1,000 per violation, plus a reasonable attorney's fee."  *Id.* at 499.  This language suggests that failure to comply with any of the section 1692g(a) requirements can give rise to liability.  Further, because the court recognized that a defendant can violate the FDCPA by including the requisite disclosures in a confusing manner, *id.* at 500, it stands to reason that the statute can also be violated by failing to include the requisite disclosures in the first instance.

Because the Seventh Circuit has referred to the FDCPA as a strict liability statute in the context of other FDCPA violations, NCCI's arguably technical violations give rise to liability.  *See Anderson v. Credit Bureau Collection Servs., Inc.*, 422 F. App'x 534, 538–39 (7th Cir. 2011) (stating that because "the FDCPA is a strict-liability statute," a

20

plaintiff "is entitled to sue to enforce its provisions, even the 'highly technical' ones");

*Ruth v. Triumph P'ships*, 577 F.3d 790, 805 (7th Cir. 2009) ("The FDCPA [ ] is a strict liability statute, and debt collectors whose conduct falls short of its requirements are liable irrespective of their intentions.").

The Seventh Circuit does not require that debt collectors employ the precise language of section 1692g(a).  *See Gruber v. Creditors' Prot. Serv., Inc.*, 742 F.3d 271, 274 (7th Cir. 2014) (ruling that a letter that stated, "If you notify this office within 30 days from receiving this notice, this office will obtain verification of the debt or obtain a copy of the judgment and mail you a copy of such judgment or verification" did not violate section 1692g(a)(4) even though it omitted the phrase, "that the debt, or any portion thereof, is disputed," because a request to verify the debt would necessarily constitute a dispute).  But although debt collectors need not use the exact language of the FDCPA, they are responsible for "substantial compliance with the debtor-protection purposes of the statute."  *Volden v. Innovative Fin. Sys., Inc.*, 440 F.3d 947, 956 (8th Cir. 2006).  NCCI has not substantially complied with the FDCPA.  By offloading its responsibility to verify debt and creditor information onto Bank of America, NCCI presumably seeks to avoid the Act's costly reporting requirements.  NCCI violated the FDCPA by failing to include the required notice under 15 U.S.C. § 1692g(a)(3), (a)(4), (a)(5).

### 3.    Confusion

Matmanivong also contends that he is entitled to summary judgment because NCCI's letters were confusing as a matter of law.[4]  In addition to including the required

---

[4] Although Matmanivong also seems to contend that the notice was misleading, his sole remaining claim is asserted under section 1692g.  Thus, the Court has not analyzed whether the letters were misleading in violation of 15 U.S.C. § 1692e.

information in the validation notice, the debt collector must disclose that information in a format that would not confuse an unsophisticated consumer. *See* 15 U.S.C. § 1692g(b); *Bartlett*, 128 F.3d at 500. For a letter to meet the "unsophisticated consumer" standard, it "must be clear and comprehensible to an individual who is uninformed, naïve, [and] trusting, but not without a rudimentary knowledge about the financial world or incapable of making basic deductions and inferences. Furthermore, a significant fraction of the population must find the letter confusing in order to violate Section 1692g(b)." *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 635 (7th Cir. 2012) (internal quotation marks and citations omitted).

Matmanivong argues that the letters' statements that Bank of America would assume the validity of the debt, verify the debt, and provide information about the original creditors were confusing. The Eleventh Circuit has determined that although a debt collector committed a technical violation of section 1692g(a)(3) when the notice stated that the creditor (rather than the debt collector) would assume the validity of the debt, the statement would not mislead the least sophisticated consumer:[5]

> [B]ecause the debt collector is obviously the agent of the creditor, the same implication arises from the notice required by § 1692g(a)(3) as from McCalla's erroneous statement. In other words, the least sophisticated consumer would think that if the debt collector was entitled to assume that the debt is valid, the creditor would have the same right. Thus, because the same implication arises whether or not the language of the notice is 'assumed valid by the debt collector,' as required by statute, or 'assumed valid by the creditor,' as stated in the letter, the letter did not mislead [under 15 U.S.C. § 1692e].

---

[5] The Court recognizes that the Eleventh Circuit applies the "least sophisticated consumer" standard. Although the least sophisticated consumer standard "may be viewed as a somewhat lesser standard" that is easier for a plaintiff to satisfy, the Seventh Circuit has clarified that the difference is primarily a matter of form. *Avila v. Rubin*, 84 F.3d 222, 226 (7th Cir. 1996). "[T]he unsophisticated consumer standard is a distinction without much of a practical difference in application." *Id.* at 227.

*Caceres v. McCalla Raymer, LLC*, 755 F.3d 1299, 1304 (11th Cir. 2014).

A court in the Southern District of Florida, on the other hand, has determined that "replacing the phrase 'debt collector' with the word 'creditor' could mislead the least-sophisticated consumer." *Iyamu v. Clarfield, Okon, Salomone, & Pincus, P.L.*, 950 F. Supp. 2d 1271, 1274 (S.D. Fla. 2013). Although the Eleventh Circuit's later decision governs courts in that circuit, the Florida district court's reasoning is nonetheless instructive. According to the court, the phrase "debt collector" was included in the statute so that

> "the consumer [would] receive the message that the debt would be assumed valid by only the debt collector and only for collection purposes. The statutorily required validation notice is intended to convey to the consumer that failure to dispute the debt permits the debt collector to proceed for collection purposes on the temporary fiction that the debt is valid, that failure to dispute a debt has no legal effect on a debtor's rights and that in any subsequent collection action, the burden would remain on the debt collector to prove the validity of the debt."

*Id.* (quoting *Orr v. Westport Recovery Corp.*, 941 F. Supp. 2d 1377, 1381 (N.D. Ga. 2013)). The court determined that the plaintiff had sufficiently alleged that the notice might mislead the least sophisticated consumer under § 1692e, because "[w]ithout the phrase . . . it is possible that the consumer would not know that the debt collector is the only entity entitled to assume the validity of the debt, or that collection is based on a temporary fiction that the debt is valid." *Id.*

Both positions appear to have merit. Because the FDCPA governs the actions of debt collectors, not creditors, it is plausible that Congress intended that only debt collectors would assume a debt's validity if undisputed and only debt collectors would verify debt amounts and creditor information. Based on this rationale, it is conceivable

that the omission of "by the debt collector" would confuse an unsophisticated consumer. An unsophisticated consumer might interpret the notice to mean that only Bank of America, and not NCCI, was responsible for providing verification and creditor information if requested.

On the other hand, it is possible that this error would not confuse an unsophisticated consumer. Perhaps a consumer could assume that NCCI would simply contact Bank of America if it were to field inquiries and disputes from borrowers. If consumers would receive identical information and have the same rights whether they contest the debt or request verification with NCCI or Bank of America, then NCCI's failure to follow the precise guidance of the statute would not confuse an unsophisticated borrower. This is a factual issue that the Court cannot adjudicate based on the record presented. Given this uncertainty, NCCI is not entitled to summary judgment on the issue of confusion.

Turning to Matmanivong's cross motion, summary judgment in favor of a plaintiff is not appropriate if the letter is not confusing or contradictory on its face and the plaintiff has not presented evidence of confusion. *See Muha v. Encore Receivable Mgmt., Inc.*, 558 F.3d 623, 629–30 (7th Cir. 2009); *Holt v. Wexler*, No. 98 C 7285, 2002 WL 475181, at *8 (N.D. Ill. Mar. 28, 2002); *Matthews v. First Revenue Assur., LLC*, No. 00 C 3711, 2001 WL 864272, at *3 (N.D. Ill. July 31, 2001). Matmanivong has not explained why it would be confusing to replace "the debt collector" with "Bank of America" and has not presented evidence on this point. Thus, summary judgment cannot be granted in

Matmanivong's favor on that issue.[6]

Matmanivong's other arguments regarding confusion are even less compelling. In both letters (using slightly different wording), NCCI states: "We are not collecting that debt nor are we demanding any money" and also, "THE CONTACT LETTER WAS AN ATTEMPT TO COLLECT A DEBT." NCCI 667; *see also* NCCI 58. Matmanivong argues that an unsophisticated debtor reading these statements would have no idea whether a debt collection attempt is occurring. Read in its entirety, however, it is clear that NCCI is reaching out on behalf of Bank of America, the entity that is attempting to collect a debt. Although NCCI, the "we" in the first sentence, is not attempting to collect a debt, Bank of America clearly is.

Matmanivong also contends that the letters are confusing because they state (again using slightly different wording): "Any questions you may have regarding the debt should be directed to the contact person of your BofA letter," and also, "If you have any questions regarding this notification, please contact NCCI." NCCI 58; *see also* NCCI 667. This is not confusing. It plainly says that Bank of America will answer questions about the debt, whereas NCCI will answer questions about the notice and document collection.

To summarize, Matmanivong is entitled to summary judgment because NCCI's validation notice did not include the information required under section 1692g(a). Because the letters were not confusing on their face and Matmanivong has not presented evidence of confusion, he is not entitled to summary judgment on that point.

_____

[6] Although NCCI asked the Court to deny summary judgment for Matmanivong on this point, it did not seek summary judgment in its favor. The Court therefore has not analyzed whether NCCI would be entitled to summary judgment on the issue of confusion.

Because NCCI's liability under the FDCPA does not depend on how many violations it committed, Matmanivong is entitled to summary judgment as to liability.

## Conclusion

For the foregoing reasons, the Court grants Matmanivong's motion for summary judgment as to liability [dkt. no. 69] and denies NCCI's motion for summary judgment [dkt. no. 54]. The case is set for a status hearing on February 13, 2015 at 9:00 a.m. Counsel should be prepared to address how the Court should deal with the pending motion for class certification.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 9, 2015